UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**NIGHT BOX**
**FILED**

AUG 2 3 1999

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

Civil Action No. 98-6879 CIV-GOLD
Magistrate Bandstra

```
-------------------------------------------------------------x
                                                             )
STEVEN CHENEY at al., individually and                       )
on behalf of all others similarly situated,                  )
                                                             )
                          Plaintiff,                         )
                                                             )
            v.                                               )
                                                             )
CYBERGUARD CORPORATION, ROBERT                               )
L. CARBERRY and WILLIAM D. MURRAY,                          )
                                                             )
                          Defendants.                        )
-------------------------------------------------------------x
```

### CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT

Lead plaintiffs Robert Govic, Michael Brown, Sudhir Mehta, Anthony Paolerico, Dean Miller, Eliot Meshulam, Jorin Daleanes, Thomas Schueck and Mary Lou Harvey ("Plaintiffs") make the allegations set forth in this Amended Class Action Complaint upon information and belief, except those allegations specifically pertaining to Plaintiffs or their counsel, which allegations are based on Plaintiffs' personal knowledge.

### I.

### NATURE OF THE ACTION

1.     This is a securities fraud class action brought on behalf of a class (the "Class") consisting of investors who acquired the common stock of defendant CyberGuard Corporation ("CyberGuard" or the "Company") between November 7, 1996 and August 24,

1998 (the "Class Period"), and who were damaged thereby. Plaintiffs seek remedies under the Securities and Exchange Act of 1934 (the "Exchange Act").

2.     The defendants include: (a) Robert Carberry, who was CyberGuard's Chairman of the Board and Chief Executive Officer from June 1996 until he was suspended by the Company on August 24, 1998 because of his role in the fraudulent conduct alleged by Plaintiffs; (b) William D. Murray, who was CyberGuard's Chief Financial Officer ("CFO") from November 19, 1997 until he was suspended by the Company on August 24, 1998 because of his role in that fraudulent scheme; (c) Patrick O. Wheeler, who was the Company's CFO or acting CFO from April of 1996 until November of 1997; (d) CyberGuard director Shelton James; and (e) CyberGuard (collectively, the "CyberGuard Defendants"). CyberGuard's auditor, KPMG Peat Marwick LLP ("KPMG" and, collectively with the remaining defendants, "Defendants"), is also named as a defendant.

3.     During the Class Period, Defendants perpetrated a massive fraud by continually reporting that CyberGuard was producing financial results that were far better than those that the Company was actually generating.

4.     In particular, Defendants repeatedly and materially overstated the revenues, gross profits, operating income and net income produced by CyberGuard and understated the expenses incurred by the Company in order to cause investors and potential acquirors of the CyberGuard to believe that the Company was prospering and that its prospects were bright.

5.     Defendants also uniformly overstated the amount of accounts receivable, current assets and total assets carried on CyberGuard's balance sheet in order to convince investors and potential acquirors that the Company possessed adequate resources to operate profitably.

-2-

6.      In addition, all of the Defendants, particularly defendant KPMG, provided investors with assurances that CyberGuard's financial statements had been prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), although Defendants were continually provided with information that demonstrated the falsity of that representation.

7.      One important tactic utilized by the CyberGuard Defendants during the Class Period to inflate the Company's financial performance was their improper recognition of revenues related to CyberGuard's purported "sales" of its software products to large resellers who acted as middlemen in the distribution of the Company's products to end users.

8.      All of the Defendants were aware of the elementary accounting principle that CyberGuard was permitted to recognize revenue under GAAP only when goods were shipped and no contingencies existed to the Company being paid.

9.      Nevertheless, in connection with the Company's dealings with its international resellers, CyberGuard adopted and implemented a policy of prematurely recognizing revenues as soon as software was shipped although Defendants knew that the Company would be paid for that software only if the resellers were successful in selling it to end users. Notably, international sales of security products represented over 60% of the Company's reported sales in 1995 and 1996.

10.      That revenue recognition policy violated GAAP and was never disclosed to CyberGuard investors.  As a result, every statement that Defendants made during the Class Period concerning the Company's revenues, gross profits, gross margins, operating profit, net profit, accounts receivable, current assets and total assets was materially misleading.

11.      Despite the patently improper nature of the CyberGuard Defendants' revenue recognition accounting policy — and the widespread application of that policy — KPMG

-3-

issued a "clean audit opinion" with respect to the Company's 1997 fiscal year financial statements. By issuing that clean audit opinion, which KPMG knew would be included in CyberGuard's fiscal 1997 SEC Form 10-K and Annual Report, KPMG assured investors that the Company's management was complying with GAAP in reporting the Company's financial results, thereby maintaining the inflated price of the Company's stock and permitting CyberGuard to continue to attract the capital that it needed to fund its money-losing operations.

12.    KPMG issued that clean audit opinion because KPMG did not follow Generally Applicable Auditing Standards ("GAAS") in performing its audit of the Company's 1997 financial statements.

13.    In particular, KPMG's audit failed to comply with GAAS because: (a) KPMG either failed to communicate with the Company's international resellers in order to determine what the terms of their payment obligations to CyberGuard were or conducted such communications but nevertheless permitted the Company to continue its fraudulent accounting practices; (b) KPMG either failed to undertake adequate testing to determine the reasons why accounts receivable attributable to the Company's international resellers were not being paid or recognized that the resellers had no obligation to pay those accounts receivable yet permitted the Company to continue to account for its revenues and accounts receivable in a fraudulent manner; and (c) KPMG either intentionally failed to require the Company to account for research and development and selling, general and administrative expenses in the manner required by GAAP or recklessly failed to recognize that the Company had failed to amortize software development expenses and was improperly deferring other costs.

14.    In any ever, KPMG's failure to comply with GAAS in auditing the Company's 1997 financial statements deprived KPMG of the reasonable basis required under the federal

securities laws for an auditor to state that financial statements were prepared in accordance with GAAP.

15.    The facts alleged below also compel the conclusion that Defendants' material misrepresentations and omissions concerning the Company's business operations and financial statements were made with scienter, i.e., with knowledge or reckless disregard for their falsity.

16.    Indeed, Plaintiffs' allegations that Defendants engaged in fraud are based, to a large extent, upon the admissions made by Defendants that they repeatedly reported materially misleading financial results.

17.    For example, on August 24, 1998, CyberGuard announced that the Company had improperly recognized approximately $2.5 million in revenues during the first three fiscal quarters of 1998 (i.e., overstated the Company's revenue by approximately 19.42%) as a result of the CyberGuard Defendants' practice of recording revenues for goods shipped to resellers although payment contingencies existed.  At that time, CyberGuard claimed that most of that $2.5 million restatement of revenues would relate to the third 1998 fiscal quarter, although it was possible that the first two quarters results had been inflated as well.

18.    CyberGuard's August 24, 1998 announcement was by no means the last of the Company's concessions of fraud.

19.    Eventually, CyberGuard was forced to admit that even its August 24, 1998 announcement portrayed the Company is an unduly positive light.  On January 13, 1999, the Company revealed that a six-month review of the CyberGuard Defendants' accounting practices had revealed that they had overstated the Company's revenues by $3,807,000, or 33.8%, during the first three quarters of fiscal 1998.

20.     The admitted $3.8 million overstatement exceeded CyberGuard's August 24, 1998 estimate of $2.5 million by $1.3 million, or 52%.

21.     CyberGuard revised that description of the scope of Defendants' accounting fraud yet again on July 26, 1999, when the Company conceded that Defendants' fraud had been perpetrated not only during the first three fiscal quarters of 1998, but throughout the Company's 1997 fiscal year.  At that time, CyberGuard conceded that, in total, Defendants had overstated the Company's revenues by $3,592,000, or 13.26%.

22.     The conclusion that the CyberGuard Defendants acted intentionally in misleading investors concerning CyberGuard's performance and prospects is also strongly supported by the fact that the those Defendants possessed substantial motives to engage in their fraudulent conduct.

23.     For example, throughout the course of the Class Period, CyberGuard was engaged in efforts to raise additional capital or to sell itself to a purchaser.  Among other things, CyberGuard has acknowledged that, up until the time that Defendants' financial fraud was belatedly disclosed, the Company was attempting to finalize a private placement transaction whereby the Company would raise over $5 million.  While that attempted private placement was merely the last of many temporary fixes employed by the Company during the Class Period to finance its operations, CyberGuard eventually conceded that the failure to complete the private placement resulted in a severe "liquidity crisis" that threatened the Company's viability.  That liquidity crisis was never disclosed to investors during the Class Period.

24.     The CyberGuard Defendants were also motivated to engage in their fraudulent conduct by their desire to advance their personal financial interests.  In particular, defendants Carberry and Murray knew that they could trigger substantial option and stock related

-6-

compensation for themselves by attracting a suitor to purchase CyberGuard at the inflated prices at which the Company traded during the Class Period.

25.     In addition, defendant James was motivated to participate in the fraud alleged herein by the insider trading in which he engaged during the Class Period. By concealing the troubled state of CyberGuard's finances, James — who served throughout the Class Period as the Chairman of CyberGuard's Audit Committee — was able to sell approximately 240,500 shares of CyberGuard common stock at prices between $6.01 and $15.08, thereby generating proceeds of over $2.5 million. Notably, those sales represented 100% of James's previously substantial holdings in CyberGuard common stock and were always made within a few weeks — and often days — of CyberGuard's announcement of purported "record" or "improved" results.

26.     The compensation packages of defendants Carberry, Murray and Wheeler provided them with additional motive to misrepresent the true state of the Company's finances. Those compensation packages awarded the Company's executives in the event that CyberGuard met certain performance objectives. Thus, Carberry, Murray and Wheeler recognized that they would be able to increase their compensation by reporting that CyberGuard had produced better financial results than the Company had actually achieved.

27.     The nature of the misrepresentations at issue here further support the conclusion that Defendants acted with knowledge that their representations were false or, at the very least, with reckless disregard for the falsity of their representations. Defendants Carberry, Murray, Wheeler and James were high-ranking and financially sophisticated officers and/or directors of a publicly-traded company who were aware that revenue for sales of software could only be recognized when all contingencies to payment had been eliminated. Thus, the Company's pervasive practice of recognizing revenues in violation GAAP could

-7-

not have escaped the attention of the Individual Defendants or the Company's professional outside auditors, KPMG, absent intentional or willful blindness to that obvious violation of GAAP. Yet, despite the fact that CyberGuard employees directly confronted Carberry and other members of the Company's management regarding CyberGuard's fraudulent accounting practices, Defendants continued to sanction those practices.

28.   The conclusion that Defendants' fraud was committed intentionally is also amply supported by the events surrounding the revelation of their misconduct to investors. Immediately before CyberGuard's belated announcement of the fraudulent conduct, Carberry and Murray, the Company's two highest-ranking executives, were suspended by the Company's board of directors (the "Board"). Eventually, both men were fired as a result of their role in CyberGuard's fraud.

29.   Moreover, immediately prior to that revelation, KPMG resigned. In its resignation letter, KPMG stated, "[W]e have concluded that we can no longer rely on management's representations and KPMG is unwilling to be associated with the financial statements prepared by management." Such highly unusual and suspicious circumstances are a clear indication that Defendants' misrepresentations were made intentionally or with reckless disregard for their falsity.

30.   When CyberGuard belatedly disclosed the financial fraud in which Defendants had engaged, investors rushed to sell their CyberGuard shares and salvage some percentage of their investment in the Company. As a result, on August 24, 1998 — the date that CyberGuard first indicated that the Company would have to restate its financial statements — CyberGuard stock plummeted from $6 3/16 per share to $1 7/8 per share, a loss of approximately 70%. That closing price was nearly 90% less than CyberGuard's Class

Period high trading price of $17.875 and was between approximately 70% and 88% less than the prices at which James sold CyberGuard shares during the Class Period.

31.     Moreover, on January 13, 1999, the Company announced that, due to KPMG's refusal to sign off on its audits of CyberGuard's 1996 and 1997 financial statements, CyberGuard stock had been delisted by NASDAQ. Investors who purchased CyberGuard common stock during the Class Period therefore are no longer able to trade the Company's stock in an easily accessible market. Defendants' fraudulent conduct is also currently under investigation by the SEC.

32.     Plaintiffs and the members of the Class have therefore suffered severe injury because the market prices of the CyberGuard common stock that they purchased during the Class Period were artificially inflated as a result of Defendants' material misrepresentations and omissions. Plaintiffs accordingly seek damages and other appropriate relief to compensate members of the Class for the financial loss caused by Defendants' violations of the federal securities laws.

## II.

## JURISDICTION AND VENUE

33.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

34.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

35.     Venue is proper in this district pursuant to Section 27 of the Exchange Act. CyberGuard maintains its corporate headquarters and principal place of business in Fort

Lauderdale, and the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

36.     In connection with the conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.

## PARTIES

### A.     Plaintiffs

37.     Plaintiffs have been named as "Lead Plaintiffs" by the Court pursuant to the procedures of the Exchange Act.

38.     Each of the Plaintiffs purchased CyberGuard common stock during the Class Period at market prices that were inflated by Defendants' misrepresentations and omissions. As a result, each Plaintiff has suffered damages.

### B.     CyberGuard

39.     CyberGuard is a vendor of software designed to protect computer networks from "hackers" and to increase the security of commerce conducted over the Internet.

40.     According to the Company's filings with the SEC and other public statements:

> CyberGuard . . . is a leading provider of enterprise security and electronic commerce solutions to Fortune 1000 companies and governments worldwide. CyberGuard's award winning, industrial-strength firewall and certificate authority products and services protect the integrity of data and applications from unauthorized access.

41.     CyberGuard's corporate headquarters is located in Fort Lauderdale, Florida.

42.     As of October 29, 1996, the Company had 6,999,477 shares of common stock outstanding. The number of outstanding shares of CyberGuard common stock increased throughout the Class Period, reaching 8,775,228 by May 7, 1998. At all material times, those shares were listed and traded on NASDAQ under the ticker symbol CYBG.

43.     Because CyberGuard has failed to comply with the disclosure requirements of the Exchange Act, the Company's stock has been delisted by NASDAQ and does not now trade in any easily accessible public market.

### C.     The Individual Defendants

44.     Defendant Robert L. Carberry was CyberGuard's Chairman of the Board, President and Chief Executive Officer from June 1996 until November 10, 1997.

45.     After that date, Carberry served as the Company's Chairman and CEO, until he was suspended by the Company on August 24, 1998 because of his role in the fraudulent conduct alleged herein. Some time after August 24, 1998, Carberry was terminated by CyberGuard. All references made herein to the CyberGuard Defendants or to the Individual Defendants are references to Carberry.

46.     Defendant William D. Murray was CyberGuard's CFO from November 19, 1997 until he was suspended by the Company on August 24, 1998. Some time after August 24, 1998, Murray was terminated by CyberGuard. Murray is named as a defendant in this action with respect to his role in making the material misrepresentations and omissions specified below in the time period after he became employed by CyberGuard. All references made herein to the CyberGuard Defendants or to the Individual Defendants with respect to conduct engaged in after November 19, 1997 are references to Murray.

47.     Defendant Patrick O. Wheeler was the Company's CFO from April of 1996 until July of 1997. Between July of 1997 and November 3, 1997, Wheeler served as the

Company's acting CFO and Vice President of North American Sales.  Wheeler is named as a

defendant in this action with respect to his role in making the material misrepresentations and

omissions specified below up until the time he left his role as the Company's acting CFO.

All references made herein to the CyberGuard Defendants or to the Individual Defendants

with respect to conduct engaged in from the beginning of the Class Period through November

3, 1997 are references to Wheeler.

48.     Defendant Shelton James was a CyberGuard director throughout the Class

Period.  In addition, from approximately August 24, 1998 until March of 1999, James served

as the Company's Chairman of the Board.  At all material times, James was the Chairman of

the Audit and Compensation and Stock Option Committees of the CyberGuard Board.  All

references to the CyberGuard Defendants or to the Individual Defendants made herein are

references to James.

49.     The Proxy Statement filed by the CyberGuard Defendants with the SEC on or

about December 18, 1997 (the "December 1997 Proxy") described the Audit Committee as

follows:

> The Audit Committee of the Board of Directors recommends to
> the Board of Directors the independent accountants to be
> nominated for selection by the Company's shareholders, reviews
> the scope of the accountants' engagement, including the
> remuneration to be paid, and reviews the independence of the
> accountants on a periodic basis.  The Audit Committee, with the
> assistance of the Company's Chief Financial Officer and other
> appropriate personnel, reviews the Company's annual financial
> statements and the independent auditor's report, including
> significant reporting or operational issues; corporate  policies
> and procedures as they relate to accounting and financial
> reporting and financial controls; litigation in which the Company
> is a party; and use by the Company's executive officers of
> expense accounts and other non-monetary perquisites, if any.
> The Audit Committee may direct the Company's legal counsel,
> independent auditors and internal audit staff to inquire into and
> report to it on any matter having to do with the Company's

accounting or financial procedures or reporting. During the
fiscal year ended June 30, 1997, the members of the Audit
Committee were Mr. James (Chairman), Mr. Maguire and Mr.
Rifenburgh. The Audit Committee held one meeting during the
1997 fiscal year and two more shortly after the completion of
the 1997 fiscal year-end audit to receive the audit report and
review with the Company's independent accountants the results
of the audit and certain other related matters.

50.     The Proxy Statement that CyberGuard filed with the SEC on November 4,

1996 (the "November 1996 Proxy Statement") contained a nearly identical disclosure, except

that James, Maguire and Brian Foremny were identified as the members of the Audit

Committee.

51.     Defendants Carberry, Murray, Wheeler and James are sometimes referred to

herein collectively as the "Individual Defendants."

52.     Carberry and James were controlling persons of CyberGuard under § 20 of the

Exchange Act throughout the Class Period by virtue of their positions as directors and/or

officers of the Company.

53.     Defendants Murray and Wheeler were controlling persons of CyberGuard

during the time periods in which they served as the Company's CFO or acting CFO because

of their status as the Company's principal financial executives.

54.     It is appropriate to treat CyberGuard and the Individual Defendants as a group

for pleading purposes and to presume that the false and misleading information conveyed in

the Company's public filings, press releases and other public statements detailed herein were

the collective actions of the Individual Defendants.

55.     The following facts, among others, support the application of the group

pleading doctrine here:

      a.     All of the Individual Defendants, by virtue of their high-level positions with the Company, were directly involved in, or were kept apprised of, the day-to-day operations of the Company.

      b.     As a result of their positions at the Company, all of the Defendants were also privy to confidential, proprietary information concerning the Company, its operations and its finances.

      c.     All of the Individual Defendants: (a) were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein; (b) knew or were reckless in failing to know that false and misleading statements were being issued regarding the Company; and (c) approved or ratified those statements.

      d.     Each Individual Defendant had the ability and opportunity to prevent the issuance of those public statements or to cause them to be corrected.

56.     As officers, directors and controlling persons of a company that issued securities to the public, the Individual Defendants were obligated: (a) to disseminate promptly accurate and truthful information with respect to the Company's operations, business, distribution systems, markets, management, earnings and present and future business prospects; (b) to correct any previously issued statements from any source that had become materially misleading or untrue; and (c) to disclose any trends that the Individual Defendants would materially affect the present and future operating results of CyberGuard so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

57.     Under rules and regulations promulgated by the SEC under the Exchange Act, particularly Item 303 of Regulation S-K, the Individual Defendants also were obligated to disclose, inter alia, all trends, demands or uncertainties that were reasonably likely to impact

-14-

CyberGuard's: (a) liquidity; (b) capital resources; or (c) net sales, revenues or income. The Individual Defendants were also obligated under Item 303 to disclose all reasons why the Company's previously reported financial information would not be indicative of its future operating results.

### D.   KPMG

58.   Defendant KPMG is an international firm of certified public accountants, auditors and consultants that provides a variety of accounting, auditing and consulting services. KPMG maintains offices in Florida at, among other places, One Biscayne Tower, 2 South Biscayne Boulevard, Miami, Florida 33131.

59.   KPMG, through the Miami office of its South Florida Business Unit, served as CyberGuard's auditor and principal accounting firm throughout the Class Period.

60.   KPMG acted in that capacity pursuant to the terms of contracts with CyberGuard that required KPMG, inter alia, to audit the Company's financial statements in accordance with GAAS and to report the results of those audits to CyberGuard, its Board and the Board's Audit Committee.

61.   In connection with its audit of CyberGuard's financial statements for fiscal 1997, KPMG received substantial fees. In light of the fact that publicly-traded companies normally replace their auditors only in the event of a significant disagreement with the auditors, KPMG was aware that, by issuing a clean audit opinion concerning CyberGuard's financial statements, it would virtually assure its continued status as the Company's auditors.

62.   During the course of its audits of the Company's financial statements, KPMG was provided with unrestricted access to CyberGuard's books and records and was able to communicate freely with the Company's management, employees and agents. In addition,

KPMG met prior to and shortly after the performance of its audit of the 1997 financial statements with the Audit Committee of the CyberGuard Board, including defendant James.

## IV.

## CLASS ACTION ALLEGATIONS

63.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased publicly-traded CyberGuard common stock at any time during the Class Period (as defined in paragraph 1 above), and who were damaged thereby.

64.     The following persons are excluded from the Class: (a) Defendants and their immediate families; (b) the officers and directors of the Company and their immediate families; (c) the legal representatives, heirs, successors or assigns of all such parties; and (d) any entity in which Defendants have or had a controlling interest.

65.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of Class members.  The member of the Class can be identified from records maintained by CyberGuard and/or its transfer agent, and can be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

66.     During the Class Period, the Company had at least 6,999,477 shares of common stock outstanding.  By the close of the Class Period, the Company's outstanding shares numbered at least 8,775,228.

67.     Those shares of common stock were actively traded on NASDAQ throughout the Class Period by Class members.  According to the Form 10-K405 that the Company filed

-16-

with the SEC on September 29, 1997 (the "September 1997 10-K"), as of September 23, 1997, there were 6,998 holders of record of the Company's common stock. Likewise, according to the Form 10-K405 that the Company filed with the SEC on or about October 1, 1996 (the "October 1996 10-K"), "[t]here were approximately 7,464 holders of record of Common Stock as of September 26, 1996."

68.     Plaintiffs' claims are typical of the claims of the members of the Class because all Class members were similarly injured by the wrongful conduct alleged by Plaintiffs.

69.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. In that regard, Plaintiffs have retained counsel competent and experienced in class and securities litigation. Moreover, Plaintiffs have no interest that is contrary to or in conflict with those of the Class members they seek to represent.

70.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     Whether the federal securities laws were violated by Defendants' acts, as alleged herein;

b.     Whether statements made by Defendants to the investing public during the Class Period misrepresented or failed to disclose material facts about the business, operations, prospects and financial condition of CyberGuard;

c.     Whether Defendants participated in and pursued the common course of conduct complained of herein;

d.     Whether Defendants acted willfully, knowingly, or recklessly in omitting and/or misrepresenting material facts;

e.      Whether the market price of CyberGuard common stock was artificially inflated during the Class Period due to the material omissions and/or misrepresentations complained of herein;

f.      Whether Defendants' misrepresentations and omissions were the cause of the damages suffered by Plaintiffs and the members of the Class;

g.      Whether all or some of the Individual Defendants were "control persons" of CyberGuard under Section 20(a) of the Exchange Act; and

h.      To what extent the members of the Class have sustained damages, and the proper measure of such damages.

71.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the misconduct alleged by Plaintiffs. There will be no difficulty in the management of this action as a class action.

**V.**

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND THE MANNER IN WHICH THEY WERE FALSE AND MISLEADING

### A.      The CyberGuard Defendants' Material Misrepresentations In The November 7, 1996 Press Release

72.      On November 7, 1996 — the first day of the Class Period — the CyberGuard Defendants issued a press release that contained a number of material misrepresentations concerning the Company's financial results for the first fiscal quarter of 1997, which ended on September 30, 1996.

73.     The press release stated that CyberGuard generated revenues for the quarter of "$3.1 million, an increase of 244 percent over revenues of $0.9 million for the same period of fiscal 1996."

74.     The CyberGuard Defendants also claimed that, during the first quarter, the Company generated a loss of $8.3 million, or $1.20 per share, including a one-time loss of approximately $0.91 per share related to a transaction entered into by the Company.

75.     Furthermore, the CyberGuard Defendants claimed in the November 7 press release that "[t]he Company continued to see strong demand for its firewall-related products throughout the quarter." Specifically, the CyberGuard Defendants stated that "CyberGuard's firewall unit shipments increased to 103 units, up from 94 systems in the previous quarter."

76.     With respect to the Company's international operations, Carberry stated, "We are especially pleased with international revenue results this quarter. For the first time in the Company's history, international revenue exceeded North American revenue, and accounted for 54 percent of total revenues for the quarter."

77.     The November 7 press release attached financial statements for the first fiscal quarter that included a number of additional material misrepresentations. In particular, those financial statements falsely represented that: (a) the Company's gross profit for the quarter was $1,194,000, or 38.9% of sales; (b) the Company's selling, general & administrative ("SG&A") expense for the quarter was only $2,344,000; (c) the Company's research and development ("R&D") expense for the quarter was only $1,056,000; (d) the Company's operating loss was only $2,206,000; and (e) as of the end of the quarter, CyberGuard had accounts receivable, total current assets and total assets of $4,624,000, $15,651,000 and $18,191,000, respectively.

-19-

78.    The following facts, all of which existed at the time the November 7 press release was issued, demonstrate that the CyberGuard Defendants' representations in that press release were materially misleading:

a.    As CyberGuard conceded in the Form 8-K that the Company filed with the SEC on or about July 30, 1999 (the "July 1999 8-K"), the Company did not generate $3.1 million in revenues for the first fiscal quarter of 1997.  Rather, CyberGuard produced revenues of $2,610,000 for the quarter, or 14.74% less than the amount claimed by the CyberGuard Defendants.

b.    Contrary to the CyberGuard Defendants' representations, the Company's gross margin for the quarter was 28.2%, not the 38.9% claimed in the November 7 press release.

c.    The Company's combined R&D and SG&A expenses for the quarter were $4,217,000, not the $3,400,000 reported in the November 7 press release.  Those amounts were understated by 24.03% by the CyberGuard Defendants because they should have been amortizing software development costs of $3,087,000 that were improperly written-off in 1996 and because the CyberGuard Defendants were deferring expenses in violation of GAAP.

d.    The CyberGuard Defendants' claim that the Company was enjoying increased shipments of its firewall products was materially misleading in light of their failure to disclose that they had adopted a policy of shipping software to the Company's Asian resellers without obtaining payment obligations in order to create the illusion that the Company was experiencing increased demand.

e.    As CyberGuard eventually conceded in the July 1999 8-K, the operating loss produced by the Company for the quarter was substantially larger than the

-20-

$2,206,000 reported in the press release.  In fact, the Company's quarterly operating loss was $3,480,000, or 57.75% more than the loss claimed by the CyberGuard Defendants.

   f.  The net loss produced by CyberGuard for the quarter was actually $9,536,000, or $1.39 per share, which was 15.35% greater than the loss of $8.3 million, or $1.20 per share, reported by the CyberGuard Defendants.

   g.  The CyberGuard Defendants' claim that the Company maintained $4,624,000 in net accounts receivable as of September 30, 1996 was false because the CyberGuard Defendants failed to disclose that the Company would never be paid for a substantial portion of its purported accounts receivable.  In particular, the accounts receivable figure was inflated by recognizing revenues for software shipped to the Company's international resellers although those resellers had no obligation to pay CyberGuard for that software.

   h.  The CyberGuard Defendants' claims that CyberGuard had total current assets of $15,651,000 and total assets of $18,191,000 as of September 30, 1996 were false because the Company's assets consisted, in significant part, of the $4,624,000 in accounts receivable that the CyberGuard Defendants claimed the Company had as of September 30.  Thus, the current assets and total assets numbers set forth on CyberGuard's balance sheet were materially false for the reasons set forth in subparagraphs 78(g).

**B.**  **The CyberGuard Defendants' Material Misrepresentations In The November 14, 1996 10-Q**

79.  On November 14, 1996, the CyberGuard Defendants filed with the SEC CyberGuard's Form 10-Q for the Company's first fiscal quarter of 1997, which ended on September 30, 1996 (the "November 1996 10-Q").

80.     That document, which repeated many of the misrepresentations made in the

November 7, 1996 press release concerning the Company's financial results for the 1997 first

fiscal quarter, was signed by defendants Carberry and Wheeler.

81.     In particular, the CyberGuard Defendants falsely represented in the November

1996 10-Q that:

        a.     CyberGuard generated revenues for the quarter of $3,067,000;

        b.     the Company produced a gross profit of $1,193,000, or 38.9% of sales,

for the quarter;

        c.     the Company's SG&A expense for the quarter was only $2,344,000;

        d.     the Company's R&D expense for the quarter was only $1,056,000;

        e.     the Company's operating loss was only $2,207,000 for the quarter;

        f.     the Company generated a net loss of $8,262,000, or $1.20 per share,

for the quarter;

        g.     the Company had accounts and notes receivable of $4,624,000, after

subtracting an allowance for uncollectible accounts of $297,000;

        h.     the Company had total current assets of $15,651,000; and

        i.     the Company had total assets of $18,191,000.

82.     The facts specifically alleged in paragraph 78 demonstrate that those

representations were materially false at the time that they were made.

83.     With respect to the financial statements included in the November 1996 10-Q,

the CyberGuard Defendants also falsely stated:

> The information furnished, in the opinion of management,
> reflects all adjustments, which consist of normal recurring
> adjustments, necessary to present fairly the results of operations
> of the Company for the three month periods ended September

-22-

30, 1996 and September 30, 1995 and the financial position of the Company as of September 30, 1996 and June 30, 1996.

84.     Again, the facts specifically alleged in ¶ 78 demonstrate that the CyberGuard Defendants' representations concerning the Company's financial statements were materially false at the time that they were made.

85.     The November 1996 10-Q also included the following materially misleading description of the Company's revenue recognition policy:

> Revenue is recognized from sales when a product is shipped, from rentals as they accrue, and from services and maintenance when performed.  Unearned income on service contracts is amortized by the straight-line method over the term of the contracts.  Revenue from long-term software contracts is accounted for by the percentage of completion method whereby income is recognized based on the estimated stage of completion of individual contracts using costs incurred as a percentage of total estimated costs at completion.  Losses on long-term contracts are recognized in the period in which such losses are determined.

86.     That statement was materially misleading at the time that it was made because, inter alia:

a.     the CyberGuard Defendants had instituted a policy of permitting the Company's international resellers to pay CyberGuard for products shipped to them only after the resellers had successfully sold those products to end users;

b.     the CyberGuard Defendants continued to prematurely recognize revenue at the time that the Company shipped products to its international resellers;

c.     the CyberGuard Defendants' policy of recognizing revenues although contingencies existed to the Company's receipt of payment violated GAAP requirements governing the recognition of revenues and artificially inflated the Company's reported earnings;

-23-

        d.     during the Company's first fiscal quarter of 1997, CyberGuard improperly recognized at least $457,000 in revenues as a result of the CyberGuard Defendants' utilization of their improper revenue recognition policies.

     87.     In the Management's Discussion and Analysis ("MD&A") section of the November 1996 10-Q, the CyberGuard Defendants also falsely represented that "the Company shipped 103 CyberGuard systems during the quarter ended September 30, 1996 compared to 18 for the quarter ending September 30, 1995."

     88.     That statement was materially misleading as a result of the facts alleged in paragraph 86.

     89.     The MD&A discussion also included the following materially misleading description of the Company's international operations:

> For the quarter ending September 30, 1996, International sales of the Company's network security products increased to $1.6 million compared to $0.4 million for the quarter ended September 30, 1995. The increase in International sales for network security products is the result of increased market penetration in Japan and the signing of two new distributors who began selling CyberGuard firewall products in Australia and Singapore. International sales represent 56.2% and 51.3% of total security product sales for the periods ending September 30, 1996 and 1995 respectively.

     90.     Those representations were materially misleading because, among other facts:

        a.     The international sales generated by the Company during the first fiscal quarter were materially less than the $1.6 million claimed by the CyberGuard Defendants.

        b.     The CyberGuard Defendants failed to disclose that they had instituted a policy of prematurely recognizing revenues for goods shipped to CyberGuard's international resellers although the resellers had no obligation to pay the Company for those goods. Thus,

the CyberGuard Defendants' representations concerning "increased" sales were based upon fraudulently-recorded sales of the Company's products.

        c.     The percentage of the Company's total sales during the first fiscal quarter that was comprised of sales made in international markets was significantly lower than the 56.2% claimed by Defendants.

### C.     The CyberGuard Defendants' Material Misrepresentations In The January 15, 1997 Press Release

91.     On January 15, 1997, the CyberGuard Defendants issued a press release that contained a number of material misrepresentations concerning the Company's financial performance for the second fiscal quarter of 1997, which ended on December 31, 1996.

92.     In the press release, the CyberGuard Defendants stated that CyberGuard "will post second quarter revenues of approximately $3.0 million in sales of firewall related security products for the quarter ended December 31, 1996. This represents a 67 percent increase over the $1.8 million in revenues for the quarter ended December 31, 1995."

93.     The January 15 press release also contained uniformly positive information concerning the Company's unit sales of its firewall products. According to the CyberGuard Defendants, during the quarter, CyberGuard "shipped 119 firewall units compared to 103 units for the quarter ended September 30, 1996, which had revenue of $3.1 million."

94.     In addition, the January 15 press release delivered a glowing description of the Company's international operations. Specifically, the CyberGuard Defendants stated, "For the quarter, the Company posted record international firewall revenues and unit sales growth, while domestic revenues were below the previous quarter on increased unit sales."

95.     Each of the foregoing representations was materially misleading at the time that it was made. Among others, the following facts, all of which existed at the time that the

CyberGuard Defendants' statements were made, demonstrate that those representations were materially false and misleading:

   a.      As CyberGuard conceded in the July 1999 8-K, the Company did not generate $3.0 million in revenues for the second fiscal quarter of 1997. Rather, CyberGuard produced revenues of $2,658,000 for the quarter, or 11.4% less than the amount claimed by the CyberGuard Defendants.

   b.      The CyberGuard Defendants' claim that the Company was enjoying increased shipments of its firewall products was materially misleading in light of their failure to disclose that they had adopted a policy of shipping software to the Company's international resellers without obtaining payment obligations in order to create the illusion that the Company was experiencing increased demand.

   c.      The CyberGuard Defendants' statements concerning the Company's international sales were misleading because the CyberGuard Defendants failed to disclose that they had instituted a policy of recognizing revenues for software shipped to the Company's international resellers although the resellers had no obligation to pay the CyberGuard for the software. Thus, the CyberGuard Defendants' representations that the Company has realized increased sales of its firewall products in international markets during the second fiscal quarter of 1997 were based upon fraudulently-recorded sales of the Company's products.

### D.      The CyberGuard Defendants' Material Misrepresentations In The January 30, 1997 Press Release

   96.      On January 30, 1997, the CyberGuard Defendants issued a press release concerning the Company's financial results for the second fiscal quarter of 1997 that contained a number of material misrepresentations. According to the press release:

> Revenues for the quarter were $3.0 million, an increase of 67 percent over revenues of $1.8 million for the same period of

fiscal 1996. For the quarter, the Company reported a net loss of $0.8 million, or ($.12) per share compared to a $1.5 million loss, or ($.25) per share for the same period of fiscal 1996.

CyberGuard also reported a significant sequential quarter gross margin improvement. Gross margins for the quarter improved to 51%, compared to 39% for the quarter ended September 30, 1996.

97.     Carberry also falsely stated in the January 30 press release that "[r]ecord international revenues, strong customer acceptance of the CyberGuard Firewall Release 3.0 product line, and significantly improved gross margins were all highlights of our second quarter's performance."

98.     In addition, the CyberGuard Defendants reported in the January 30 press release that the Company's shipment of firewall units increased by 17% on a sequential basis and by "332% compared to the quarter ended December 31, 1995."

99.     The January 30 press release also delivered a false, uniformly positive description of the Company's international business operations. In particular, the press release stated, "CyberGuard recognized record international revenue and unit volume for the quarter which included Release 3.0 product introduced to the international distribution channels in December."

100.    The financial statements for the three and six-month periods ended December 31, 1996 that were included in the January 30 press release included a number of additional material misrepresentations. In particular, the CyberGuard Defendants falsely represented in those financial statements that:

       a.       the Company's revenues for the six-month period were $6,114,000;

       b.       the Company's gross profit during that time frame was $2,733,000, or 44.7% of sales;

-27-

  c. the Company's R&D expense for the quarter was only $1,011,000;

  d. CyberGuard's R&D expense for the six-month period was $2,067,000;

  e. the Company's SG&A expense for the quarter was only $2,552,000;

  f. CyberGuard's SG&A expense for the six-month period was $4,896,000;

  g. CyberGuard produced an operating loss of only $2,024,000 for the quarter and $4,230,000 for the six month period;

  h. the Company lost only $1.30 per share for the six-month period; and

  i. CyberGuard had net accounts receivable, current assets and total assets of $3,364,000, $14,462,000 and $16,956,000, respectively, at the end of the quarter.

 101. The foregoing representations were materially false and misleading at the time that they were made. The following facts, all of which existed at the time that press release was issued, rendered the statements made by the CyberGuard Defendants materially false:

  a. All of the facts alleged in paragraph 95.

  b. As CyberGuard eventually conceded in the July 1999 8-K, the revenues generated by the Company during the second fiscal quarter of 1997 were actually $2,658,000, not the $3.0 million claimed by the CyberGuard Defendants in the press release. The CyberGuard Defendants therefore overstated the Company's revenues by 12.87%.

  c. As CyberGuard eventually conceded in the July 1999 8-K, the revenues generated by the Company for the first two fiscal quarters of 1997 were actually $5,268,000, or 13.84% less than the $6,114,000 claimed by the CyberGuard Defendants.

  d. CyberGuard's combined R&D and SG&A expenses for the second fiscal quarter were actually $4,505,000, not the $3,563,000 reported by the CyberGuard Defendants. Likewise, the Company's combined R&D and SG&A expenses for the six-

month period were actually $8,722,000, not the $6,963,000 reported by the CyberGuard Defendants. The CyberGuard Defendants understated those expenses by 26.44% for the quarter and by 25.26% for the six-month period because they should have been amortizing software development costs of $3,087,000 that were improperly written-off in 1996 and because they were deferring expenses in violation of GAAP.

         e.     The operating loss suffered by the Company for the quarter ended December 31, 1996 was substantially larger than the $2,024,000 claimed by the Company in the January 30 press release. In fact, that operating loss was at least $3,355,000, i.e., 65.76% larger than the amount reported by the CyberGuard Defendants.

         f.     The operating loss produced by CyberGuard for the six-month period ended December 31, 1996 was substantially larger than the $4,230,000 claimed by the CyberGuard Defendants in the January 30 press release. The Company's actual operating loss amounted to $6,835,000, or 61.58% more than the loss reported by the CyberGuard Defendants.

         g.     The net loss suffered by CyberGuard during the second fiscal quarter of 1998 was substantially larger than the $0.8 million, or $ 0.12 per share, claimed by the CyberGuard Defendants in the January 30 press release. In fact, the loss suffered by the Company for the quarter was $2,386,000, or $0.34 per share, i.e., 183% more than the loss claimed by the CyberGuard Defendants.

         h.     Likewise, the net loss suffered by CyberGuard for the six months ended December 31, 1996 was far larger than the loss of $1.30 per share reported by the CyberGuard Defendants in their January 30 press release. The actual loss suffered by the Company for that period was $1.73, or 33% more than the loss claimed by the CyberGuard Defendants.

i.      Contrary to the CyberGuard Defendants' representations concerning the gross margin produced by the Company during the second quarter, the Company's actual gross margin was 43.27%.

j.      Furthermore, contrary to the CyberGuard Defendants' representations in the January 30 press release, the Company was not experiencing significantly improved gross margins.  In fact, the Company's gross margin for the second fiscal quarter of 1997 represented only a small improvement over the 39% gross margin reported by CyberGuard for the Company's first fiscal quarter, which ended on September 30, 1996.

k.      The CyberGuard Defendants' representations concerning the gross margins produced by the Company during the first two fiscal quarters of 1997 were also false.  While the CyberGuard Defendants claimed in the January 30, 1997 press release that the Company's gross margin for that time frame was 44.7%, the Company's actual gross margin for the six-month period ended December 31, 1996 was 35.8%.

l.      The CyberGuard Defendants' representations concerning the Company's international operations were materially misleading because they failed to disclose that they had permitted the Company's Asian resellers to pay CyberGuard for software only after the resellers sold the products to end users.  The CyberGuard Defendants also failed to disclose the highly material fact that CyberGuard was improperly recognizing revenue related to software shipped to the Asian resellers although those resellers were under no obligation to pay CyberGuard for the software unless it was sold to end users.

m.      While the CyberGuard Defendants claimed that the Company had $3,364,000 in net accounts receivable as of December 31, 1996, CyberGuard's accounts receivable were actually materially lower than that amount.  The CyberGuard Defendants overstated the accounts receivable owned by the Company because they failed to take account

-30-

of the fact that CyberGuard would never be paid for a substantial portion of those receivables.

n.     The CyberGuard Defendants' claims that CyberGuard had total current assets of $14,462,000 and total assets of $16,956,000 as of December 31, 1996 were false because the Company's assets consisted, in significant part, of the $3,364,000 in accounts receivable that the CyberGuard Defendants claimed the Company had as of December 31. Thus, the current assets and total assets numbers set forth on CyberGuard's balance sheet were materially false for the reasons set forth in subparagraph 101(l).

### E.     The CyberGuard Defendants' Material Misrepresentations In The February 14, 1997 10-Q

102.     On February 14, 1997, the CyberGuard Defendants filed a Form 10-Q with the SEC (the "February 1997 10-Q") that repeated many of their previous misrepresentations concerning the Company's financial results for the Company's second fiscal quarter of 1997, which ended on December 31, 1996.  The February 1997 10-Q was signed by defendants Wheeler and Carberry.

103.     In particular, the CyberGuard Defendants represented in the February 1997 10-Q that:

a.     the Company had generated revenues of $3,047,000 for the quarter and of $6,114,000 for the six months ended December 31, 1996;

b.     the Company had generated a gross profit of $1,539,000, or 50.5%, for the quarter and of $2,732,000, or 44.68%, for the six-month period;

c.     the Company's R&D expense for the quarter was only $1,011,000;

d.     CyberGuard's R&D expense for the six-month period was $2,067,000;

e.     the Company's SG&A expense for the quarter was only $2,552,000;

-31-

    f.  CyberGuard's SG&A expense for the six-month period was

$4,896,000;

    g.  the Company had produced an operating loss of  $2,024,000 for the

quarter and of $4,231,000 for the six-month period;

    h.  the Company recorded a net loss of $817,000 ($0.12 per share) for the

quarter and of $9,079,000 ($1.30 per share) for the six-month period;

    i.  the Company had accounts and notes receivable of $3,364,000, after

subtracting an allowance for uncollectible accounts of $448,000; and

    j.  the Company had total current assets of $14,462,000 and total assets of

$16,956,000.

  104. Those representations were materially false and misleading as a result of the

facts alleged in paragraphs 95 and 101.

  105. As they did throughout the Class Period, the CyberGuard Defendants also

falsely stated in the February 1997 10-Q that:

> The information furnished, in the opinion of management,
> reflects all adjustments, which consist of normal recurring
> adjustments, necessary to present fairly the results of operations
> of the Company for the three and six month periods ended
> December 31, 1996 and December 29, 1995 and the financial
> position of the Company as of December 31, 1996 and June 30,
> 1996.

  106. That statements was materially misleading as a result of the facts alleged in

paragraphs 95 and 101.

  107. The February 1997 10-Q also contained the following material

misrepresentation concerning the Company's revenue recognition policy:

> Revenue is recognized from sales when a product is shipped,
> from rentals as they accrue, and from services and maintenance
> when performed.  Unearned income on service contracts is

amortized by the straight-line method over the term of the
contracts. Revenue from long-term software contracts is
accounted for by the percentage of completion method whereby
income is recognized based on the estimated stage of completion
of individual contracts using costs incurred as a percentage of
total estimated costs at completion. Losses on long-term
contracts are recognized in the period in which such losses are
determined.

108.   That statement was materially misleading as a result of the facts alleged in

paragraph 86, 95 and 101.

109.   The MD&A section of the February 1997 10-Q contained a number of

additional material misrepresentations. For example, in discussing the Company's revenues

for the quarter, the CyberGuard Defendants stated, "Specifically, the Company shipped 120

CyberGuard systems during the quarter ended December 31, 1996 compared to 28 for the

quarter ending December 29, 1995."

110.   That representation was materially misleading because the CyberGuard

Defendants failed to disclose that the Company had been able to achieve the announced level

of shipments only by guaranteeing its international resellers that they would not have to pay

for software obtained from CyberGuard until that software was sold through to end users.

Furthermore, the statement was misleading because it implicitly suggested that CyberGuard

was entitled to receive payment for all merchandise that it had shipped, when, in fact, that

was not the case.

111.   With respect to the Company's international sales, the February 1997 10-Q

falsely stated:

For the quarter ending December 31, 1996, International sales
of the Company's network security products increased to $1.8
million compared to $1.1 million for the quarter ended
December 29, 1995. The increase in International sales for
network security products is the result of increased market
penetration in Japan and Korea, as well as increased Firewall

-33-

> unit shipments in Europe. The increased demand for
> CyberGuard Firewall products in Europe is attributed to
> customer awareness of the imminent U.K. Government
> certification for the CyberGuard Firewall application program
> suite. International sales represent 66% and 62% of total
> security product sales for the periods ending December 31, 1996
> and December 29, 1995 respectively.

112.   That positive characterization of the Company's international operations was materially misleading for a number of reasons. In particular, the CyberGuard Defendants' statements were misleading because:

a.     the CyberGuard Defendants failed to disclose that they had permitted the Company's Asian resellers to pay CyberGuard for software only after the resellers sold the software to end users;

b.     the CyberGuard Defendants concealed the highly material fact that CyberGuard was improperly recognizing revenue related to software shipped to the Asian resellers because those resellers were under no obligation to pay the Company for software unless it was sold to end users;

c.     the international revenues generated by the Company during the quarter were materially lower than the $1.8 million claimed by the CyberGuard Defendants; and

d.     international sales comprised a substantially lower percentage of the Company's total sales for the quarter than the 66% that the CyberGuard Defendants claimed.

**F.     The CyberGuard Defendants' Material Misrepresentations In The April 16, 1997 Press Release**

113.   On April 16, 1997, the CyberGuard Defendants issued a materially misleading press release concerning the Company's financial results for the Company's third fiscal quarter of 1997, which ended on March 31, 1997.

-34-

114.   The CyberGuard Defendants stated in the press release that the Company had generated $4.1 million in revenues related to firewall sales during the quarter. According to the press release, that result "represent[ed] a 64% increase in revenue over the $2.5 million reported for the quarter ended March 31, 1996, and a 36% increase in revenue over the $3 million reported in the second fiscal quarter ended December 31, 1996."

115.   The CyberGuard Defendants also claimed that the Company had generated "record firewall unit sales on a worldwide basis." Specifically, the CyberGuard Defendants stated that the Company had shipped 172 units during the quarter, "a 171% increase over the 63 units sold in the quarter ended March 31, 1996" and a "44% increase over the 119 units shipped in the previous quarter."

116.   The following facts, all of which existed at the time that the April 16 press release was issued, demonstrate that the press release was materially misleading:

a.   As CyberGuard conceded in the July 1999 8-K, the revenues generated by the Company for the quarter were $4 million, not the $4.1 million claimed by the CyberGuard Defendants.

b.   Contrary to the CyberGuard Defendants' claims, the Company's revenues did not increase by 64% over the revenues reported by CyberGuard for the same quarter of fiscal 1996 or by 36% over the revenues reported by the Company during the second fiscal quarter of 1997.

c.   As is specifically alleged in paragraphs 95 and 101, CyberGuard produced only $2,658,000 in revenues during the second fiscal quarter of 1997, not the $3 million claimed by the CyberGuard Defendants in the April 16 press release.

d.   The CyberGuard Defendants' representations concerning the Company's purported growth in unit sales was misleading because CyberGuard posted those

-35-

purported increases only by violating GAAP by recognizing revenues related to products that were shipped to the Company's international resellers without any commitment that the resellers would actually pay for those products.

     e.    Thus, the CyberGuard Defendants' representations concerning the growth in the Company's unit sales were false because those statistics included "sales" that the Company could not record as revenues under GAAP.

### G.    The CyberGuard Defendants' Material Misrepresentations In The May 5, 1997 Press Release

117.    On May 5, 1997, the CyberGuard Defendants issued a materially misleading press release concerning the financial results generated by the Company for the third fiscal quarter of 1997, ended March 31, 1997.

118.    According to the press release, "Revenue of firewall related products for the quarter was a record $4.1 million, an increase of 37 percent over second quarter revenue of $3.0 million. Revenue for the quarter increased 64 percent over revenue of $2.5 million for the same period of fiscal 1996."

119.    The May 5 press release also quoted Carberry referring to the Company's results in glowing terms. Specifically, Carberry stated, "We achieved record revenue, significantly expanded U.S. distribution channels and improved gross profit margins. Our strong growth this quarter validates our business plan."

120.    The press release contained a number of additional misrepresentations concerning the results achieved by the Company for the quarter and nine months ended March 31, 1997. In particular, the CyberGuard Defendants stated:

     a.    that CyberGuard produced a net loss of only $0.89 million, or $0.12 per share, for the quarter, compared to a loss of $1.81 million, or $0.31 per share, for same quarter of the previous year;

b. "CyberGuard Firewall unit shipments for the quarter increased 44 percent compared to the previous quarter, and 171 percent compared to the quarter ended March 30, 1996. This represents the seventh consecutive quarter of increased unit sales for the Company's firewall and related products";

c. "For the quarter, the Company also reported improved sequential gross margins as a result of increased shipments of the CyberGuard Firewall Release 3 software. Specifically, gross margin percentage increased to 55 percent for the three months ended March 31, 1997 compared to 51 percent for the previous quarter ended December 31, 1996, and 39 percent for the quarter ended September 30, 1996";

d. the Company generated revenues from the sale of firewall products and services of $10,219,000 for the nine months ended March 31, 1997;

e. the Company produced a gross profit of $4,967,000, or 48.61% of sales, during that nine-month period;

f. CyberGuard incurred R&D expenses of $1,028,000 for the quarter and of $3,095,000 for the first nine months of the fiscal year;

g. the Company incurred SG&A expenses of $2,847,000 for the quarter and of $7,743,000 for the nine-month period;

h. the Company produced an operating loss of $1,640,000 for the quarter and of $5,871,000 for the first three quarters of the fiscal year;

i. the Company produced a net loss of only $9,971,000, or $1.40 per share, for the first nine months of the fiscal year;

j. as of March 31, 1997, the Company had: (i) accounts receivable of $4,856,000; (ii) total current assets of $14,731,000; and (iii) total assets of $17,414,000.

121. The following facts, all of which existed at the time that the CyberGuard Defendants issued the May 5, 1997 press release, demonstrate that the representations made in that press release were materially misleading:

a. All of the facts alleged in paragraph 116.

b. The revenues generated by CyberGuard for the first nine months of fiscal 1997 were $9,321,000, not the $10,219,000 claimed by the CyberGuard Defendants.

-37-

Thus, the CyberGuard Defendants overstated the revenues generated by the Company during that time period by 9.63%.

c.    While the CyberGuard Defendants claimed that the Company generated a gross profit of $2,235,000 for the third fiscal quarter, the Company actually produced a gross profit of only $2,183,000.

d.    CyberGuard's combined R&D and SG&A expenses for the third fiscal quarter were actually $4,691,000, not the $3,875,000 reported by the CyberGuard Defendants.  Likewise, the Company's combined R&D and SG&A expenses for the nine-month period were actually $13,413,000 not the $10,838,000 reported by the CyberGuard Defendants.  The CyberGuard Defendants understated those expenses by 21.06% for the quarter and by 23.76% for the six-month period because they should have been amortizing software development costs of $3,087,000 that were improperly written-off in 1996 and because they were deferring expenses in violation of GAAP.

e.    Although the CyberGuard Defendants claimed that the Company generated a gross profit of $4,967,000, or 48.61% of sales, for the nine months ended March 31, 1997, the Company actually produced a gross profit of $4,069,000, or 43.65% of sales.

f.    While Defendants claimed that the Company's "[u]nit sales" increased by 44% over the sales reported during the second fiscal quarter of 1997 and by 171% over the sales reported during the third fiscal quarter of 1996, those increases did not actually incur.  As is specifically alleged above, CyberGuard posted those purported increases only by violating GAAP by recognizing revenues related to products that were shipped to the Company's international resellers without any commitment that the resellers would actually pay for those products.

-38-

g.     Contrary to the CyberGuard Defendants' representation that the Company suffered an operating loss of only $1,064,000 during the fiscal third quarter, CyberGuard actually suffered a loss of $1,932,000, or 81.58% more than the amount claimed by the CyberGuard Defendants.

h.     While the CyberGuard Defendants claimed that the Company had suffered an operating loss of $5,871,000 for the nine months ended March 31, 1997, the operating loss suffered by the Company was actually $9,344,000, or 59.16% greater than the amount claimed by the CyberGuard Defendants.

i.     Although the CyberGuard Defendants claimed that the Company had suffered a net loss of only $0.89 million, or $0.12 per share, during the third fiscal quarter, the net loss suffered by the Company was actually $1,178,000, or $0.24 per share, i.e., 100% higher than the loss claimed by the CyberGuard Defendants.

j.     Similarly, the CyberGuard Defendants' assertion that the Company had suffered a net loss of $9,971,000, or $1.40 per share, for the nine months ended March 31, 1997, vastly understated the loss actually suffered by the Company.  CyberGuard's net loss for that period amounted to $13,700,000, or $1.97 per share, i.e., 40.71% more than the amount claimed by the CyberGuard Defendants.

k.     The CyberGuard Defendants' representation that the Company had net accounts receivable of $4,856,000 as of March 31, 1997 was false because that figure failed to take account of the fact that CyberGuard would never be paid for a substantial portion of its purported accounts receivable.  In particular, the accounts receivable figure was inflated by recognizing revenues for software shipped to the Company's international resellers although those resellers had no obligation to pay CyberGuard for that software.

-39-

l.      The CyberGuard Defendants' claims that the Company had total current assets of $14,731,000 and total assets of $17,414,000 as of September 30, 1996 were false because the Company's assets consisted, in significant part, of the $4,856,000 in accounts receivable that the CyberGuard Defendants claimed the Company had as of September 30. Thus, the current assets and total assets numbers set forth on CyberGuard's balance sheet were materially false for the reasons set forth in subparagraphs 121(k).

### H.      The CyberGuard Defendants' Material Misrepresentations In The May 1997 10-Q

122.    The CyberGuard Defendants repeated many of the misrepresentations made in their press releases concerning the Company's financial results for its third fiscal quarter of 1997, which ended on March 31, 1997, in a Form 10-Q that the Company filed with the SEC on May 14, 1997 (the "May 1997 10-Q"). The May 1997 10-Q was signed by defendants Carberry and Wheeler.

123.    Among other misrepresentations, the CyberGuard Defendants stated in the May 1997 10-Q that:

a.      CyberGuard had generated revenues of $4,105,000 for the quarter and of $10,219,000 for the nine months ended March 31, 1997;

b.      the Company had produced a gross profit of $2,235,000, or 54.45%, for the quarter and of $4,967,000, or 48.61%, for the nine-month period;

c.      CyberGuard incurred R&D expenses of $1,028,000 for the quarter and of $3,095,000 for the first nine months of the fiscal year;

d.      the Company incurred SG&A expenses of $2,847,000 for the quarter and of $7,743,000 for the nine-month period;

e.     the Company had produced an operating loss of $1,640,000 for the quarter and of $5,871,000 for the nine-month period;

f.     CyberGuard had recorded a net loss of $892,000 ($0.12 per share) for the quarter and of $9,971,000 ($1.40 per share) for the nine-month period;

g.     the Company had accounts and notes receivable of $4,856,000 after subtracting an allowance for uncollectible accounts of $484,000; and

h.     the Company had total current assets of $14,731,000 and total assets of $17,414,000 as of March 31, 1997.

124.   All of those misrepresentations were materially misleading at the time that they were made by virtue of the facts alleged in paragraphs 116 and 121.

125.   With respect to the financial statements included in the May 1997 10-Q, the CyberGuard Defendants also falsely stated:

> The information furnished, in the opinion of management, reflects all adjustments, which consist of normal recurring adjustments, necessary to present fairly the results of operations of the Company for the three month periods ended March 31, 1997 and March 30, 1996 and the financial position of the Company as of March 31, 1997 and June 30, 1996.

126.   That representation was materially misleading because of the facts alleged in paragraphs 116 and 121.

127.   The May 1997 10-Q also included the following materially misleading representation concerning the Company's revenue recognition policies:

> Revenue is recognized from sales when a product is shipped, from rentals as they accrue, and from services and maintenance when performed. Unearned income on service contracts is amortized by the straight-line method over the term of the contracts. Revenue from long-term software contracts is accounted for by the percentage of completion method whereby income is recognized based on the estimated stage of completion of individual contracts using costs incurred as a percentage of

total estimated costs at completion.  Losses on long-term
contracts are recognized in the period in which such losses are
determined.

128.   Those representations were rendered materially misleading by the facts alleged

in paragraphs 86, 116 and 121.

129.   In the MD&A section of the May 1997 10-Q, the CyberGuard Defendants

falsely stated that "the Company shipped 172 CyberGuard systems during the quarter ended

March 31, 1997 compared to 63 for the quarter ending March 30, 1996." The facts alleged

in paragraph 116 and 121 demonstrate that the CyberGuard Defendants' description of the

Company's unit sales was materially misleading.

130.   The CyberGuard Defendants also included the following false representations

concerning the Company's international operations in the May 1997 10-Q:

> For the quarter ending March 31, 1997, international sales of
> the Company's network security products increased to $2.6
> million compared to $0.9 million for the quarter ended March
> 30, 1996. The increase in international sales for network
> security products is the result of continued market penetration in
> Japan and Korea, as well as increased Firewall unit shipments in
> Europe, especially the United Kingdom.  The Company believes
> that increased demand for CyberGuard Firewall products in the
> United Kingdom is attributed to customer awareness of the U.K.
> government certification for the CyberGuard Firewall
> application program suite; specifically, the Company's
> CyberGuard V.2 was awarded the United Kingdom
> government's ITSEC E-3 rating in February, 1997.
> International sales represent 64% and 36% of total security
> product sales for the periods ending March 31, 1997 and March
> 30, 1996 respectively.

131.   The facts alleged in paragraph 116 and 121 demonstrate that the foregoing

description of the Company's international operations was materially misleading at the time

that it was made.

-42-

I.    **The CyberGuard Defendants' Material Misrepresentations
      In The July 24, 1997 Press Release**

132.   On July 24, 1997, the CyberGuard Defendants issued a press release

concerning the Company's financial results for the 1997 fourth fiscal quarter and fiscal year,

which ended on June 30, 1997. In that press release, the CyberGuard Defendants made a

number of misrepresentations concerning the revenues, margins and profits generated by the

Company during those time periods.

133.   For example, the CyberGuard Defendants claimed that the Company had

generated fourth quarter revenues of $5.4 million, which "represent[ed] a 32% increase in

revenue over the $4.1 million reported for the quarter ended March 31, 1997, and a 93%

increase in revenue over the $2.9 million in firewall related revenue reported for the fiscal

quarter ended June 30, 1996."

134.   With respect to the fiscal year, the press release falsely claimed that

CyberGuard had generated revenues of "$15.6 million, compared to the $8.2 million in

firewall related revenue for the four quarters ended June 30, 1996."

135.   The CyberGuard Defendants also reported that the Company had shipped a

"record" 273 firewall units during the quarter, "representing a 56% increase over the 172

units shipped in the previous quarter ended March 31, 1997" and "a 190% increase over the

94 units shipped for the quarter ended June 30, 1996."

136.   The press release also quoted Carberry as stating:

> We are very pleased with the continuing strong customer
> demand for our CyberGuard Firewall family of products and the
> resulting excellent quarter-to-quarter top-line growth.
>
> Record unit sales on a worldwide basis through both direct and
> indirect channels indicate the CyberGuard Firewall is properly
> positioned for our distribution system.

137.    The following facts, all of which existed at the time that the July 24 press release was issued, demonstrate that the press release was materially false and misleading:

a.      As CyberGuard conceded in the July 1999 8-K, the revenues generated by the Company for the quarter were $4,903,000, not $5.4 million, i.e., 9.2% less than the amount claimed by the CyberGuard Defendants.

b.      Contrary to the CyberGuard Defendants' claims, the Company's revenues did not increase by 93% over the revenues reported by CyberGuard for the same quarter of fiscal 1996 or by 32% over the revenues reported by the Company during the third fiscal quarter of 1997.

c.      In fact, the $4,903,000 in revenues generated by CyberGuard for the quarter represented only a 69% increase over the $4.1 million in revenues reported by the Company during the three-month period ended June 30, 1996 and a 19.59% improvement over the revenues of $4.1 million reported by the Company for the third fiscal quarter of 1997.

d.      The CyberGuard Defendants' representations concerning the Company's purported growth in unit sales was misleading because CyberGuard posted those purported increases only by violating GAAP by prematurely recognizing revenues related to products that were shipped to the Company's international resellers without any commitment that the resellers would actually pay for those products.

e.      Thus, the CyberGuard Defendants' representations concerning the growth in the Company's unit sales were false because those statistics included "sales" that the Company could not record as revenues under GAAP.

-44-

**J.   The CyberGuard Defendants' Material Misrepresentations
In The September 10, 1997 Press Release**

138.   On September 10, 1997, the CyberGuard Defendants issued another press

release concerning the Company's financial results for the 1997 fourth fiscal quarter and

fiscal year, which ended on June 30, 1997.

139.   The headline on that press release stated, "CyberGuard Reports 91% Annual

Revenue Growth and Significant Quarterly Gross Margin Improvements."

140.   The body of the September 10 press release was equally positive, and equally

false.  For example, with respect to the 1997 fiscal year, the CyberGuard Defendants stated:

> Revenue for security products, systems and services for the 12
> months ended June 30, 1997 was a record $15.6 million, an
> increase of 91 percent over revenue of $8.2 million for the same
> 12-month period ended June 30, 1996.  Unit shipments during
> the same time period increased 228 percent.  Worldwide
> revenue growth for the year was balanced, with more than half
> of overall revenues derived outside of North America.

141.   Similarly, with respect to the quarter ended June 30, 1997, the CyberGuard

Defendants stated:

> Revenue for the quarter ended June 30, 1997 was a record $5.4
> million, an increase of 86 percent over revenue of $2.9 million
> in firewall related revenue for the same period of fiscal 1996.
> Unit shipments for the fourth fiscal quarter increased 191
> percent over the same quarter of 1996.

142.   The September 10 press release also quoted Carberry as stating:

> International Data Corporation projected the firewall industry
> growth rate to be 44 percent by revenue and 100 percent by unit
> during the last twelve months.  CyberGuard grew at twice the
> annual revenue growth rate and almost twice the annual unit
> growth rate during the past year.  For the fiscal year,
> CyberGuard significantly outperformed the industry growth rate,
> which reflects the continued strong demand for CyberGuard's
> recognized "best of breed" products and services.

143.    Carberry also stated in the September 10 press release that "we continue to recognize significant quarter-to-quarter gross margin improvements, with a 63 percent gross profit margin for the quarter just ended."

144.    The September 10 press release also included false statements concerning the losses produced by CyberGuard during the year and quarter ended June 30, 1997.  In particular, the CyberGuard Defendants claimed that the Company had produced a "net loss of $12.5 million, or ($1.76) per share, compared to a $31.7 million loss, or ($5.28) per share, for the comparable 12-month period ended June 30, 1996."

145.    The CyberGuard Defendants also claimed that, "[f]or the quarter ended June 30, 1997, the Company reported a net loss of $2.5 million or ($0.34) per share compared to a loss of $27.8 million or ($4.60) per share for the quarter ended June 30, 1996."

146.    The September 10 press release contained additional false representations concerning the Company's gross margins.  Specifically, the CyberGuard Defendants claimed that "gross margins increased to 63 percent for the quarter ended June 30, 1997 compared to 54 percent for the previous quarter ended March 31, 1997 and 50 percent for the quarter ended December 31, 1996" as a result of "increased shipments of the CyberGuard Firewall Release 3 software."

147.    The CyberGuard Defendants also made materially false statements concerning the Company's expenses in the September 10 press release.  Specifically, the CyberGuard Defendants reported that the Company had incurred R&D expenses of $1,628,000 and SG&A expenses of $3,667,000 for the quarter.

148.    The following facts, all of which existed at the time that the CyberGuard Defendants issued the September 10, 1997 press release, demonstrate that the representations

-46-

made by the CyberGuard Defendants in that press release were materially misleading at the time that they were made.

        a.      All of the facts alleged in paragraph 137.

        b.      The revenues generated by CyberGuard during fiscal 1997 were $14,224,000, not the $15.6 million claimed by the CyberGuard Defendants. Thus, the revenues for that time period represented a 73% increase over the revenues reported by the Company during fiscal 1996, not the increase of 91% claimed by the CyberGuard Defendants.

        c.      The revenues generated by CyberGuard during the fourth quarter of fiscal 1997 were $4,903,000, not the $5.4 million claimed by the CyberGuard Defendants. Thus, the revenues for that time period represented a 69% increase over the revenues reported by the Company during the fourth quarter of fiscal 1996, not the increase of 86% claimed by the CyberGuard Defendants.

        d.      While the CyberGuard Defendants claimed that the Company generated gross profits of $3,414,000 for the quarter, the Company actually produced gross profits of only $2,911,000.

        e.      The combined R&D and SG&A expenses incurred by CyberGuard during the quarter were $6,455,000, not the $5,557,000 reported by the CyberGuard Defendants. The CyberGuard Defendants understated those expenses by 16.16% because they should have been amortizing software development costs of $3,087,000 that were improperly written-off in 1996 and because they were deferring expenses in violation of GAAP.

        f.      While the CyberGuard Defendants claimed that the Company's "[u]nit sales" increased by 191% over the sales reported during the fourth fiscal quarter of 1996 and

by 228% over the sales reported during fiscal 1996, those increases did not actually incur. As is specifically alleged above, CyberGuard posted those purported increases only by recognizing revenues, in violation of GAAP, related to products that were shipped to the Company's international resellers without any commitment that the resellers would actually pay for those products.

g. Although the CyberGuard Defendants claimed that the Company had suffered a net loss of only $2.5 million, or $0.32 per share, for the fourth quarter, the net loss suffered by the Company was actually $3,742,000, or $0.49 per share, i.e., 53.13% more than the loss announced by the CyberGuard Defendants.

h. Similarly, the CyberGuard Defendants' claim that the Company had suffered a net loss of $12.5 million, or $1.76 per share, for the 1997 fiscal year vastly understated the loss actually suffered by the Company. CyberGuard's net loss for the year amounted to $17,442,000, or $2.46 per share, i.e., 39.77% more than the amount reported by the CyberGuard Defendants.

### K. Defendants' Material Misrepresentations In the September 1997 10-K

149. On or about September 29, 1997, Defendants filed CyberGuard's 10-K with the SEC for the 1997 fiscal year, which ended on June 30, 1997 (the "September 1997 10-K"). The September 1997 10-K was signed by, among others, Wheeler, James and Carberry.

150. The September 1997 10-K contained CyberGuard's balance sheet, statement of operations and statement of cash flows for the 1997 fiscal year. Those financial statements were audited by KPMG.

151.   The September 1997 10-K contained the following material misrepresentations concerning CyberGuard's international operations:

> Additionally, the company realized strong growth internationally during the 12 months ended June 30, 1997. International revenues for security products and services were $9.1 million, up $5.4 million or 144.0% compared to $3.7 million for the same 12 month period in 1996. This increase in International security products revenues is attributable to (1) the expansion of the company's reseller channels in the Pacific-Rim region, most notably Japan, Korea and Taiwan, and (2) to the increase in customer orders in the United Kingdom and Western Europe following the formal award of the ITSEC E3 certification standard to the CyberGuard Firewall in March 1997.

152.   Those representations were materially misleading as a result of the facts alleged in paragraphs 137 and 148.

153.   With respect to the total number of units shipped during fiscal 1997, the CyberGuard Defendants falsely stated, "For the year ended June 30, 1997 the Company shipped a total of 667 firewall units compared to 203 for the 12 months ended June 30, 1996."

154.   That description of the Company's unit sales was materially misleading as a result of the facts alleged in paragraph 137 and 148.

155.   The financial statements audited by KPMG that appeared in the September 1997 10-K included a number of additional misrepresentations.

156.   In the audit report letter included in the September 1997 10-K, KPMG falsely stated:

> We have audited the accompanying consolidated balance sheets of CyberGuard Corporation and subsidiaries as of June 30, 1997 and 1996, and the related consolidated statements of operations, shareholders' equity, and cash flows for the year ended June 30, 1997, the nine months ended June 30, 1996 and the year ended September 30, 1995. These consolidated financial statements are the responsibility of the Company's

management.  Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of CyberGuard Corporation and subsidiaries as of June 30, 1997 and 1996, and the results of their operations and their cash flows for the year ended June 30, 1997, the nine months ended June 30, 1996 and the year ended September 30, 1995 in conformity with generally accepted accounting principles.

157.    Contrary to KPMG's representation that the Company's financial statements had been prepared in accordance with GAAP, Defendants falsely stated in those financial statements that:

a.    the Company had generated revenues of $15,621,000 for the year;

b.    CyberGuard had produced a gross profit of $8,381,000, or 53.7%, for the year;

c.    the Company had incurred R&D expenses of $4,723,000 for the year;

d.    CyberGuard had incurred SG&A expenses of $11,410,000 for the year;

e.    CyberGuard had generated an operating loss of only $8,014,000;

f.    the Company had produced a net loss of only $12,490,000, or $1.76 per share;

-50-

g.    as of June 30, 1997, CyberGuard had accounts and notes receivable of $6,642,000, after subtracting an allowance for uncollectible accounts of $318,000; and

h.    CyberGuard had total current assets of 12,993,000 and total assets of $15,974,000.

158.   The facts alleged in paragraphs 137 and 148 demonstrate that the foregoing representations were false at the time that they were made.  In addition, the following facts, all of which existed at the time that the September 1997 10-K was filed, demonstrate that the foregoing representations concerning the Company's accounts receivable, current assets and total assets were false at the time that they were made:

a.    CyberGuard's combined R&D and SG&A expenses for the fiscal year were $19,868,000, not the $16,133,000 reported by the CyberGuard Defendants.  The CyberGuard Defendants understated those expenses by 23.15% because they should have been amortizing software development costs of $3,087,000 that were improperly written-off in 1996 and because they were deferring expenses in violation of GAAP.

b.    Defendants' claim that CyberGuard maintained $6,416,000 in net accounts receivable as of June 30, 1997 failed to take account of the fact that the Company would never be paid for a substantial portion of its purported accounts receivable.

c.    In particular, Defendants disregarded the facts that: (1) the accounts receivable had been inflated by the CyberGuard Defendants' practice of recognizing revenues for software shipped to the Company's international resellers although those resellers had no obligation to pay CyberGuard for that software; (2) the Company's Asian resellers were experiencing severe economic problems as a result of the financial crisis that impacted Asian economies beginning in the second half of calendar 1997; and (3) the economic problems that

those resellers were experiencing made it even less likely that CyberGuard would be paid for software that the Company had shipped to the resellers without any payment obligation.

        d.     The CyberGuard Defendants' claims that CyberGuard had total current assets of 12,993,000 and total assets of $15,974,000 as of June 30, 1997 were unfounded because the Company's assets consisted, in significant part, of the $6,416,000 in accounts receivable that the CyberGuard Defendants claimed the Company had as of that time. Thus, the current assets and total assets reported on CyberGuard's balance sheet were materially false for the reasons set forth in subparagraphs 158(b)-(c).

    159.    A number of disclosures made in the notes to the financial statements included in the September 1997 10-K were also materially misleading. For example, Defendants stated:

> Management of the Company has made a number of estimates and assumptions relating to the reporting of assets and liabilities and the disclosure of contingent assets and liabilities to prepare these financial statements in conformity with generally accepted accounting principles.

    160.    That representation was materially false because the Company's reported accounts receivable were inaccurate for the reasons specified in sub-paragraphs 158(b)-(c).

    161.    Defendants also included the following materially misleading description of the Company's revenue recognition policies in the September 1997 10-K:

> The Company accounts for software revenues in accordance with the American Institute of Certified Public Accountants Statement of Position 91-1, Software Revenue Recognition. Revenues earned under software license agreements with end users are generally recognized when the software has been shipped, payment is due within one year, collectibility is probable, and there are no significant obligations remaining. Unearned income on service contracts is amortized by the straight-line method over the term of the contracts. Revenue from long-term software contracts is accounted for by the percentage of completion method whereby income is recognized

-52-

based on the estimated stage of completion of individual
contracts using costs incurred as a percentage of total estimated
costs at completion. Losses on long-term contracts are
recognized in the period in which such losses are determined.

162.    That representation was materially misleading by virtue of the facts alleged in
paragraph 86, 137 and 148.

163.    KPMG's clean audit report concerning the Company's fiscal 1997 financial
statements was also materially misleading because KPMG falsely stated that it had complied
with GAAS in performing its audit.

164.    That representation was knowingly or recklessly false because KPMG's audit
of the Company's 1997 financial statements failed to comply with GAAS in at least the
following respects.

a.    KPMG knowingly or recklessly failed to comply with a number of
critical Auditing Interpretations ("AU"), which are the well-accepted guidelines regarding the
requirements of GAAS that are issued by a Task Force of the American Institute of Certified
Public Accountants' Auditing Standards Board.

b.    KPMG knowingly or recklessly violated AU § 110.01 by stating that in
its audit report that CyberGuard's financial statements had been prepared in accordance with
GAAP although the information set forth in those financial statements suffered from all of
the deficiencies described in paragraphs 137 and 148.

c.    KPMG knowingly or recklessly violated AU § 150.02 by failing to
adequately plan its audit. The deficiencies in KPMG's efforts to plan the CyberGuard audit
included KMPG's failure to obtain sufficient knowledge of matters relating to the nature of
CyberGuard's business, organization and operating characteristics (AU § 311.07) and its
failure to identify particular areas of CyberGuard's business that required special

-53-

consideration in the auditing process (AU § 311.06). As a result, KPMG's audit report lacked a reasonable basis in fact.

       d.     KPMG knowingly or recklessly violated AU § 316.05 by failing to design its audit to provide reasonable assurance of detecting errors and intentional misstatements that were material to the Company's financial statements.

       e.     Similarly, KPMG knowingly or recklessly violated AU § 230.01 by failing to exercise due professional care in performing its audit and in preparing its audit report. In addition, KPMG failed to satisfy the requirement of AU § 316.18 that each audit should be planned and performed with an attitude of professional skepticism.

       f.     KPMG violated the requirements of AU § 311.10 by failing to provide adequate supervision of the assistants involved in the performance of the CyberGuard audit.

       g.     In violation of AU § 150.02 and AU § 319.02, KPMG failed to develop an adequate understanding of CyberGuard's internal control structure, control environment, accounting system and control procedures in order to plan the nature, timing and extent of tests necessary to perform an audit of CyberGuard.

       h.     In violation of AU § 319.28-29 and AU § 319.61, KPMG failed to make an adequate assessment of control risk, i.e., the risk that a material misstatement made in a company's financial statements will go undetected by an entity's internal control structure, policies or procedures.

       i.     KPMG knowingly or recklessly failed to obtain sufficient competent evidential matter to support its audit opinion, as is required by AU § 150.02. In particular, KPMG failed to acquire sufficient support for the sales to international resellers recorded by the Company and for the accounts receivable attributable to such sales.

j.      KPMG knowingly or recklessly failed to adhere to AU § 431.01's requirement that an audit report disclose any inadequacies in the disclosures made in a financial statement's footnotes.

k.      KPMG knowingly or recklessly violated the requirement of AU § 431.03 that, in the event that management fails to provide any disclosure required by GAAP in financial statements, the auditor should express a qualified or an adverse opinion upon the financial statements and provide the necessary disclosure.

l.      In violation of AU §§ 330.34 and 330.28, KPMG failed to undertake adequate measures to confirm the existence of the Company's accounts receivable.  In particular, KPMG either: (i) did not engage in sufficient direct communications with the Company's resellers to determine that they had entered agreements with CyberGuard that deferred any obligation to pay the Company for its software until such time as the resellers sold the software to end users; or (ii) ascertained that information yet nevertheless permitted the CyberGuard Defendants to continue to inflate the Company's accounts receivable.

m.      Contrary to the requirements of AU § 332.25, KPMG knowingly or recklessly failed to determine whether CyberGuard's agreements with its resellers were subject to unusual payment terms, such as the agreements that permitted CyberGuard's international resellers to avoid payment for the Company's software until the resellers sold that software to end users.

165.    Each of the material misrepresentations made in the financial statements that were included in the September 1997 10-K were repeated by Defendants on a number of occasions thereafter when those financial statements were incorporated by reference in other SEC filings made by CyberGuard.

-55-

166.   For example, the Company's fiscal 1997 financial statements were disseminated to the public when those financial statements were included or incorporated by reference in, among other SEC filings: (a) the Form 10-K/A that the Company filed with the SEC on or about October 22, 1997; and (b) the Form 10-K/A that the Company filed with the SEC on or about October 28, 1997. In addition, the balance sheet information included in the September 1997 10-K was set forth in each of the Forms 10-Q that CyberGuard filed with the SEC during the Company's 1998 fiscal year.

### L.   The CyberGuard Defendants' Material Misrepresentations In The October 7, 1997 Press Release

167.   On October 7, 1997, the CyberGuard Defendants issued a press release concerning the Company's preliminary financial results for the first fiscal quarter of 1998, which ended on September 30, 1997.

168.   The October 7 press release stated, "Based on current information, revenue for network security products and services for the three months ended September 30, 1997 is expected to be approximately $ 5.1 million, compared to $ 3.1 million for the same three-month period of last year."

169.   The October 7 press release also stated that "[g]ross margins for the first fiscal quarter are expected to continue to improve as a result of increased shipments of the award-winning CyberGuard Firewall Release 3 and 4 products."

170.   Although the CyberGuard Defendants were aware that the Company was experiencing severe problems in its international operations, the October 7 press release also stated that "CyberGuard [was] encouraged by the fact that international resellers continue to sell through existing inventories."

171.    Furthermore, the October 7 press release stated that, although the Company had experienced "lower than expected performance for the first fiscal quarter of 1998, CyberGuard now anticipates profitability to occur in the third fiscal quarter of 1998."

172.    The following facts, all of which existed at the time that the October 7 press release was issued, demonstrate that the CyberGuard Defendants' representations in that press release were materially misleading:

    a.    As CyberGuard conceded in the July 1999 8-K, the Company did not generate $5.1 million in revenues for the first fiscal quarter of 1998.  Rather, CyberGuard produced revenues of $4,173,000 for the quarter, or 18% less than the amount claimed by the CyberGuard Defendants.

    b.    Contrary to the CyberGuard Defendants' representations, the Company's quarterly gross margin did not represent a substantial improvement over past reported results.  In fact, CyberGuard's gross margin for the first fiscal quarter of 1998 (ended September 30, 1997) was 57.56%, as compared to a reported gross margin of 63.2% for the fourth fiscal quarter of 1997 (ended June 30, 1997) and reported gross margin of 54% for the third fiscal quarter of 1997 (ended March 31, 1997).

    c.    The CyberGuard Defendants claimed that CyberGuard was enjoying increased shipments of CyberGuard Firewall Release 3 and 4 products.  In fact, however, the Company was experiencing severe obstacles to its efforts to increase its sales of those products as a result of the economic turmoil that was experienced by the Asian nations in which CyberGuard sold much of its products.

    d.    The CyberGuard Defendants' claim that the Company would attain profitability in the third fiscal quarter of 1998 was materially false and misleading because

-57-

the CyberGuard Defendants knew that such results could be achieved only through the continued implementation of their fraudulent accounting practices.

### M.   The CyberGuard Defendants' Material Misrepresentations In The October 27 Press Release

173.   On October 27, 1997, the CyberGuard Defendants issued another press release concerning the Company's financial results for the first fiscal quarter of 1998, which ended on September 30, 1997.

174.   The October 27 press release contained a number of materially misleading representations.  Specifically, the CyberGuard Defendants stated:

a.   "Revenue for network security products and services for the three months ended September 30, 1997 was $ 5.1 million, an increase of 65 percent over revenue of $ 3.1 million for the same three-month period ended September 30, 1996."

b.   "Gross margins for the first fiscal quarter of 1998 were 64.5 percent compared to 63.2 percent for the fourth fiscal quarter of 1997 and 38.9 percent for the first fiscal quarter of 1997."

c.   "For the quarter ended September 30, 1997, the Company reported a net loss of $ 1.7 million, or ($ 0.22) per share, compared to a net loss of $ 8.3 million or ($ 1.20) per share for the first quarter ended September 30, 1996."

175.   According to the October 27 press release, Carberry also stated,

> We were pleased to see gross margins continue to improve during the quarter, a key to achieving profitability. . . Revenue in North America increased more than 20 percent in the first quarter as we successfully grew our channels in that geography, while international revenue decreased after growing more than 50 percent during the previous two quarters. We remain confident that quarter-to-quarter growth in the international markets will resume.

176.   The financial statements that were attached to the October 27 press release contained a number of addition material misrepresentations. In particular, the CyberGuard Defendants stated that:

a.   CyberGuard's revenues for the quarter were $5,063,000;

b.   the Company's gross profit for the quarter was $3,267,000;

c.   CyberGuard's R&D expenses for the quarter were $1,580,000;

d.   the Company's SG&A expenses for the quarter were $3,838,000;

e.   the Company's operating loss for the quarter was $2,151,000;

f.   CyberGuard's net loss for the quarter was $1,699,000, or $0.22 per share;

g.   CyberGuard had $6,416,000 in net accounts receivable as of September 30, 1997;

h.   CyberGuard had total current assets of $15,295,000 as of September 30, 1997; and

i.   the Company had total assets of $18,269,000 as of that date.

177.   The representations made by the CyberGuard Defendants in the October 27 press release were materially misleading in several critical respects. The facts that demonstrate that those representations were materially misleading include the following:

a.      All of the facts specifically alleged in paragraph 172.

b.      While the CyberGuard Defendants claimed that the revenues generated by the Company for the quarter represented a dramatic 65% improvement over the network security products and services revenues produced by Company during the same quarter of the previous year, the year-to-year revenue increase was actually only about one-half of that claimed percentage increase.

c.      CyberGuard's combined R&D and SG&A expenses for the first quarter were $5,810,000, not the $5,418,000 reported by the CyberGuard Defendants.  The CyberGuard Defendants understated those expenses by 7.24% because they should have been amortizing software development costs of $3,087,000 that were improperly written-off in 1996 and because they were deferring expenses in violation of GAAP.

d.      The operating loss produced by the Company for the quarter was actually $3,041,000, or 41.38% larger than the loss of $2,151,000 reported by the CyberGuard Defendants.

e.      The net loss produced by CyberGuard for the quarter was materially larger than the $1,699,000, or $0.22 per share, claimed by the CyberGuard Defendants.  In fact, the Company's net loss for the quarter amounted to $3,144,000, or $0.41 per share, *i.e.,* 86.36% greater than the loss claimed by the CyberGuard Defendants.

f.      While Carberry claimed that CyberGuard was "confident that quarter-to-quarter growth in the international markets" would resume, CyberGuard had been forced to agree not to bill its international resellers for software shipped to them by CyberGuard until such time as the resellers were able to sell those products through to end users.  Thus, at the time that Carberry's representation was made, CyberGuard was

-60-

experiencing increased resistance from its resellers to placing orders for those products, a fact not disclosed by the CyberGuard Defendants throughout the Class Period.

g.      The CyberGuard Defendants' claim that the Company maintained $6,416,000 in net accounts receivable as of September 30, 1997 failed to take account of the fact that the Company would never be paid for a substantial portion of its purported accounts receivable.

h.      In particular, the CyberGuard Defendants failed to take account of the facts that: (1) the accounts receivable had been inflated by their practice of recognizing revenues for goods shipped to the Company's international resellers although those resellers had no obligation to pay CyberGuard for that software; (2) the Company's Asian resellers were experiencing severe economic problems as a result of the financial crisis that was impacting Asian economies; and (3) the economic problems that those resellers were experiencing made it even less likely that CyberGuard would be paid for the software that the Company had shipped to the resellers without any payment obligation.

i.      The CyberGuard Defendants' claims that the Company had total current assets of $15,295,000 and total assets of $18,269,000 as of September 30, 1997 were materially false because the Company's assets consisted, in significant part, of the $6,416,000 in accounts receivable that the CyberGuard Defendants claimed the Company had as of September 30.  Thus, the current assets and total assets numbers set forth on CyberGuard's balance sheet were materially false for the reasons set forth in subparagraphs 177(g)-(h).

N.    **Defendants' Material Misrepresentations In
        The November 1997 Form 10-Q**

178.   The CyberGuard Defendants repeated many of the misrepresentations made in

the October 27, 1997 press release in the Form 10-Q that the Company filed with the SEC

on November 13, 1997 for the Company's first fiscal quarter of 1998, which ended on

September 30, 1997 (the "November 1997 10-Q"). The November 1997 10-Q was signed

by defendants Carberry and Murray.

179.   In the November 1997 10-Q, the CyberGuard Defendants falsely represented

that:

a.     the Company had generated revenues of $5,063,000 for the quarter;

b.     CyberGuard had produced a gross profit of $3,267,000 for the quarter;

c.     "Gross Profit as a percent of sales increased to 64.5% from 38.9% for

the quarter ended September 30, 1997";

d.     CyberGuard's R&D expenses for the quarter were $1,580,000;

e.     the Company's SG&A expenses for the quarter were $3,841,000;

f.     the Company had produced an operating loss of only $2,154,000 for

the quarter;

g.     the Company had produced a net loss of $1,702,000, or $0.22 per

share, for the quarter;

h.     the Company had accounts and notes receivable of $6,416,000, after

subtracting an allowance for uncollectible accounts of $570,000;

i.     the $570,000 allowance for uncollectible accounts maintained by the

Company was adequate;

-62-

j.    the Company had total current assets of $15,295,000 at the end of the quarter; and

k.    CyberGuard had total assets of $18,269,000 as of the end of the quarter.

180.    All of the facts specifically alleged above in paragraphs 172 and 177 demonstrate that those statements made by the CyberGuard Defendants in the November 1997 10-Q were materially misleading at the time that they were made.

181.    With respect to the financial statements included in the November 1997 10-Q, the CyberGuard Defendants also falsely stated:

> The information furnished, in the opinion of management, reflects all adjustments, which consist of normal recurring adjustments, necessary to present fairly the results of operations of the Company for the three month periods ended September 30, 1997 and September 30, 1996 and the financial position of the Company as of September 30, 1997 and June 30, 1997.

182.    Again, the facts specifically alleged in paragraphs 174 and 177 demonstrate that the CyberGuard Defendants' representations concerning the Company's financial statements were materially false at the time that they were made.

183.    The CyberGuard Defendants also made a materially false representation concerning the Company's revenue recognition policies in the November 1997 10-Q. Specifically, that document stated, "Revenue is recognized from sales when a product is shipped, from rentals as they accrue, and from services and maintenance when performed."

184.    That statement was materially false and misleading at the time that it was made because, inter alia:

       a.    the CyberGuard Defendants had instituted a policy of permitting the

Company's international resellers to pay CyberGuard for products shipped to them only after

the resellers had successfully sold those products to end users;

       b.    despite the implementation of that policy, the CyberGuard Defendants

continued to recognize revenue at the time that the Company shipped products to

international resellers;

       c.    the CyberGuard Defendants' policy of recognizing revenues although

contingencies existed to the Company's receipt of payment violated GAAP requirements

governing the recognition of revenues; and

       d.    during the Company's first fiscal quarter of 1998, CyberGuard

improperly recognized at least $890,000 in revenues as a result of the CyberGuard

Defendants' utilization of their improper revenue recognition policies.

    185.   The MD&A section of the November 1997 10-Q contained a number of

additional material misrepresentations.  That section of the November 1997 10-Q falsely

stated:

> For the quarter ended September 30, 1997, net sales increased
> by approximately $2.0 million when compared to the quarter
> ended September 30, 1996.  The $2.0 million increase is
> comprised of an increase of $1.8 million in network security
> product sales and $0.2 million in service revenues for the
> current quarter.  The $1.8 million or 62.6% increase in network
> security product sales is the result of increased shipments of the
> Company's CyberGuard firewall systems.  Specifically, the
> Company shipped 264 CyberGuard systems during the quarter
> ended September 30, 1997 compared to 103 for the quarter
> ending September 30, 1996.
>
> For the quarter ended September 30, 1997, International sales of
> the Company's network security products increased to $2.0
> million compared to $1.6 million for the quarter ended
> September 30, 1996.  The increase in international sales for
> network security products is the result of increased market

> penetration in Europe due, the Company believes, to the formal
> award of the ITSEC E3 certification standard given to the
> CyberGuard Firewall. International sales represent 41.5% and
> 56.2% of total security product sales for the periods ended
> September 30, 1997 and 1996 respectively.

186.    The following facts, all of which existed at the time that the CyberGuard

Defendants made the foregoing misrepresentations concerning the Company's revenues in the

MD&A section of the November 1997 10-Q, demonstrate that those representations were

materially misleading:

a.    The Company's revenues for the first fiscal quarter did not increase

over the revenues reported by the Company for the fourth fiscal quarter of 1997.

CyberGuard ultimately conceded in the July 1999 8-K that CyberGuard's revenues for the

first fiscal quarter were only $4,173,000, not the $5,063,000 reported by the CyberGuard

Defendants.  As a result, the Company's revenues actually decreased by $1,229,000 from the

$5,400,000 reported by the CyberGuard Defendants for the last fiscal quarter of 1997.

b.    The CyberGuard Defendants' claims that the Company had experienced

"increased shipments of the Company's CyberGuard firewall systems" and that CyberGuard

had "shipped 264 CyberGuard systems during the quarter ended September 30, 1997

compared to 103 for the quarter ending September 30, 1996" were materially misleading

because the CyberGuard Defendants failed to disclose that those shipments had been

produced only through the use of the fraudulent accounting policies specifically described

herein.

c.    In particular, the CyberGuard Defendants' statements were materially

misleading because they failed to disclose that CyberGuard had managed to ship the reported

number of firewall systems only by promising resellers that they would not have to pay for

that software until the resellers were successful in selling the software to end users.

d.      The CyberGuard Defendants' statements concerning the Company's international sales were particularly misleading because they failed to disclose that they had instituted a policy of recognizing revenues for software shipped to CyberGuard's international resellers although the resellers had no obligation to pay the Company for that software. Thus, the CyberGuard Defendants' representations that the Company has realized increased sales of its firewall products in international markets during the first fiscal quarter of 1998 were based upon fraudulently-recorded sales of the Company's products.

e.      The percentage of the Company's total sales during the first fiscal quarter that were comprised of sales made in international markets was significantly lower than the 41.5% claimed by the CyberGuard Defendants.

187.    In addition, the CyberGuard Defendants falsely stated in the MD&A section of the November 1997 10-Q regarding the Company's liquidity and capital resources that "[t]he Company believes that its current liquidity and capital resources are sufficient to fund the Company's current business plan for the next twelve months."

188.    That representation was belied by a host of facts that existed at the time that the CyberGuard Defendants' representations concerning the Company's liquidity were made. In particular, those representations were contradicted by the following facts:

a.      At the time that the CyberGuard Defendants' representations were made, the Company was experiencing decreased sales and other business problems in its international markets, particularly in Asia.

b.      In order to disguise those decreased sales, the CyberGuard Defendants had implemented a policy of improperly recognizing revenues for software that was shipped to CyberGuard's international resellers despite the fact that the resellers were not obligated to pay for that software unless they were successful in selling the software to end users.

-66-

c.      The CyberGuard Defendants therefore recognized that, unless the Company was able to attract additional investment capital or a purchaser for CyberGuard, the Company would be unable to fund its business plan for a year.

**O.      The CyberGuard Defendants' Material Misrepresentations
In The November 19 Press Release**

189.    Just days after the November 1997 10-Q was issued, the CyberGuard Defendants issued a press release on November 19, 1997 that included additional material misrepresentations.

190.    That press release concerned the presentation that the Company's executives were scheduled to make at the Southeast Research Partners Sixth Annual Institutional Conference in Fort Lauderdale.  In that press release, the CyberGuard Defendants stated that "CyberGuard has grown from an $8.2 million company to a $15.6 million company in one year, with consistently improving gross margins — a key to achieving profitability."

191.    The following facts, which existed at the time that the November 19 press release was issued, demonstrate that the CyberGuard Defendants' representations in the press release were materially false:

a.      The Company generated revenues of only $14.2 million during the 1997 fiscal year, not the $15.6 million claimed by the CyberGuard Defendants.

b.      As is specifically alleged in paragraphs 174 and 177, CyberGuard was not realizing improved gross margins at the time of the November 19 press release.  In fact, during the first fiscal quarter of 1998, the Company produced gross margins that were far worse than those reported by CyberGuard for the previous three quarters.

**P.    The CyberGuard Defendants' Material Misrepresentations In
The January 26, 1998 Press Release**

192.    On January 26, 1998, the CyberGuard Defendants issued a press release

concerning the Company's financial results for the second fiscal quarter of 1998, which

ended ib December 31, 1997.

193.    That press release included a number of materially misleading representations

concerning the Company's financial results and business operations.  In particular, the press

release falsely stated:

a.      "Revenues for the quarter were $ 4.9 million compared to $ 3.0 million

for the same three-month period ended December 31, 1996, an increase of 60 percent."

b.      "Revenues for the first quarter of fiscal 1998 were $ 5.1 million."

c.      "For the quarter ended December 31, 1997, the Company reported an

operating loss of $ 2.8 million, or ($ 0.34) per share; other income of $ 0.2 million or $

0.02 per share; and a net loss of $ 2.6 million or ($ 0.32) per share."

d.      "Gross margins for the second quarter fiscal 1998 were 62.3 percent

compared to 50.5 percent for the second quarter fiscal 1997, and 64.5 percent for the first

quarter of fiscal 1998.  Continued improvement in gross profit margins is expected as the

Company's product mix continues to migrate to a software-only solution and as its product

offerings expand with new products for Microsoft Windows NT."

194.    Defendant Carberry also commented directly upon the Company's Asian

operations in the press release without revealing that the Company was recognizing revenues

in Asia prior to the time that sales had actually been completed.  Carberry stated:

> While we achieved revenue growth in North America and
> Europe, as with the entire industry, we were affected by the
> turmoil in the Asian market. . . . We are strategically

committed to the Asia-Pacific market and anticipate only
moderate revenue growth in this region in the near term.

195.    The financial statements that were attached to the January 26 press release
contained a number of additional material misrepresentations.  Specifically, the CyberGuard
Defendants stated that:

        a.      the Company had generated revenues of $9,917,000 for the six-month
period ended December 31, 1997;

        b.      the Company's gross profit for the same period was 6,295,000, or
63.5%;

        c.      CyberGuard's R&D expenses were $1,582,000 and $3,162,000 for the
quarter and six-month period, respectively;

        d.      the Company's SG&A expenses were $4,235,000 and $8,076,000 for
the quarter and six-month period, respectively;

        e.      CyberGuard had produced an operating loss of $4,944,000 and a net
loss of $4,305,000, or $0.54 per share, for the same six-month period; and

        f.      CyberGuard had net accounts receivable, current assets and total assets
of $6,642,000, $13,432,000 and $16,392,000, respectively, as of December 31, 1997.

196.    The representations made by the CyberGuard Defendants in the January 26
press release were materially misleading at the time that they were made.  The following
facts, all of which existed at the time the January 26 press release was issued, rendered the
statements made by the CyberGuard Defendants materially false:

        a.      As CyberGuard eventually conceded in the July 1999 8-K, the revenues
generated by the Company during the second fiscal quarter of 1998 were actually
$4,185,000, not the $4.9 million claimed by the CyberGuard Defendants in the press release.

-69-

b.      As CyberGuard eventually conceded in its July 1999 8-K, the revenues generated by the Company for the first two fiscal quarters of 1998 were actually $8,358,000, not the $9,917,000 reported in the January 26 press release.

c.      As is specifically alleged in paragraph 172, the revenues generated by the Company for the first fiscal quarter of 1998 were $4,173,000, not the $5.1 million claimed by the CyberGuard Defendants in the January 26 press release.

d.      CyberGuard's combined R&D and SG&A expenses for the second fiscal quarter were actually $6,377,000 not the $5,817,000 reported by the CyberGuard Defendants.  Likewise, the Company's combined R&D and SG&A expenses for the six-month period were actually $12,187,000, not the $11,238,000 reported by the CyberGuard Defendants.  The CyberGuard Defendants understated those expenses by 9.63% for the quarter and by 8.36% for the six-month period because they should have been amortizing software development costs of $3,087,000 that were improperly written-off in 1996 and because they were deferring expenses in violation of GAAP.

e.      The operating loss suffered by the Company for the quarter ended December 31, 1997 was substantially larger than the $2.8 million, or $0.34 per share, claimed by the Company in the January 26 press release.  In fact, that operating loss was at least $3.47 million, or 24% larger than the amount claimed by CyberGuard.

f.      The operating loss produced by the Company for the six-month period ended December 31, 1997 was substantially larger than the $4,944,000 reported in the January 26 press release.  The Company's operating loss for that period was actually at least $6,503,000, or 32% more than the loss reported by the CyberGuard Defendants.

g.      The net loss suffered by CyberGuard during the second fiscal quarter of 1998 was substantially larger than the $2.6 million, or $0.32 per share, reported by the

CyberGuard Defendants in the January 26 press release.  In fact, the loss suffered by the Company for the quarter was $3,887,000, or $0.48 per share, i.e., 50% larger than the loss claimed by the CyberGuard Defendants.

h.     Likewise, the net loss suffered by CyberGuard for the six months ended December 31, 1997 was far larger than the loss of $4,305,000, or $0.54 per share, reported by the CyberGuard Defendants in their January 26 press release.  The loss suffered by the Company in that time frame was actually $7,031,000, or $0.89 per share, i.e., 64.81% greater than the loss claimed by the CyberGuard Defendants.

i.     Contrary to the CyberGuard Defendants' representations concerning the gross profits produced by the Company during the second quarter, CyberGuard's gross profit for the quarter was actually $2,362,000, or 21.94% less than the $3,026,000 claimed by the CyberGuard Defendants.

j.     Furthermore, contrary to the CyberGuard Defendants' representations in the January 26 press release, the Company was not experiencing significantly improved gross margins.  In fact, the Company's gross margin for the second fiscal quarter of 1998 represented only a small improvement over the 50.5% gross margin reported by the Company for the second quarter fiscal 1997.

k.     The CyberGuard Defendants' representations concerning the gross profit produced by the Company during the first two fiscal quarters of 1998 were also false.  While the CyberGuard Defendants claimed in the January 26 press release that the Company's gross profit for that time frame was $6,295,000, the Company's gross profit for the six-month period ended December 31, 1997 was actually $5,034,000.

l.     Carberry's statement concerning the Company's Asian operations was materially misleading because Carberry failed to disclose the scope of the problems that

-71-

CyberGuard was experiencing in Asia. In particular, Carberry concealed the fact that CyberGuard had permitted the Company's Asian resellers to pay CyberGuard for software shipped to the resellers only after the resellers sold the software to end users. Carberry also failed to disclose the highly material fact that CyberGuard was improperly recognizing revenue related to software shipped to the Asian resellers although those resellers were under no obligation to pay CyberGuard for that software unless it was sold to end users.

        m.    While the CyberGuard Defendants claimed that the Company had $6,642,000 in net accounts receivable as of December 31, 1997, the Company's accounts receivable were actually materially lower than that amount. The CyberGuard Defendants overstated the accounts receivable owned by the Company because they failed to take account of the fact that CyberGuard would never be paid for a substantial portion of those receivables.

        n.    The CyberGuard Defendants' estimate of the Company's accounts receivable also failed to take account of the fact that the accounts receivable had been inflated by their practice of recognizing revenues for software shipped to the Company's international resellers although those resellers had no obligation to pay CyberGuard for that software if the resellers did not succeed in selling the software to end users.

        o.    The CyberGuard Defendants' inflated estimate of the Company's accounts receivable also failed to take account of the fact that the Company's Asian resellers were experiencing severe economic problems as a result of the financial crisis that impacted the Asian economy beginning in the second half of calendar 1997. The economic problems that those resellers were experiencing made it even less likely that CyberGuard would be paid for the software that the Company had shipped to the resellers without any obligation for the resellers to pay CyberGuard.

p.      The CyberGuard Defendants' claims that the Company had total current assets of $13,432,000 and total assets of $16,392,000 as of December 31, 1997 were materially false because the Company's assets consisted, in significant part, of the $6,642,000 in accounts receivable that the CyberGuard Defendants claimed the Company had as of December 31. Thus, the current assets and total assets numbers set forth on CyberGuard's balance sheet were materially false for the reasons set forth in subparagraphs 196(m)-(o).

**Q.      Defendants' Material Misrepresentations
In The February 1998 10-Q**

197.    The CyberGuard Defendants repeated many of the misrepresentations that they made in the January 26 press release in the Form 10-Q filed by CyberGuard with the SEC on February 13, 1998 for the Company's second fiscal quarter of 1998, which ended December 31, 1997 (the "February 1998 10-Q"). The February 1998 10-Q was signed by defendants Carberry and Murray.

198.    In the February 1998 10-Q, the CyberGuard Defendants falsely stated that:

a.      the Company had generated revenues of $4,854,000 for the quarter and of $9,917,000 for the six-month period ended December 31, 1997;

b.      the Company had produced a gross profit of $3,026,000 for the quarter and of $6,293,000 for the six-month period ended December 31, 1997;

c.      "Gross Profit as a percent of sales increased to 62.3% from 50.5% for the quarter ended December 31, 1997 compared to the corresponding period in the previous year";

d. "The Company's gross profit as a percent of sales increased to 63.5% from 44.7% for the six months ended December 31, 1997 compared to the corresponding period in the previous year";

e. CyberGuard's R&D expenses were $1,582,000 and $3,162,000 for the quarter and six-month period, respectively;

f. the Company's SG&A expenses were $4,235,000 and $8,076,000 for the quarter and six-month period, respectively;

g. the Company had produced an operating loss of $2,791,000 for the quarter and of $4,945,000 for the six-month period ended December 31, 1997;

h. the Company had produced a net loss of $2,604,000, or $0.32 per share, for the quarter and of $4,306,000, or $0.54 per share, for the six-month period ended December 31, 1997;

i. the Company had accounts and notes receivable of $6,232,000, after subtracting an allowance for uncollectible accounts of $733,000;

j. the $733,000 allowance for uncollectible accounts carried by the Company was adequate;

k. the Company had total current assets of $13,432,000 at the end of the quarter; and

l. CyberGuard had total assets of $16,393,000 as of the end of the quarter.

199. Each of the foregoing representations was materially false and misleading at the time that it was made by virtue of the facts specifically alleged in paragraph 196.

200.    The February 1998 10-Q contained a number of additional false

representations. With respect to the financial statements included in the February 1998 10-Q,

the CyberGuard Defendants falsely stated:

> The information furnished, in the opinion of management,
> reflects all adjustments, which consist of normal recurring
> adjustments, necessary to present fairly the results of operations
> of the Company for the three- and six-month periods ended
> December 31, 1997 and December 31, 1996 and the financial
> position of the Company as of December 31, 1997 and June 30,
> 1997.

201.    That representation was materially false and misleading for all of the reasons

specified in paragraphs 196.

202.    The description of the Company's revenue recognition policy that the

CyberGuard Defendants included in the Company's February 1998 10-Q was also materially

misleading. The CyberGuard Defendants stated, "Revenue is recognized from sales when a

product is delivered, from rentals as they accrue, and from services and maintenance when

performed. Unearned income on service contracts is amortized by the straight-line method

over the term of the contracts."

203.    That statement was materially misleading at the time that it was made as a

result of the facts specifically alleged in paragraphs 184 and 196.

204.    The MD&A section of the February 1998 10-Q contained a number of

additional material misrepresentations concerning CyberGuard's operations and financial

performance.

205.    With respect to the revenues generated by the Company for the quarter ended

December 31, 1997, the February 1998 10-Q stated:

> For the quarter ended December 31, 1997, net sales increased
> by approximately $1.8 million compared to the quarter ended
> December 31, 1996. The $1.8 million increase represents an

increase of $1.7 million in product revenues and $0.1 million in service revenues over the 1996 quarter. The $1.7 million (or 59.6%) increase in network security product revenues is the result of increased shipments of the Company's CyberGuard firewall systems. Specifically, the Company shipped 252 CyberGuard Firewall systems during the quarter ended December 31, 1997, compared to 119 for the quarter ended December 31, 1996.

For the quarter ended December 31, 1997, international sales of the Company's network security products increased to $2.1 million from $1.9 million for the quarter ended December 31, 1996. The increase in revenue from international sales of network security products is the result of increased market penetration in Europe due, the Company believes, to the formal award of the ITSEC E3 certification standard given to the CyberGuard Firewall. International sales represented 42.6% and 61.8% of total security product sales for the periods ending December 31, 1997 and 1996 respectively.

206.    Likewise, with respect to the revenues generated by the Company during the

six-month period ended December 31, 1996, the CyberGuard Defendants stated:

For the six-month period ended December 31, 1997, net revenues increased by approximately $3.8 million to $9.7 million when compared to the six-month period ended December 31, 1996. The $3.8 million increase represents an increase of $3.5 million in revenues from the sale of network security products and $0.3 million in service-related revenues. The $3.5 million (or 61.4%) increase in network security product revenues is the result of increased shipments of the Company's CyberGuard firewall product. Specifically, the Company shipped 516 CyberGuard systems during the six-month period ended December 31, 1997, compared to 285 for the six-month period ended December 31, 1996.

For the six-month period ended December 31, 1997, international sales of the Company's network security products increased to $4.1 million compared to $3.5 million for the six month period ended December 31, 1996. The increase in international sales represents a 30.3% increase in sales in Europe over the corresponding period in the prior year. The increase in international sales is due, the Company believes, to the formal award of the ITSEC E3 certification standard given to the CyberGuard Firewall. International sales represent 41.5%

-76-

and 57.6% of total security product sales for the six-month periods ending December 31, 1997 and 1996 respectively.

207.   The following facts demonstrate that the those representations concerning the Company's revenues during the quarter and six-month period ended December 31, 1997 were materially misleading at the time that they were made:

a.   CyberGuard ultimately conceded in the July 1999 8-K that the Company's revenues for the second fiscal quarter were only $4,185,000, not the $4,854,000 claimed by the CyberGuard Defendants in the February 1998 10-Q.

b.   Similarly, CyberGuard conceded in the July 1999 8-K that the Company's revenues for the six-month period ended December 31, 1997 were only $8,358,000, not the $9,917,000 claimed by the CyberGuard Defendants in the February 1998 10-Q.

c.   The CyberGuard Defendants' claims that the Company had experienced "increased shipments of the Company's CyberGuard firewall systems" and that CyberGuard had "shipped 252 CyberGuard Firewall systems during the quarter ended December 31, 1997, compared to 119 for the quarter ended December 31, 1996" were materially misleading because the CyberGuard Defendants failed to disclose that those shipments had been produced only through the use of the fraudulent accounting policies specifically alleged herein.

d.   In particular, the CyberGuard Defendants' statements were materially misleading because they failed to disclose that the Company had managed to ship the reported level of firewall systems only by promising resellers that they would not have to pay for that software until the resellers were successful in selling the software to end users.

-77-

      e.     Likewise, the CyberGuard Defendants' representations that CyberGuard had realized "increased shipments of the Company's CyberGuard firewall product" and had "shipped 516 CyberGuard systems during the six-month period ended December 31, 1997, compared to 285 for the six-month period ended December 31, 1996" were materially misleading as a result of the facts specifically alleged in paragraphs 184 and 196.

      f.     The CyberGuard Defendants' statements concerning the Company's international sales were particularly misleading because they failed to disclose that they had instituted a policy of recognizing revenues for software shipped to international resellers although the resellers had no obligation to pay the Company for that software.  Accordingly, contrary to the representations made in the February 1998 10-Q, CyberGuard was not generating increased sales of its firewall products in international markets.

      g.     In addition, the percentage of the Company's overall sales that were comprised of international sales during the second fiscal quarter was materially lower than the 42.6% claimed by the CyberGuard Defendants.  The percentage of the Company's overall sales that were comprised of international sales during the six-month period ended December 31, 1997 was also materially lower than the 41.5% claimed by the CyberGuard Defendants in the February 1998 10-Q.

208.   In the MD&A section regarding the Company's liquidity and capital resources, the CyberGuard Defendants repeated their representation that "[t]he Company believes that its current liquidity and capital resources are sufficient to fund the Company's current business plan for the next twelve months."  That statement was materially misleading at the time that it was made as a result of the facts specifically alleged in paragraph 188.

**R.    The CyberGuard Defendants' Material Misrepresentations
In The April 1998 Press Release**

209.    On April 29, 1998, the CyberGuard Defendants issued a press release in which they disclosed the purported financial results generated by CyberGuard for the third fiscal quarter of 1998, which ended on March 31, 1998.

210.    The April 29 press release included a number of material misrepresentations. According to the press release:

a.    "Revenues for the quarter were $ 5.2 million compared to $ 4.1 million for the same three-month period ended March 31, 1997, an increase of 26 percent."

b.    "Revenues for the second quarter ended December 31, 1997 of fiscal 1998 were $4.9 million."

c.    "For the first nine months of FY 1998 ended March 31, 1998, revenues were $15.1 million, compared to $ 10.2 million for the same nine-month period ended March 31, 1997, an increase of 47.5 percent."

d.    "Gross margins for the third quarter of fiscal 1998 improved to 65 percent compared to 54 percent for the third quarter of fiscal 1997, and 63 percent for the second  quarter of fiscal 1998."

e.    CyberGuard's gross profit for the quarter was $3,374,000;

f.    CyberGuard's gross profit for the nine months ended March 31, 1998 was $9,666,000, or 64.15% of sales.

g.    "Unit sales increased 108 percent over the comparable period of fiscal 1997."

h.    CyberGuard's R&D expenses were $1,059,000 and $4,221,000 for the quarter and nine-month period, respectively;

i.      the Company's SG&A expenses were $3,988,000 and $12,064,000 for the quarter and nine-month period, respectively;

j.      "For the quarter ended March 31, 1998, the Company reported an operating loss of $ 1.7 million or ($ 0.20) per share, compared to an operating loss of $ 1.6 million or ($ 0.20) per share for the corresponding period of the previous year."

k.      The Company had suffered operating losses of $1,673,000 and $6,619,000, respectively, for the three and nine-month periods ended March 31.

l.      The Company suffered net losses of $1,644,000 ($0.19 per share) and $5,951,000 ($0.75 per share) for the same three and nine-month periods.

m.      The Company had net accounts receivable, current assets and total assets of $7,362,000, $13,952,000 and $16,775,000, respectively, as of March 31.

211.    The following facts, all of which were known or recklessly disregarded by the CyberGuard Defendants at the time the April 1998 press release was issued, demonstrate that the foregoing representations were materially false at the time that they were made:

a.      As CyberGuard conceded in the July 1999 8-K, the revenues generated by the Company for the quarter were $4,516,000, not $5.2 million, i.e., 12.2% less than the amount reported by the CyberGuard Defendants.

b.      Contrary to the CyberGuard Defendants' claims, the Company's revenues did not increase by 26% over the revenues reported by CyberGuard for the same quarter of fiscal 1997. In fact, the $4,516,000 in revenues generated by CyberGuard for the quarter represented only a 10% increase from the $4.1 million in revenues reported by the Company during the three-month period ended March 31, 1997.

c.     As is specifically alleged in paragraph 207, CyberGuard produced only $4,185,000 in revenues during the second fiscal quarter of 1998, not the $4.9 million claimed by the CyberGuard Defendants.

d.     Contrary to the CyberGuard Defendants' statement in the April 29 press release, the revenues generated by the Company for the first nine months of fiscal 1998 were $12,874,000, not $15.1 million.  Thus, the revenues for that time period represented a 25.98% increase over the revenues reported by the Company during the first nine months of fiscal 1997, not the increase of 47.5% claimed by the CyberGuard Defendants.

e.     While the CyberGuard Defendants claimed that the Company generated gross profits of $3,374,000, or 65.5% of sales, for the third fiscal quarter, the Company actually produced gross profits of only $2,768,000, or 61.29% of sales.

f.     Although the CyberGuard Defendants claimed that the Company generated gross profits of $9,666,000, or 64.15% of sales, for the nine months ended March 31, 1998, the Company actually produced gross profits of $7,471,000, or 58% of sales.

g.     While the CyberGuard Defendants claimed that the Company's "[u]nit sales" increased by 108% over the sales reported during the third fiscal quarter of 1997, that increase did not actually incur.  As is specifically alleged above, CyberGuard posted the reported increase only by violating GAAP by recording revenues related to software that was shipped to the Company's international resellers without any commitment that the resellers would actually pay for that software.

h.     CyberGuard's combined R&D and SG&A expenses for the third fiscal quarter were actually $5,547,000, not the $5,047,000 reported by the CyberGuard Defendants.  Likewise, the Company's combined R&D and SG&A expenses for the nine-month period were actually $17,644,000 not the $16,285,000 reported by the CyberGuard

-81-

Defendants. The CyberGuard Defendants understated those expenses by 9.91% for the quarter and by 8.35% for the nine-month period because they should have been amortizing software development costs of $3,087,000 that were improperly written-off in 1996 and because they were deferring expenses in violation of GAAP.

i.      Contrary to the CyberGuard Defendants' representation that the Company suffered an operating loss of only $1.7 million, or $0.20 per share, during the fiscal third quarter, CyberGuard actually suffered a substantially larger operating loss. In fact, the Company's actual operating loss for the quarter was at least $2,806,000, or $0.33 per share.

j.      While the CyberGuard Defendants claimed that the Company had suffered an operating loss of only $6,619,000 for the nine months ended March 31, 1998, the operating loss suffered by the Company was actually substantially higher. In fact, that loss amounted to at least $8,814,000.

k.      Although the CyberGuard Defendants claimed that the Company had suffered a net loss of only $1,644,000, or $0.19 per share, during the third fiscal quarter, the net loss suffered by the Company was actually $2,750,000, or $0.32 per share, i.e., 68.42% larger than the loss claimed by the CyberGuard Defendants.

l.      Similarly, the CyberGuard Defendants' claim that the Company had suffered a net loss of $5,951,000, or $0.75 per share, for the nine months ended March 31, 1998, vastly understated the loss actually suffered by the Company. CyberGuard's net loss for that period amounted to at least $9,781,000, or $1.21 per share, i.e., 61.33% more than the amount claimed by the CyberGuard Defendants.

m.      The CyberGuard Defendants' representation that the Company had net accounts receivable of $7,362,000 as of March 31, 1998 was also materially misleading.

That representation failed to take account of the fact that CyberGuard would never be paid for a substantial portion of its purported accounts receivable.

n.      In particular, the CyberGuard Defendants' estimate of the Company's accounts receivable failed to take account of the fact that the accounts receivable had been inflated by their practice of recognizing revenues for software shipped to the Company's international resellers although those resellers had no obligation to pay CyberGuard for that software if the resellers did not succeed in selling it to end users.

o.      The CyberGuard Defendants' inflated estimate of the Company's accounts receivable also failed to take account of the fact that the Company's Asian resellers were experiencing severe economic problems as a result of the financial crisis that impacted the Asian economy beginning in the second half of calendar 1997. The economic problems that those resellers were experiencing made it even less likely that CyberGuard would be paid for the software that the Company had shipped to the resellers without any obligation for the resellers to pay CyberGuard.

p.      The CyberGuard Defendants' claims that the Company had total current assets of $13,952,000 and total assets of $16,775,000 as of March 31, 1998 were materially false because the Company's assets consisted, in significant part, of the $7,362,000 in accounts receivable that the CyberGuard Defendants claimed the Company had as of March 31. Thus, the current assets and total assets numbers set forth on CyberGuard's balance sheet were materially false for the reasons set forth in subparagraphs 211(m)-(o).

212.    Defendant Carberry made additional false representations concerning CyberGuard's financial performance in the press release. Carberry stated:

> This quarter was marked by overall revenue growth and the launch of the new, highly differentiated NT product line. . . .More than 10 percent of this quarter's revenue was

> derived from our new CyberGuard® Firewall for Windows© NT
> with SecureGuard©. Continued growth in eCommerce programs,
> continued gross margin improvements, and the reduction of
> inventory in existing channels as well as the addition of several
> new channels were all positive business indicators.

213.    The following facts, which existed at the time Carberry made the foregoing

representation, rendered his statement materially false and misleading: (a) as is specifically

alleged in paragraph 211, Carberry's reference to the Company's "overall revenue growth"

during the third fiscal quarter was materially misleading; and (b) as is specifically alleged in

paragraph 211, the Company's gross margins were not as reported by the CyberGuard

Defendants.

**S.    Defendants' Material Misrepresentations In The May 1998 10-Q**

214.    Many of the misrepresentations made by the CyberGuard Defendants in the

April 29 press release were repeated by the CyberGuard Defendants in the Form 10-Q filed

by the Company with the SEC for the Company's third fiscal quarter of 1998 (which ended

on March 31, 1998) on May 15, 1998 (the "May 1998 10-Q").  The May 1998 10-Q was

signed by defendants Carberry and Murray.

215.    In the May 1998 10-Q, the CyberGuard Defendants falsely stated that:

a.    the Company had generated revenues of $5,152,000 for the quarter and

of $15,069,000 for the nine-month period ended March 31, 1998;

b.    the Company had produced a gross profit of $3,374,000 for the quarter

and of $9,666,000 for the nine-month period ended March 31, 1998;

c.    "Gross Profit as a percent of sales increased to 65.5% from 54.4% for

the quarter ended March 31, 1998 compared to the corresponding period in the previous

year";

      d.     "The Company's gross profit as a percent of sales increased to 64.1% from 48.6% for the nine months ended March 31, 1998 compared to the corresponding period in the previous year";

      e.     CyberGuard's R&D expenses were $1,059,000 and $4,221,000 for the quarter and nine-month period, respectively;

      f.     the Company's SG&A expenses were $3,988,000 and $12,064,000 for the quarter and nine-month period, respectively;

      g.     the Company had produced an operating loss of $1,673,000 for the quarter and of $6,619,000 for the nine-month period ended March 31, 1998;

      h.     the Company had produced a net loss of $1,644,000, or $0.19 per share, for the quarter and of $5,951,000, or $0.75 per share, for the nine-month period ended March 31, 1998;

      i.     the Company had accounts and notes receivable of $7,362,000 after subtracting an allowance for uncollectible accounts of $606,000;

      j.     the $606,000 allowance for uncollectible reflected on the Company's financial statements was adequate;

      k.     the Company had total current assets of $13,952,000 at the end of the quarter; and

      l.     CyberGuard had total assets of $16,775,000 at end of the quarter.

    216.    Each of the foregoing misrepresentations was rendered materially false and misleading by the specific facts alleged in paragraph 211.

    217.    With respect to the financial statements included in the May 1998 10-Q, the CyberGuard Defendants also falsely stated:

> The information furnished, in the opinion of management,
> reflects all adjustments, which consist of normal recurring
> adjustments, necessary to present fairly the results of operations
> of the Company for the three- and nine-month periods ended
> March 31, 1998 and March 31, 1997 and the financial position
> of the Company as of March 31, 1998 and June 30, 1997.

218.   That representation was false for all of the reasons specified in paragraph 211.

219.   The description of CyberGuard's revenue recognition policy that appeared in the May 1998 10-Q was also false.  Once again, the CyberGuard Defendants stated, "Revenue is recognized from sales when a product is delivered, from rentals as they accrue, and from services and maintenance when performed."

220.   That statement was materially misleading at the time that it was made because, inter alia: (a) the CyberGuard Defendants had instituted a policy of permitting the Company's international resellers to pay CyberGuard for software shipped to them only after the resellers had successfully sold that software to end users; (b) the CyberGuard Defendants continued to recognize revenue at the time that the Company shipped products to international resellers; (c) the Company's policy of recognizing revenues although contingencies existed to CyberGuard's receipt of payment violated GAAP; (d) during the third fiscal quarter of 1998, CyberGuard improperly recognized at least $636,000 in revenues as a result of the CyberGuard Defendants' utilization of their improper revenue recognition policies; and (e) during the first three fiscal quarters of 1998, CyberGuard improperly recognized at least $2,195,000 in revenues as a result of the CyberGuard Defendants' use of their improper revenue recognition policies.

221.   The MD&A section of the May 1998 10-Q contained a number of additional material misrepresentations concerning CyberGuard's operations and financial performance.

222.   With respect to the revenues generated by the Company for the quarter ended

March 31, 1998, the May 1998 10-Q stated:

> For the quarter ended March 31, 1998, net revenue increased by
> approximately $1.05 million (or 25.6%) compared to the quarter
> ended March 31, 1997.  During the quarter ended March 31,
> 1998, revenue from the various firewall products and TradeVPI
> products increased from $3.8 million to $4.3 million,
> representing an increase of 13% over sales in the same quarter
> of the previous year.  The increase is the result of a greater
> number of shipments of the Company's firewall product;
> specifically, the Company shipped 355 CyberGuard Firewall
> systems during the quarter ended March 31, 1998 compared to
> 171 for the quarter ended March 31, 1997. . . .
>
> For the quarter ended March 31, 1998, international sales of the
> Company's network security products decreased slightly to $2.5
> million from $2.6 million for the quarter ended March 31,
> 1997. The nominal decline in revenue from international sales of
> network security products is the result of economic pressures
> placed on the Asian market.  International sales represented
> 47.9% and 64.3% of total security product revenue for the
> periods ending March 31, 1998 and 1997 respectively.

223.   Similarly, with respect to the revenues generated by the Company during the

nine-month period ended March 31, 1998, the CyberGuard Defendants stated:

> For the nine-month period ended March 31, 1998, net revenue
> (refers to gross product sales less any returns and allowances)
> increased by approximately $4.9 million to $15.1 million when
> compared to the nine-month period ended March 31, 1997.  The
> $4.9 million increase is represented by $4.0 million in revenue
> from the sale of network security products and $0.9 million in
> service-related revenues.  The $4.0 million (or 41%) increase in
> network security product revenues is the result of increased
> shipments of the Company's CyberGuard Firewall and Trade
> VPI products.  Specifically, the Company shipped 861
> CyberGuard systems during the nine-month period ended March
> 31, 1998 compared to 391 for the nine-month period ended
> March 31, 1997 an increase of 120%. . . .
>
> For the nine-month period ended March 31, 1998, international
> sales of the Company's network security products increased to
> $6.6 million compared to $6.2 million for the nine month period
> ended March 31, 1997. . . . International sales represent 44%

and 60% of total security product sales for the nine-month
periods ending March 31, 1998 and 1997 respectively.

224.   The following facts, all of which existed at the time that the foregoing
representations concerning the Company's revenues during the three and nine-month periods
ended March 31, 1998 were made, demonstrate that those representations were materially
false and misleading:

a.   CyberGuard ultimately conceded in the July 1999 8-K that the
Company's revenues for the third fiscal quarter were only $4,516,000, not the $5,152,000
claimed by the CyberGuard Defendants in the May 1998 10-Q.  As a result, the Company's
revenues for the third fiscal quarter of 1998 actually increased by only approximately 10%
from the revenues reported during the same quarter of the previous year.

b.   Similarly, CyberGuard conceded in the July 1999 8-K that the
Company's revenues for the nine-month period ended March 31, 1997 were only
$12,874,000, not the $15,069,000 claimed by the CyberGuard Defendants in the May 1998
10-Q.  As a result, the Company's revenues increased by only approximately 25.98% from
those reported by the CyberGuard Defendants for the same nine-month period of fiscal 1997.

c.   The CyberGuard Defendants' claims that the Company had experienced
a "greater number of shipments of the Company's firewall product" and that the "Company
shipped 355 CyberGuard Firewall systems during the quarter ended March 31, 1998
compared to 171 for the quarter ended March 31, 1997" were materially misleading because
the CyberGuard Defendants failed to disclose that those increases had been produced through
the use of the fraudulent accounting policies specifically alleged herein.  In particular, the
CyberGuard Defendants' statements were materially misleading because they failed to
disclose that the Company had promised its international resellers that they would not have to

-88-

pay for CyberGuard software until the resellers were successful in selling that software to end users.

        d.     Likewise, the CyberGuard Defendants' representations that the Company had experienced "increased shipments of the Company's CyberGuard firewall and Trade VPI products" and that "the Company shipped 861 CyberGuard systems during the nine-month period ended March 31, 1998 compared to 391 for the nine-month period ended March 31, 1997 an increase of 120%," were materially misleading as a result of the facts specifically alleged in paragraphs 211 and 220.

        e.     The CyberGuard Defendants' statements concerning the Company's international sales were particularly misleading because the CyberGuard Defendants failed to disclose that they had instituted a policy of recognizing revenues for software shipped to the Company's international resellers although the resellers had no obligation to pay the Company for that software.

        f.     In addition, the percentage of the Company's overall sales that was comprised of international sales during the third fiscal quarter was materially lower than the 47.9% claimed by the CyberGuard Defendants. Likewise, the percentage of the Company's overall sales that was comprised of international sales during the nine-month period ended March 31, 1998 was materially lower than the 44% claimed by Defendants in the May 1998 10-Q.

        T.     **The CyberGuard Defendants' Material Misrepresentations In The June 1998 8-K**

       225.    On June 23, 1998, the Company filed a Form 8-K periodic report with the SEC (the "June 1998 8-K").

226.   That document was filed with the SEC in connection with the Company's stock-for-stock merger with ARCA Systems, Inc.

227.   In the June 1998 8-K, Defendants repeated each of the misrepresentations concerning CyberGuard's revenues, gross profits, operating losses, net losses, accounts receivable, current assets and net assets that are specifically alleged in paragraph 215.

228.   The facts specifically alleged above at paragraphs 211, 220 and 224 demonstrate that all of the misrepresentations in paragraph 215 were materially misleading at the time that they were made.

### U.    Defendants' Material Omissions

229.   In addition to the affirmative misrepresentations specified above, Defendants' fraudulent scheme was perpetrated by means of their failure to disclose material facts they were obligated to reveal as a result of: (a) their positive statements concerning the Company; (b) the disclosure regulations promulgated by the SEC, including Item 303 of SEC Regulation S-K; and (c) the insider trading engaged in by defendant James during the Class Period.

230.   The material facts that Defendants were obligated to disclose during the Class Period include the following:

a.   CyberGuard's financial statements for each of the fiscal quarters of 1997, the 1997 fiscal year and the first three fiscal quarters of 1998 materially overstated the Company's revenues, gross margin, gross profit, operating income, net income, accounts receivable, current assets and total assets;

b.   throughout the Class Period, the accounting controls and systems maintained by CyberGuard were inadequate in that, inter alia, they enabled the CyberGuard

-90-

Defendants to improperly account for the Company's revenues, gross margin, gross profit, operating income, net income, accounts receivable, current assets and total assets;

   c. the Company had instituted a policy of permitting the Company's Asian resellers to defer payment on software shipped to those resellers for as long as it took for the resellers to sell the software to end users;

   d. the Company was experiencing severely depressed demand for its software in Asian markets; and

   e. some of the Company's Asian resellers were experiencing severe financial problems which placed the Company's ability to expand in Asian markets in severe jeopardy and which dramatically increased the likelihood that CyberGuard would never be paid for the software that was shipped to those resellers.

  **U.** **The GAAP Violations Committed By Defendants**

  231. All of the financial statements issued or audited by Defendants during the Class Period, including those set forth in the press releases, Forms 10-Q, Form 10-K and other SEC filings issued by the Company during the Class Period were materially misleading because they failed to comply with GAAP.

  232. Pursuant to SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)), financial statements that are filed with the SEC that do not comply with GAAP are presumed to be misleading and inaccurate.

  233. The most obvious manner in which the financial statements published by the Company during the Class Period failed to comply with GAAP concerned the manner in which Defendants accounted for CyberGuard's revenues.

  234. GAAP provides that revenue should not be recognized until an exchange has occurred, the earnings process is complete, and the collection of the sales price is reasonably

assured. Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts ("Concepts Statement") No. 5, ¶ 83; Accounting Principles Board Opinion No. 10, ¶ 12. The conditions for revenue recognition ordinarily are met when products and services are exchanged for cash or claims to cash and when the entity had substantially performed the obligations that entitle it to the benefits represented by the revenue.

235.    As is specifically alleged above, those preconditions for revenue recognition were not met with respect to the revenues recognized by the Company during each of the fiscal years and fiscal quarters of the Class Period.

236.    The financial statements published by Defendants during the Class Period also materially overstated the Company's accounts receivable, and, therefore, CyberGuard's current assets and total assets.

237.    The CyberGuard Defendants have acknowledged in several publications, including the August 25, 1998 edition of the <u>Fort Lauderdale Sun-Sentinel</u>, that "slow payments from customers" created a severe liquidity problem at CyberGuard.

238.    Despite those slow payments, however, Defendants never increased the Company's accounts receivable reserve to account for the fact that payments that were left outstanding over extended periods of time were much less likely to be paid at all than accounts that were paid off rapidly. The likelihood that the Company would be unable to collect those payments was particularly strong because of the financial problems that CyberGuard's resellers experienced during the Class Period.

239.    GAAP provides that financial statements should recognize and report a charge to income when: (i) information existing at the date of the financial statements indicates that it is probable (<u>i.e.</u>, a likely chance) that an asset had been impaired or a liability had been incurred; and (ii) the amount of such loss can be reasonably estimated. FASB's Statement of

Financial Accounting Standards ("SFAS"), No. 5, ¶ 8.  Furthermore, when condition "(i)" above has been met and a range of loss can be reasonably estimated but no single amount within the range is a better estimate than any other amount, the minimum amount should be charged against income.  FASB Interpretation No. 14.

240.    Furthermore, when both conditions "(i)" and "(ii)" specified in paragraph 239 are not met, but it is at least reasonably possible (i.e., a greater than slight but less than likely chance) that a loss has been incurred, the financial statements should disclose the nature of the contingency and estimate the possible loss or range of loss or state that such estimate cannot be made.  SFAS, No. 5, ¶ 10.

241.    Because CyberGuard shipped millions of dollars worth of software to the Company's resellers during the Class Period without obtaining any commitment of payment, the foregoing GAAP provisions demanded: (a) that Defendants record a substantial charge on the Company's financial statements to account for the likelihood that CyberGuard would never be paid for those goods; or (b) at minimum, that Defendants disclose the fact that it was reasonably possible that CyberGuard would be unable to collect a substantial portion of the accounts receivable that were reflected on the Company's financial statements and that the Company would therefore be forced to record a loss related to those receivables.

242.    By virtue of the foregoing misconduct, Defendants presented CyberGuard's financial statements for each of the financial reporting periods during the Class Period in a manner that violated at least the following provisions of GAAP:

a.    the principle that financial reporting should provide information that is useful to present to potential investors and creditors and other users to assist them in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

-93-

b.      the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

c.      the principle that financial reporting should provide material information about an enterprise's financial performance during a reporting period (Concepts Statement No. 1, ¶ 42);

d.      the principle that financial reporting should be reliable, i.e., that it should represent what it purports to represent (Concepts Statement No. 2, ¶¶ 58-59);

e.      the principle of completeness, which mandates that nothing should be left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79);

f.      the principle that conservatism should be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (Concepts Statement No. 2, ¶¶ 95, 97); and

g.      the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners for the use of enterprise resources entrusted to them, particularly with respect to a publicly-traded companies (FASB Statement of Concepts No. 1, ¶ 50).

# VI.

## THE BELATED AND GRADUAL REVELATION OF CYBERGUARD'S TROUBLED FINANCIAL STATUS

### A.   Defendants' Initial Announcement Of Their Accounting Fraud

243.   At least as early as August 19, 1998, KPMG determined during the course of its annual audit of CyberGuard's financial statements that Defendants' accounting fraud could no longer be concealed.

244.   As a result, KPMG met with CyberGuard's Audit Committee on August 19, 1998 to discuss the Company's software revenue recognition policies and the possibility of disclosing Defendants' fraud.

245.   During the course of that meeting, the members of the Audit Committee informed KPMG that the Audit Committee agreed with KPMG's assessment that the Company's management had engaged in fraudulent accounting practices and that the Company needed to restate its financial results for the first three quarters of fiscal 1998.

246.   By the time of that meeting, KPMG had devised a strategy, after consultation with its legal counsel, to distance itself from the fraudulent accounting practices that had been employed at the Company under KPMG's watch.  As part of that strategy, KPMG wrote to the Board on August 21 to resign as the Company's auditors.

247.   In a Form 8-K periodic report that was filed with the SEC on or about August 28, 1998 (the "August 1998 8-K"), CyberGuard described the circumstances surrounding KPMG's announcement of its decision to terminate its relationship with the Company as follows:

> On August 21, 1998, KPMG Peat Marwick LLP (the "Accountant"), the Company's independent public accounting firm resigned, effective immediately.  A copy of the Accountant's letter of resignation is attached as Exhibit 99.

The Accountant's reports on the financial statements for the Company for the past two years did not contain any adverse opinion or disclaimer of opinion and such reports were not qualified or modified as to uncertainty, audit scope or accounting principles. The Accountant's resignation was not recommended or approved by the Company's Board of Directors or any committee thereof.

Despite the purported disagreement referenced in Exhibit 99, since June 30, 1996, the Company is not aware of any disagreements with the Accountant on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which, if not resolved to the satisfaction of the Accountant, would have caused the Accountant to make a reference thereto in its reports.

In its letter of resignation, the Accountant also advised the Company that it concluded that it could no longer rely on management's representations and that it is unwilling to be associated with the financial statements prepared by management.

The Accountant has declined to discuss the foregoing with the Board of Directors or any committee thereof.   The Company has authorized the Accountant to respond fully to the inquiries of any successor accountant concerning the subject matter of the foregoing.

248.    The August 21 KPMG resignation letter, which was copied to the Chief

Accountant of the SEC, stated:

We have a disagreement with management of the Company regarding the methodology used for software revenue recognition.

We hereby advise you that we have concluded that we can no longer rely on management's representations and KPMG is unwilling to be associated with the financial statements prepared by management.  Accordingly, effective immediately we are resigning as independent auditors for the Company.

We strongly recommend that the Company promptly consult with its legal counsel regarding any disclosure obligations it may have under the federal securities laws, or

otherwise, with respect to the Company's stated intent to restate certain of its quarterly financial statements.

249.   Three days after KPMG's resignation, CyberGuard issued a press release on August 24, 1998 in which it conceded that the CyberGuard Defendants had vastly overstated the Company's revenues and related financial results for the third fiscal quarter of 1998.

250.   The August 24 press release stated:

> CyberGuard Corporation's . . . Audit Committee today announced that due to a review of its revenue recognition policies relating to distributors and resellers, the Company will restate financial results for its third fiscal quarter ended March 31, 1998.

251.   The press release continued:

> CyberGuard currently estimates that the magnitude of the restatement is in the order of $2.5 million.  It is expected that most of this restatement will be reflected in the third fiscal quarter results, but there is a possibility that some portion of this amount would be reflected in a restatement of the first and/or second fiscal quarter.  Expectations for fourth fiscal quarter revenue will also be impacted negatively due to the application of these software revenue recognition policies related to distributors and resellers.
>
> The Company today also announced that a Special Committee consisting of its four outside directors has assumed executive control of the Company.  Mr. Shelly James has been appointed Chairman of this Committee and has been named acting Chairman of the Board of Directors.  In addition, the Company announced that Mr. Robert Carberry, chairman and chief executive officer, and Mr. Bill Murray, chief financial officer, have been temporarily suspended from management pending the completion of the Special Committee's review, and that Mr. Brad Lesher, vice president of international sales, has announced his retirement.

252.   The August 24 press release also contained as ominous disclosure concerning CyberGuard's prospects for survival.  CyberGuard stated that it was "seeking an additional source of capital for the Company's operations" because "[s]low payments from customers

(principally Asian) and the recent events described above have placed significant pressures on the Company's liquidity."

253.   Unsurprisingly, investors reacted to the belated revelation of Defendants' fraud by rushing to sell their CyberGuard stock.

254.   As a result, CyberGuard's stock price dropped from $6.1875 per share to close at $1.875 per share on August 24, a one-day decline of approximately 70%.  During that collapse in the Company's market value, over 5 million CyberGuard shares traded hands, a total that was approximately 30 times the daily average volume.

255.   The $1.875 per share closing price on August 24 represented a decrease of $16, or 90%, from the high trading price of $17.875 per share achieved by CyberGuard during the Class Period as a result of Defendants' false representations and omissions.

**B.      CyberGuard's Ongoing Negotiations With KPMG Regarding The Restatement Of The Company's Financial Results**

256.   In the aftermath of CyberGuard's announcement of Defendants' accounting fraud, the Board continued to negotiate with KPMG regarding the terms pursuant to which KPMG would assist the Company in restating its financial statements.

257.   KPMG had determined, however, that it should not involve itself in the efforts to report CyberGuard's actual financial results.  Accordingly, KPMG refused to assist CyberGuard in preparing the financial statements that CyberGuard was required to file with the SEC in order to maintain its listing on NASDAQ.

258.   As a result, KPMG wrote to the SEC on September 30, 1998 to report its resignation as the Company's auditor.  In that letter, KPMG stated:

> We were previously principal accountants for CyberGuard Corporation . . . On August 21, 1998, we resigned as principal accountants.  We have read CyberGuard Corporation's statements  included under Item 4 of its Form 8-K dated August

21, 1998, and we agree with such statements except we are not
in a position to agree or disagree with CyberGuard
Corporation's statement that our resignation was not
recommended or approved by their Board of Directors or any
committee thereof.  Further, we refer you to our comments
related to a disagreement with management of the Company and
our inability to rely on management's representations included in
our letter to the Chairman of the Audit Committee dated August
21, 1998 and copied to the Chief Accountant, Securities and
Exchange Commission.

259.    After receiving a copy of that letter, CyberGuard again described the

circumstances that led to KPMG's resignation as the Company's auditor in a Form 8-K/A

periodic report that the Company filed with the SEC on or about November 4, 1998 (the

"November 1998 8-K").  In that document, CyberGuard stated:

On August 21, 1998, KPMG Peat Marwick LLP
("KPMG"), the Company's independent public accounting firm,
resigned effective immediately.  In KPMG's letter of
resignation, KPMG stated that it had "a disagreement with
management of the Company regarding the methodology used
for software revenue recognition."  In its letter of resignation,
KPMG also advised the Company that it concluded that it could
no longer rely on management's representations and that it was
unwilling to be associated with the financial statements prepared
by management.

On August 19, 1998, two days before KPMG's
resignation, the Company's Audit Committee met with KPMG
to discuss the Company's software revenue recognition policies
and KPMG's concerns about the quality of the financial
information which had been presented by management to the
Audit Committee and to KPMG.  During that meeting, the
Audit Committee advised KPMG that the Audit Committee (and
not management) had the exclusive decision-making authority
and duties with respect to the Company's financial statements.
The Audit Committee advised KPMG that it agreed with KPMG
as to KPMG's preliminary assessment of these matters and
discussed the steps that should be implemented to resolve these
issues, including a restatement of the Company's interim
financial statements.

260.   The November 1998 8-K also included a revised version of the letter that KPMG had sent to the SEC on September 30, 1998.  That letter, which was dated November 3, 1998, repeated most of the statements in the September 30 letter.  The November 3 letter also included the unusual declaration that KPMG had read the statements made by the Company in the November 1998 8-K and that it "agree[d] with such statements except we are not in a position to agree or disagree with CyberGuard Corporation's statement that our resignation was not recommended or approved by their Board of Directors or any committee thereof."

261.   The September 30 KPMG letter did include the following sentence that was omitted from the November 3 document:

> Further, we refer you to our comments related to a disagreement with management of the Company and our inability to rely on management's representations included in our letter to the Chairman of the Audit Committee dated August 21, 1998 and copied to the Chief Accountant, Securities and Exchange Commission.

## C.   CyberGuard's Second Round Of Revelations Concerning Its Financial Disarray

262.   On January 13, 1999, CyberGuard finally released preliminary financial results for the fiscal year ended June 30, 1998.  The results were not audited, however.  CyberGuard claimed that the results were not audited because KPMG refused to reissue its audit opinions with respect to CyberGuard's 1996 and 1997 fiscal years because of its inability to rely upon the representations previously made to KPMG by the Company's management.

263.   In the January 13, 1999 press release concerning those preliminary results, CyberGuard stated that the Company had suffered a loss of $15,523,000, or $1.84 per share, for the 1998 fiscal year on revenues of only $14,180,000.  Those results were significantly

worse than the loss of $12,490,000, or $1.76 per share, that CyberGuard had reported for the 1997 fiscal year on revenues of $15,621,000.

264.    The January 13 press release also revealed that CyberGuard remained an extremely troubled company. In particular, the press release stated:

> The filing of the Company's Form 10-K for fiscal year 1998 continues to be postponed. The filing of the Form 10-K requires that the former accountants, KPMG Peat Marwick, include their reissued opinion for fiscal years ended June 30, 1997 and 1996. The Company is currently exploring the alternatives available to expeditiously complete this process.

265.    The Company's inability to obtain clean audit opinions from KPMG for the 1997 and 1996 fiscal years was no small matter to CyberGuard shareholders. As the Company conceded in the January 13 press release, because it could not complete its SEC Forms 10-K or 10-Q until KPMG signed off on the prior years' financial statements, the Company's stock was "delisted from the NASDAQ Stock Market, effective close of business January 12, 1999."

266.    The January 13 press release further revealed that, even four months after the close of the Company's first fiscal quarter of 1999 on September 30, 1998, the Company was unable to report official results for the quarter. Similarly, the January 13 press release conceded that the Company was unable to release official results for the quarter ended December 31, 1998.

267.    To date, CyberGuard's stock has not been re-listed on NASDAQ. As a result, CyberGuard shareholders are, for all practical purposes, prevented from selling any substantial number of the Company's shares because there is no established market in which CyberGuard stock trades.

268.    The January 13 press release also demonstrated that CyberGuard's previous representations concerning the scope of Defendants' fraud were materially misleading.

269.    In particular, CyberGuard stated in the January 13 press release that, while it had represented on August 24, 1998 that the total amount of the restatement of CyberGuard's revenues for the first three quarters of fiscal 1998 would amount to only $2.5 million, the actual amount of that restatement was $3,807,000, or 52.3% more than originally claimed.

270.    According to the CyberGuard press release, the additional reductions in the Company's previously reported revenues "relate principally to international transactions, certain end user revenues and an analysis of the proper timing for recording service revenue."

271.    The January 13 press release also cryptically stated that the additional reductions "were a result of an oversight or misuse of the facts in applying the Company's revenue recognition policy."

272.    The January 13, 1999 press release also specifically described the amounts by which CyberGuard had overstated its revenues during the first three fiscal quarters of 1998. CyberGuard acknowledged the following overstatements:

| Quarter Ended | Reported Revenue | Actual Revenue | Amount of Overstatement | % Overstatement |
|---|---|---|---|---|
| 9/30/97 | 5,063,000 | 3,433,000 | 1,630,000 | 47.5% |
| 12/31/97 | 4,854,000 | 3,890,000 | 964,000 | 24.8% |
| 3/31/98 | 5,152,000 | 3,939,000 | 1,213,000 | 30.8% |
| **TOTALS** | 15,069,000 | 11,262,000 | 3,807,000 | 33.8% |

### D.   CyberGuard's Third Round Of Revelations Concerning The Company's Financial Disarray: The Release Of Restated Results For The 1997 And 1998 Fiscal Years

273.   Over six months after CyberGuard released the January 13, 1997 press release concerning the Company's restated financial results for 1998, the Company issued a July 26, 1999 press release that revealed that the Defendants had no reasonable basis for any of their representations concerning the Company's financial results.

274.   In the July 26 press release, CyberGuard announced restated financial results for all of fiscal year 1997 and the first three quarters of fiscal 1998.

275.   The July 26 press release reported that, for the 1997 fiscal year, CyberGuard had generated a loss of $17,442,000, or $2.46 per share, on revenues of $14,224,000. Those results were substantially worse than those earlier reported by Defendants — a net loss of $12,490,000, or $1.76 per share, on revenues of $15,621,000.

276.   With respect to the 1998 fiscal year, CyberGuard announced that the Company had suffered a net loss of $18,264,000, or $2.17 per share, on revenues of $15,552,000.

277.   In the July 26 press release, CyberGuard also acknowledged the amounts by which Defendants had overstated  the Company's financial results during each of the four quarters of the 1997 fiscal year and the first three quarters of the 1998 fiscal year.

278.   For fiscal 1997, the July 26 press release acknowledged the following quarterly overstatements of revenues:

| Quarter Ended | Reported Revenue | Actual Revenue | Amount of Overstatement | % Overstatement |
|---------------|------------------|----------------|-------------------------|-----------------|
| 9/30/96 | 3,067,000 | 2,610,000 | 457,000 | 21.16% |
| 12/31/96 | 3,047,000 | 2,658,000 | 389,000 | 14.64% |
| 3/31/97 | 4,105,000 | 4,053,000 | 52,000 | 1.28% |
| 6/30/97 | 5,402,000 | 4,903,000 | 499,000 | 10.18% |
| **TOTALS** | 15,621,000 | 14,224,000 | 1,397,000 | 9.82% |

279.   For fiscal 1998, CyberGuard acknowledged the following overstatements of revenues:

| Quarter Ended | Reported Revenue | Actual Revenue | Amount of Overstatement | % Overstatement |
|---------------|------------------|----------------|-------------------------|-----------------|
| 9/30/97 | 5,063,000 | 4,173,000 | 890,000 | 21.33% |
| 12/31/97 | 4,854,000 | 4,185,000 | 669,000 | 15.99% |
| 3/31/98 | 5,152,000 | 4,516,000 | 636,000 | 14.08% |
| **TOTALS** | 15,069,000 | 12,874,000 | 2,195,000 | 17.05% |

280.   Thus, the July 26 press release conceded that, during the Class Period, Defendants overstated the Company's revenues by a total amount of $3,592,000, or 13.26%. The restatement announced in the July 26 press release therefore: (a) was slightly less than the $3,807,000 restatement of revenues announced by the Company on January 13; and (b) covered an additional year not addressed in the January 13 press release.

281.   On July 30, 1999, the Company finally filed the Company's financial statements for the 1997 and 1998 fiscal years with the SEC as part of the July 1999 8-K.

282.   The restated financial results set forth in the July 1999 8-K conformed to those announced by the Company in its July 26, 1999 press release.

-104-

## VII.

## ADDITIONAL FACTS AND CIRCUMSTANCES THAT DEMONSTRATE THAT THE CYBERGUARD DEFENDANTS ACTED WITH SCIENTER

283.   The CyberGuard Defendants made the misrepresentations and omissions concerning then-existing facts complained of herein with scienter in that they knew or recklessly disregarded that their representations concerning the Company were materially false and misleading when made.

284.   With respect to any forward-looking misrepresentations or omissions alleged herein, the CyberGuard Defendants made such misrepresentations or omissions with knowledge that their statements were materially false.  The facts alleged in the following paragraphs, among others, strongly support the conclusion that the CyberGuard Defendants acted with scienter.

### A.   The CyberGuard Defendants Possessed Substantial Motives To Commit The Fraudulent Acts Alleged Herein

285.   Each of the CyberGuard Defendants possessed substantial motives for misrepresenting CyberGuard's financial results and the status of the Company's operations and future prospects throughout the Class Period.

#### (1)   The CyberGuard Defendants Were Motivated To Mislead Investors Concerning The Company's Business And Operations By CyberGuard's Need To Attract Additional Investment Capital

286.   One obvious motive that the CyberGuard Defendants possessed during the Class Period for engaging in the fraudulent conduct alleged by Plaintiffs was that the Company was engaged in a constant struggle to raise sufficient capital to fund its money-losing operations.

287.    At all material times, the CyberGuard Defendants were aware that the Company was not capable of producing profitable results until such time as it significantly increased its revenues as a result of CyberGuard's high level of fixed costs.

288.    Accordingly, the CyberGuard Defendants sought throughout the Class Period to sell the Company's assets and common stock in order to fund the Company's expenses until such time as CyberGuard could build a sufficiently large revenue stream to produce profitable results.

289.    In order to achieve the objective of continuing to attract investor capital, the CyberGuard Defendants attempted to convince investors that the Company was producing increased revenues and enjoying increased market acceptance of its products.

290.    The CyberGuard Defendants were faced with the need to attract additional capital from the first days of the Company's existence as a corporate entity.

291.    The entity that eventually became CyberGuard was created in August of 1994 when Harris Corporation ("Harris") created a separate corporate entity to consolidate its computer systems division's real-time and trusted computer businesses.

292.    On October 7, 1994, Harris spun off the predecessor corporation of CyberGuard, Harris Computer Systems Corp. ("Harris Computer"), to Harris's shareholders.

293.    After that spin-off, Harris Computer funded the money-losing operations of its network security products business with the profits derived by the company's real-time computer business.

294.    Eventually, however, Harris Computer's executives determined that the real-time business and the network security business should be separated. Accordingly, in anticipation of the sale of the Harris Computer's real-time computer business, that business

-106-

and Harris Computer's network security products business (what is now CyberGuard) were separated into two units in May of 1995.

295.    In June of 1996, the plan to separate the real-time and network security businesses came to fruition when Harris Computer sold its real-time business to Concurrent Computer Corp. ("Concurrent") in exchange for 10 million shares of Concurrent common stock and 1 million shares of Concurrent convertible preferred stock. Thereafter, Harris Computer changed its name to CyberGuard.

296.    After the sale of the real-time business, however, CyberGuard was faced with the need to fund its money-losing network security products business. As a result, the Company was repeatedly forced to seek out additional sources of capital.

297.    Initially, the Company sold 2 million shares of the Concurrent stock that it acquired in connection with the sale of the real-time business for proceeds of $3.4 million.

298.    That sale was merely a short-term solution to CyberGuard's cash needs. At the time of the sale of the real-time computer business, CyberGuard intended to raise the capital necessary to fund the Company's operations by conducting a public offering of CyberGuard common stock. In preparation for that public offering, the Company incurred approximately $1 million in expenses.

299.    After expending that much-needed capital, however, unfavorable market conditions forced the Company to cancel the public offering in August of 1996.

300.    CyberGuard was therefore forced in August of 1996 to undertake desperate measures to finance the Company's operations. According to the Form 8-K that the Company filed with the SEC on or about August 22, 1996 (the "August 1996 8-K"), CyberGuard sold 7.9 million shares of the Concurrent common stock received in connection with the sale of the real-time business between August 8, 1996 and August 21, 1996 for a

-107-

price of only $7.9 million.  As a result of those sales, CyberGuard held only 31,700 shares of Concurrent common stock as of the time the August 1996 8-K was filed.

301.    Throughout the remainder of 1996 and the first half of 1997, the CyberGuard Defendants funded the Company's money-losing operations with the proceeds of the sale of that Concurrent stock.

302.    By May of 1997, however, the Company had expended the vast majority of the proceeds of its sale of Concurrent stock.  As a result, the CyberGuard Defendants were again forced to locate a source of investment capital to fund the Company's continuing losses.

303.    The result of that search was the Private Securities Subscription Agreement (the "Subscription Agreement") CyberGuard executed on May 15, 1997.

304.    The Subscription Agreement provided the CyberGuard Defendants with an ongoing motive to inflate the Company's stock price.

305.    As described by the CyberGuard Defendants in the Form S-3/A Registration Statement that the Company filed with the SEC on June 12, 1997 (the "June 1997 S-3") , pursuant to the Subscription Agreement:

> the Selling Shareholder agreed to purchase, and the Company agreed to sell, up to $7,500,000 (up to a maximum of 1,470,085) shares of Common Stock at a negotiated price based on the average per-share closing bid price as reported by Bloomberg, L.P. ("Closing Bid Price") over a period preceding a "call for proceeds" by the Company.  Pursuant to the Subscription Agreement, the Company either (i) must make a call for proceeds of at least $3,750,000 by May 14, 1998 and for all of the proceeds by November 15, 1998 or (ii) issue to the Selling Shareholder warrants with respect to a maximum of 170,000 shares of the Company's common stock at an exercise price equal to the market price of common stock on the target dates for these minimum calls.

306.   Thus, the number of shares that CyberGuard would be forced to issue under the terms of the Subscription Agreement was inversely proportional to the market price of the Company's stock.  As a result, the Subscription Agreement provided the CyberGuard Defendants with a substantial incentive to inflate the Company's stock price throughout the remainder of the Class Period.

307.   As the Company's losses continued to mount through November of 1997, thereby eating through the money raised pursuant to the Subscription Agreement, the CyberGuard Defendants concluded that the Company would either be required to sell itself or to obtain additional sources of revenue.

308.   As a result, as was reported in a press release issued by the Company on or about November 11, 1997, the CyberGuard Defendants caused the Company to engage SoundView Financial Group, Inc. ("SoundView") to act as the Company's financial advisor in connection with: (a) a potential sale of the Company; and (b) the Company's continuing efforts to raise additional financing.

309.   The CyberGuard Defendants were aware at the time that they engaged SoundView that SoundView's ability to arrange a sale of CyberGuard or additional financing was dependent upon the Company's reporting of continued revenue growth and strides toward profitability.

310.   Accordingly, as SoundView worked throughout the remainder of the Class Period to attract a potential purchaser for CyberGuard or to raise additional financing for the Company, the CyberGuard Defendants were aware that the revelation of the adverse facts alleged herein would eliminate any possibility of SoundView obtaining those objectives.

311.   At least as early as July 7, 1998, when CyberGuard filed a Form S-3 Registration Statement with the SEC, the Company had sold all of the shares that it was

permitted to sell pursuant to the Subscription Agreement, thereby raising $7.5 million in cash.

312.    Because CyberGuard's losses were continuing to accrue at that juncture, and SoundView had been unsuccessful in attracting a potential suitor for the Company, the CyberGuard Defendants were under increasing pressure during 1998 to find an additional source of financing for the Company.

313.    As the CyberGuard Defendants worked throughout 1998 to locate that additional source of financing, they were aware that the possibility of locating additional capital would be severely impaired, if not eliminated, if the Company did not continue to report improving financial results.

314.    The June 17, 1998 merger transaction between CyberGuard and ARCA Systems, Inc. ("Arca"), a privately-held computer security integration services firm, also provided the CyberGuard Defendants with a substantial motive to make misrepresentations concerning the Company's operations.

315.    As the CyberGuard Defendants stated in the Form 8-K periodic report that the Company filed with the SEC on June 23, 1998 (the "June 1998 8-K"):

> In connection with the [CyberGuard-Arca] Merger, (i) each of the 3,726,667 shares of ARCA common stock issued and outstanding immediately prior to the Merger was converted into the right to receive .11819 shares of [CyberGuard] Common Stock (rounded to the nearest thousandth of a share), subject to the payment of cash in lieu of fractional shares; (ii) each of the 76,130 shares of ARCA Series A preferred stock issued and outstanding immediately prior to the Merger was converted into the right to receive .54817 shares of [CyberGuard] Common Stock (rounded to the nearest thousandth of a share), subject to the payment of cash in lieu of fractional shares; (iii) each of the 515,000 shares of ARCA Series B preferred stock issued and outstanding immediately prior to the Merger was converted into the right to receive .19361 shares of [CyberGuard] Common Stock (rounded to the nearest thousandth of a share), subject to

the payment of cash in lieu of fractional shares; and (iv) certain loans, which aggregated approximately $113,000 with principal and interest, to ARCA from certain shareholders of ARCA were converted into and exchanged for 8,577 shares of [CyberGuard] Common Stock.  In the aggregate, approximately 590,429 shares of [CyberGuard's] Common Stock, constituting approximately 6.7% of its then-outstanding shares, were issued in the Merger with an additional 116,842 shares reserved for issuance pursuant to options outstanding under ARCA's 1988 Stock Option Plan which was assumed by [CyberGuard] in the Merger.

316.   Because the Arca transaction was a stock-for-stock merger, the number of CyberGuard shares that the CyberGuard Defendants had to agree to issue to Arca's shareholders in connection with the transaction was decreased by the fact that CyberGuard's stock price was inflated.

317.   In addition, the CyberGuard Defendants were aware that Arca's shareholders would not agree to accept CyberGuard stock in exchange for the Arca shareholders' interest in that company unless the CyberGuard Defendants created the false impression that CyberGuard was making significant steps towards profitability.

318.   The Arca transaction therefore provided the CyberGuard Defendants with additional incentive to mislead investors concerning the Company's business operations and financial performance.

319.   By the end of the Class Period, CyberGuard's need to attract additional financing had reached crisis status.  As James acknowledged in the August 25, 1998 edition of the *Fort Lauderdale Sun-Sentinel,* up until the time that CyberGuard announced its accounting fraud, "CyberGuard had been seeking additional capital for the company's operation" by means of a private placement transaction.

-111-

320.    James also conceded during the course of a January 14, 1999 conference call with investors that the Company had been attempting to raise $5 million in cash by means of that private placement.

321.    The strength of the CyberGuard Defendants' motive to conceal the Company's deteriorating financial condition is also demonstrated by the numerous steps that the Company had to take to avoid a bankruptcy filing once Defendants' accounting fraud was belatedly disclosed.

322.    As James conceded following the disclosure of Defendants' fraud, by August of 1998, CyberGuard was in the midst of a "liquidity crisis" or, as James stated during the course of the January 14, 1999 conference call, "a very difficult cash flow situation."

323.    James also conceded that CyberGuard's inability to complete the private placement that was being negotiated at the time that Defendants' accounting fraud was disclosed forced the Company to "sell[] certain assets and enter[] into a private placement so that between September and December we raised approximately $6 million which got us through the worst of that liquidity problem."

324.    The transactions to which James referred included a deal announced on September 14, 1998 whereby CyberGuard sold its Galaxy Internet search engine to America's Health Network for $2 million.

325.    CyberGuard announced another transaction designed to raise much-needed capital for the Company on October 5, 1998. At that time, the Company revealed that it had sold its interest in the recently-acquired Arca business to Exodus Communications Inc. for $3.4 million in cash.

326.    As CyberGuard eventually clarified in the July 1999 8-K, by virtue of the Arca sale, CyberGuard received approximately $3,261,000, the return of the 590,429 shares

of the Company's stock that CyberGuard had issued to former Arca shareholders in connection with the Company's purchase of Arca in June of 1998 and "the release of any potential legal claims the Arca shareholders might have had against the Company."

327.   According to the July 1999 8-K, the sale of Arca

> resulted in a settlement loss that was recorded in the fourth quarter of fiscal 1998 of [$2,386,000] which was determined based on the Company's investment in and advances to Arca less the [$3,261,000] cash received and the 590,429 shares of common stock at its fair value using its quoted market value on the return date.

328.   The desperate state of CyberGuard's finances was further demonstrated by a transaction disclosed by the Company in a press release issued on December 24, 1998.  That transaction called for CyberGuard to issue convertible debt in the face amount of $1.125 million to what was identified as "a private investment group."

329.   In order to obtain that financing, the Company was forced to offer the "private investment group" considerable concessions.  In addition to paying interest to the debt holders at 200 basis points above prime, the investors were provided with the ability to convert their debt into 750,000 shares of CyberGuard common stock at a conversion price of $1.50 and with 500,000 warrants to purchase the Company's stock at a price of $2.00.

### (2)   The Terms Of The Compensation Agreements Of Carberry, Murray And Wheeler Provided Them With Additional Motive To Commit Fraud

330.   The manner in which the Individual Defendants were compensated provided them with further incentive to create the misleading impression that CyberGuard was operating successfully.

331.   According to the Proxy Statement filed by the Company with the SEC on or about November 5, 1997 (the "November 1997 Proxy"), Carberry's annual bonus from

CyberGuard and his receipt of additional stock options as compensation were directly linked to "Carberry's meeting the Company's revenue, income and production targets and in providing the organization and strategy for enhancing shareholder value in the future." Accordingly, Carberry's financial interests were directly served by inflating the Company's revenues and earnings.

332.   Murray and Wheeler were also provided with motive to inflate the Company's financial results by the fact that, according to the December 1997 Proxy, their annual bonuses were "based upon certain Company performance targets."

333.   The manner in which the Individual Defendants were compensated in the event that they were successful in locating a purchaser or merger partner for the Company provided with them with additional incentive to engage in the fraudulent acts alleged by Plaintiffs.

334.   First, the Individual Defendants were entitled to substantial severance pay in the event that they were terminated in the aftermath of a merger or sale of CyberGuard.

335.   Under Carberry's employment agreement, he was entitled to receive severance pay equal to three times his annual salary plus three times his "target bonus" of 50% of that salary in the event that he was terminated within one year following a "change in control" over CyberGuard.

336.   Like Carberry, Wheeler's compensation agreement with the Company called for him to receive substantial salary, bonus and other compensation immediately upon his termination as an officer of the Company as a result of a "change of control" transaction. Specifically, Wheeler's compensation agreement called for him to receive two times his annual salary and two times his annual "target bonus" of 40% of his salary in the event a change of control took place.

-114-

337.   In addition to that severance pay, the Individual Defendants' compensation agreements provided them with significant option-related benefits in the event that they were successful in attracting a purchaser or merger partner for CyberGuard.

338.   According to the November 1997 Proxy, defendant Carberry had been awarded 439,000 stock options by the Company in the 1996 and 1997 fiscal years. Of those options, 326,000 were not exercisable as of November 5, 1997. An additional 113,000 became exercisable on March 5, 1998.

339.   Similarly, a significant portion of defendant Wheeler's compensation was paid in the form of options to purchase CyberGuard stock. According to the November 1997 Proxy, however, 50,000 of the 78,000 options owned by Wheeler were not exercisable.

340.   The November 1997 Proxy also revealed that, in the event that the Company entered any "change of control" transaction, all options held by the Company's executives became immediately exercisable.

341.   The CyberGuard Defendants were aware throughout the Class Period that the possibility of attracting a purchaser or merger partner for the Company would be reduced, if not eliminated, if CyberGuard's true financial performance were disclosed to investors. Thus, the fact that Carberry and Wheeler could unlock the value of their substantial unexercisable stock options only by attracting a purchaser or merger partner for CyberGuard provided them with strong incentive to misrepresent the Company's financial status.

### (3)   Defendant James' Insider Selling Provided Him With A Substantial Motive For His Fraudulent Conduct

342.   The substantial insider selling engaged in by defendant James provided him with a powerful motive to conceal the adverse factors impacting CyberGuard's operations during the Class Period.

343.   The following chart demonstrates the insider selling engaged in by James during the Class Period:

| Date Of Sale | # Of Shares | Price Per Share ($) | Total Proceeds ($) |
|---|---|---|---|
| 11/30/96 | 1500 | 11.09 | 16,635 |
| 11/30/96 | 3000 | 10.80 | 32,400 |
| 11/30/96 | 6000 | 11.05 | 66,300 |
| 11/30/96 | 7200 | 10.47 | 75,384 |
| 11/30/96 | 20,800 | 11.15 | 231,920 |
| 12/3/96 | 26,000 | 13.42 | 348,920 |
| 12/4/96 | 10,000 | 11.74 | 117,400 |
| 12/5/96 | 15,000 | 12.70 | 190,500 |
| 12/10/96 | 11,900 | 14.08 | 167,552 |
| 11/17/97 | 1000 | 7.93 | 7,930 |
| 11/21/97 | 8400 | 7.49 | 62,916 |
| 11/24/97 | 10,700 | 7.32 | 78,324 |
| 11/26/97 | 29,900 | 6.36 | 190,164 |
| 11/28/97 | 20,000 | 6.01 | 120,200 |
| 2/11/98 | 4,500 | 6.45 | 29,025 |

| 2/11/98 | 1600 | 6.43 | 10,288 |
|---------|------|------|--------|
| 2/12/98 | 2300 | 6.43 | 14,789 |
| 2/23/98 | 15,000 | 8.51 | 127,650 |
| 5/1/98 | 7,800 | 15.08 | 117,624 |
| 5/6/98 | 20,000 | 13.30 | 266,000 |
| 5/11/98 | 5000 | 14.24 | 71,200 |
| 5/15/98 | 8000 | 14.00 | 112,000 |
| 5/19/98 | 400 | 13.72 | 5,488 |
| 5/20/98 | 1000 | 12.50 | 12,500 |
| 5/20/98 | 3500 | 12.85 | 44,975 |
| **TOTALS** | 240,500 | | $2,518,084 |

344.   Each of James's sales of CyberGuard stock was made within a few weeks —
and often as little as a few days — after the Company announced purportedly "improved" or
"record" results.

345.   Moreover, James's trades reduced his previously substantial ownership interest
in CyberGuard to zero prior to the announcement of Defendants' accounting fraud, which
occurred under James's watch as the Chairman of the Company's Audit Committee.  As a
result, James was the biggest beneficiary of the fraud perpetrated at CyberGuard during the
Class Period.

346.   James's insider trading was therefore significant in amount and unusual in timing.  That insider trading provides significant support for the conclusion that James acted with scienter.

### B.     The Extensive Experience Of The Individual Defendants

347.   As was revealed in CyberGuard's public filings during the Class Period, each of the Individual Defendants was a sophisticated businessman who possessed the wherewithal and access to information necessary to understand: (a) the significance of the adverse business developments that impacted the Company's operations during the Class Period; and (b) the fact that the accounting methods utilized by Defendants were patently improper.

#### (1)     Defendant Carberry

348.   Carberry was appointed Chairman, President and Chief Executive Officer of CyberGuard Corporation in June 1996.  Carberry joined CyberGuard as the President of the Company's Trusted Systems Division in March 1996.

349.   Carberry also had extensive experience in the computer industry and as an executive of publicly-traded companies before assuming his positions at CyberGuard.

350.   Carberry served as Vice President for New Technology at the Blockbuster/Viacom Group and Vice President, Managing Executive for Blockbuster Technology Holding Corporation.  Prior to working for Blockbuster, Carberry served in a number of positions with International Business Machines Corp., including: (a) President of Multimedia Investment Organization, a division of IBM; (b) Vice President Technology/Business Development for the Personal Computer Division; (c) Director of the Large Systems Programming Laboratory; and (d) IBM Corporate Director of Technology.

### (2)     Defendant Murray

351.    Defendant Murray was a partner at the accounting firm Arthur Andersen & Co., where he worked for eleven years.  In addition, before he began to work as CyberGuard's CFO and Vice President of Finance, Murray was CFO of Networks Inc., a CyberGuard reseller partner.

352.    Furthermore, as the 8-K periodic report that CyberGuard filed with the SEC on November 20, 1997 stated, before joining CyberGuard, Murray had "27 years of experience as a financial executive and in public accounting including as a partner at Arthur Andersen & Company."

### (3)     Defendant Wheeler

353.    As the November 1997 Proxy revealed, defendant Wheeler was a financial sophisticate.

354.    Wheeler was the Company's CFO or acting CFO between April 1996 and November 1997.  Prior to assuming those positions, Wheeler "held various financial and sales positions of increasing responsibility with the Company including Midwest Regional Sales Manager, Director of Accounting and Senior Account Manager."

355.    In addition, before starting his employment with CyberGuard, Wheeler was employed by the national accounting firm Price Waterhouse L.L.P.

### (4)     Defendant James

356.    James has served as Chief Executive Officer of Elcotel, Inc., a public company that manufactures telecommunications equipment, since May of 1991.  In addition, James is the Chairman of that company.

357.    James is also President of Fundamental Management Corporation, an investment management firm specializing in active investment in small capitalization

companies. James was also Executive Vice President of Fundamental from 1990 until April 1993.

358.   Before 1990, James was Executive Vice President of Gould, Inc., a diversified electronics company, and President of Gould's Computer Systems Division.

359.   In addition to the foregoing positions, James serves on the boards of directors of Concurrent Computer Corporation, CSPI, NAI Technologies, Inc., Group Long Distance, Fundamental Management Corporation and SK Technologies, Inc.

### C.   The Individual Defendants' Access To The Adverse Information Concerning CyberGuard's Operations

360.   The conclusion that the CyberGuard Defendants acted with scienter is also supported by the fact that the Individual Defendants were provided with complete access to all of the adverse information concerning CyberGuard's operations that is alleged herein as a result of their status as the Company's highest ranking executives.

361.   Defendants were provided with such adverse, material information by means of, inter alia, their access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), regular communications with other officers and employees at CyberGuard, attendance at meetings of the management and Board of CyberGuard and committees thereof, and via reports and other information provided to them in connection therewith.

### D.    The CyberGuard Defendants Have Publicly And Repeatedly Admitted Facts That Demonstrate That They Acted With Scienter

362.    Perhaps the most compelling evidence that the CyberGuard Defendants' misrepresentations and omissions were made with scienter are <u>CyberGuard's own admissions</u> that the Company engaged in improper accounting during the Class Period.

363.    For example, according to an August 25, 1998 article in the <u>Fort Lauderdale Sun-Sentinel</u>, James acknowledged that CyberGuard was forced to restate its financial results because CyberGuard improperly recorded revenue when it shipped software products to distributors and resellers who were primarily located in Asia, where approximately 30% of the Company's sales were generated.

364.    Similarly, the August 31, 1998 edition of <u>Computer Reseller News</u> stated:

> [CyberGuard] had been recognizing revenue from distributor and reseller partners, including several new partners in Asia, when those partners purchased products from the company, according to Lisa Thornhill, a CyberGuard spokeswoman. CyberGuard, however, had not been receiving payment from its channel partners until they sold the products to their own customers, she said.

365.    And the August 25, 1998 edition of <u>The Miami Herald</u> likewise stated:

> CyberGuard spokeswoman Lisa Thornhill said Peat Marwick expressed concern about CyberGuard's policy of booking revenues on shipments to Asian distributors who weren't paying for the product.
>
> "We would sell to the resellers and recognize the revenue, and they were not paying us until they sold it the end user," she said.

366.    Defendant James also acknowledged Defendants' accounting fraud during the course of a January 14, 1999 conference call that was held to discuss the Company's financial status. According to James:

> What started to happen — and did happen — we started to sign up a number of resellers and they would sign a Master PO [purchase order] and we would issue them an invoice but there were contingencies that they did not actually have to actually make payment until they sold through and so that was actually the issue that we have.

367.   During the same conference call, James admitted that much of the $3,807,000 in revenue that CyberGuard then believed it would have to restate was not merely moved from one accounting period to a later accounting period because of premature recognition. Rather, as James was forced to concede, the vast majority of that revenue would never be generated by CyberGuard.

368.   In response to a question as to whether any of the $3,807,000 in revenue would be recaptured by CyberGuard, James and CyberGuard's current CFO Terry Zielinski stated that the Company: (a) would probably recapture $1 million in product sales at some point in time; and (b) would probably recapture $300,000 to 400,000 of deferred maintenance revenues "over the next 16 to 24 months."

369.   According to Zielinski, however, "The remainder has probably disappeared." Thus, at least $2.4 million of the purported "revenues" that Defendants claimed were generated by CyberGuard during the Class Period were not only recognized in inappropriate accounting periods but will never be realized by the Company at all.

### E.   The CyberGuard Defendants' Fraudulent Acts Have Been Confirmed By CyberGuard Employees

370.   The conclusion that the CyberGuard Defendants' material misrepresentations and omissions were made with scienter is fully confirmed by the statements of former CyberGuard employees.

-122-

371.   In particular, one former CyberGuard accountant, Benito Jiminez, has verified that he spoke with CyberGuard Controller Steven S. Gallers on multiple occasions regarding CyberGuard's improper revenue recognition practices.

372.   In response to Jiminez's criticisms, Gallers told Jiminez to "keep quiet" regarding the Company's accounting practices and warned that Jiminez should not "bite the hand that feeds" him.  When Jiminez continued to complain regarding CyberGuard's improper revenue recognition practices, he was moved to an office isolated from other CyberGuard employees.

373.   Jiminez has identified the following improper accounting practices that were employed by CyberGuard during the Class Period:

   a.      The Company frequently booked revenues upon the receipt of oral sales order from customers.  As a result, the Company violated the GAAP rule that revenues may only be recognized upon shipment of products.

   b.      CyberGuard frequently recorded revenues although the CyberGuard Defendants were aware that particular sales would not actually be consummated or that products that had been shipped were going to be returned to the Company.

   c.      In accounting for installment sales contracts and annual maintenance agreements, CyberGuard failed to recognize revenue in the appropriate quarters.  Rather, the Company recognized a disproportionate percentage of the revenue attributable to installment sales contracts and annual maintenance agreements in earlier quarters in order to create the perception that the Company's revenues were increasing.

   d.      CyberGuard repeatedly recorded revenues for sales made to customers who had not actually placed orders to the Company.

e.     Similarly, the Company regularly recorded revenues for sales made to customers although CyberGuard had agreed not to bill for the products until a later date.

f.     Jiminez has also identified an instance in which CyberGuard shipped software to a former customer although an executive of that company stated that her company did not need any additional CyberGuard products, was suffering severe financial problems and would likely go out of business in the near future. Despite those circumstances, CyberGuard shipped additional products to the customer in order to inflate the Company's quarterly financial results.

g.     In connection with all of the foregoing fraudulent revenue recognition practices, the Defendants recorded accounts receivable on the Company's balance sheet that they knew or recklessly disregarded would never be collected.

374.   Jiminez was by no means the only CyberGuard employee who complained to senior management that the Company was engaging in improper accounting practices.

375.   For example, Gallers was also confronted with complaints regarding CyberGuard's accounting practices that were registered by Donald Reese, who was an accounts receivable clerk at the Company.

376.   Reese told Gallers that he was aware that CyberGuard was improperly recognizing revenue and recording accounts receivable in connection with the receipt of purchase orders from companies located in Asia, such as Hucon of Japan. Although the purchase orders were only an expression of the Asian companies' intent to purchase software from CyberGuard in the future, CyberGuard recognized all of the potential revenue arising from the receipt of the purchase orders at the time that the orders were received.

377.   When Reese attempted to discuss this practice with Gallers, Reese was told by Gallers that CyberGuard intended to continue accounting for the purchase orders received from Asian companies in the same manner.

378.   Furthermore, Frank Gelbart, CyberGuard's former Vice President of North American Sales and Marketing, has confirmed that he discussed CyberGuard's improper accounting practices with the Company's senior management, including defendant Carberry.

379.   In particular, Gelbart informed Carberry of revenues and accounts receivable that CyberGuard was improperly recording even as early as the first half of the 1996 calendar year.

380.   Gelbart told Carberry that CyberGuard had improperly recognized between $300,000 and $500,000 in revenues during 1996 in connection with firewall software shipped to resellers.  As Gelbart informed Carberry, that firewall software was accepted by the resellers only on the condition that they would have no obligation to pay for the software until after they resold it to end users.  Thus, as is specifically alleged above, GAAP prohibited CyberGuard from recognizing the revenues related to that software until such time as the resellers sold it.

381.   Gelbart also specifically informed Carberry that CyberGuard had improperly booked between $100,000 and $150,000 in revenues and related accounts receivable purportedly attributable to software sales made by CyberGuard to Choreo of Toronto, Canada.  As Gelbart informed Carberry, those revenues were recognized improperly because Choreo had been promised that it would not have to pay for that software until such time as Choreo sold the software to end users.

382.   Gelbart also informed Carberry that CyberGuard continued to book revenues and record accounts receivable related to purported sales of firewall products made to the

lottery company Gtech although Gtech refused to pay for the software because it did not function properly.

383.    In response to Gelbart's report concerning those substantial accounting improprieties, Carberry told Gelbart not to worry about CyberGuard's accounting practices, which Carberry claimed were "none of [Gelbart's] business."

384.    Because Gelbart was not satisfied by that response, he scheduled a meeting with CyberGuard director David Proctor. After Gelbart described the same accounting irregularities that he had brought to Carberry's attention, Proctor asked only whether Carberry was aware of the irregularities.

385.    The only change to result from Gelbart's efforts to apprise the Board of the accounting improprieties in which CyberGuard had engaged, however, was Gelbart's termination.

386.    Shortly after the meeting with Proctor, Gelbart was called to meet with Carberry. At that time, Carberry informed Gelbart that his contract with CyberGuard would not be renewed for another year.

387.    The Company's employees have also confirmed that the CyberGuard Defendants were aware that the Company had reported hundreds of thousands of dollars of revenues and accounts receivable related to purported sales of demonstration units to resellers for which the resellers refused to pay.

388.    In particular, between March of 1995 and October of 1996, CyberGuard's contracts with its resellers purportedly required the resellers to purchase a demonstration unit which included CyberGuard hardware and software for a total cost of between $20,000 to $25,000.

389.   Because the purchase of such a unit was not a standard requirement for resellers in the software industry, many of the Company's resellers informed CyberGuard that they would not pay the $20,000 to $25,000 that CyberGuard claimed was owed under the terms of the resellers' agreements with the Company.

390.   CyberGuard employees have confirmed that, despite the fact that the Company was aware that many of the resellers did not intend to pay for the demonstration units, the Company recognized revenues related to the purported sale of those units.

391.   In addition, long after Defendants recognized that the accounts receivable related to the demonstration units would not be collected, Defendants did not cause CyberGuard to take a charge against the Company's accounts receivable to take account for the fact that the Company would never be paid for the units.

**F.    The Nature Of The Adverse Information Eventually
       Conceded By Defendants Supports The Conclusion That
       They Acted With Scienter**

392.   The nature of the adverse information that was eventually disclosed by CyberGuard also strongly supports the conclusion that the CyberGuard Defendants acted with scienter.

393.   In that regard, it is significant that the fraud in which Defendants engaged related to three of the most critical, and closely-watched, aspects of the Company's operations: (a) the Company's accounting system, policies and controls; (b) the Company's international operations, particularly in Asia; and (c) CyberGuard's efforts to expand sales though its reseller network.

394.   With respect to the accounting improprieties in which Defendants engaged, it is obvious that the Individual Defendants, because of their status as the Company's principal

-127-

executive officers, were the people responsible for developing and implementing the Company's accounting policies and practices.

395.    Accordingly, it is reasonable to infer: (a) that the CyberGuard Defendants were aware of the improper accounting practices utilized by the Company throughout the Class Period; and (b) that the Individual Defendants were the persons responsible for the adoption and utilization of the those improper accounting policies.

396.    The CyberGuard Defendants' own statements also make it clear that they closely monitored the Company's international operations, particularly those in Asia, throughout the Class Period because of the significance of that region to the Company's performance and because of the turmoil that Asian economies experienced in the latter part of 1997 and throughout 1998.

397.    The CyberGuard Defendants acknowledged their awareness that Asia's economic problems were impacting the Company's operations in the February 1998 10-Q. There, the CyberGuard Defendants stated that "[d]uring the quarter ended December 31, 1997, the Company's sales in Asia decreased as a result of general economic conditions in that area of the world."

398.    The CyberGuard Defendants demonstrated their focus upon the Company's international operations in a number of additional filings that they made with the SEC during the Class Period.

399.    For example, in the Form 10-K that the Company filed with the SEC on October 22, 1997 (the "October 1997 10-K"), the CyberGuard Defendants stated that CyberGuard's international revenue for the 1997 fiscal year was "$9.1 million, up $5.4 million or 144.0% compared to $3.7 million for the same 12 month period in 1996." The October 1997 10-K also noted that "[t]his increase in International security products revenues

-128-

is attributable to (1) the expansion of the company's reseller channels in the Pacific-Rim region, most notably Japan, Korea and Taiwan. . . ."

400. The fact that the CyberGuard Defendants' fraud related in large part to the improper recognition of revenues purportedly generated through CyberGuard's reseller network also supports the conclusion that the CyberGuard Defendants acted with scienter.

401. As was true of the Company's international operations, the CyberGuard Defendants were focused throughout the Class Period upon the results generated by the Company's reseller network.

402. In that regard, the October 1997 10-K acknowledged that, "[o]n a world-wide basis, the Company's strategy is to increase the amount of product provided to the market through the reseller channel." The same document also stated that "[t]he Company is seeking to expand its indirect sales channels for the marketing of its products and has a goal to have its indirect channels account for 80% of its sales by the end of fiscal year 1998."

403. The CyberGuard Defendants also emphasized the Company's dependence upon growing sales through its network of resellers in the Form S-3/A Registration Statement that the Company filed with the SEC on June 12, 1997. There, the CyberGuard Defendants stated:

> In marketing its products, the Company depends substantially, and expects to increase its dependence, upon the performance of indirect sales channels, including systems integrators and value added resellers (or "VARs"), over which the Company does not have complete authority. The Company's relationships with most of its resellers have been established within the last two years, and the Company is unable to predict with accuracy the extent to which its resellers will be successful in marketing and selling the Company's products. Moreover, the Company's future success will depend in part on its ability to establish collaborative marketing relationships in other indirect sales channels.

404.    Thus, the facts that the fraud alleged by Plaintiffs involved the Company's accounting policies and two areas of CyberGuard's business upon which the CyberGuard Defendants focused significant attention during the Class Period provide additional support for the conclusion that the false and misleading statements made by the CyberGuard Defendants during the Class Period were made with scienter.

### G.    The Abrupt Termination Of Carberry And Murray Further Supports The Conclusion That The CyberGuard Defendants Acted With Scienter

405.    The manner in which defendants Carberry and Murray were discharged by the Company further substantiates the conclusion that the CyberGuard Defendants acted with scienter.

406.    Carberry and Murray were the two highest-ranking officers of the Company. Indeed, the Company claimed in its SEC filings, including a Form S-3 Registration Statement that the Company filed with the SEC in November of 1997, that Carberry was so important to the Company that CyberGuard "maintain[ed] key man life insurance on the Company's Chief Executive Officer" and that "the loss of the services of [Carberry] or other key employees of the Company could have a material adverse effect on the Company."

407.    Nevertheless, once KPMG met with the Board to discuss Defendants' accounting fraud, Carberry and Murray were summarily suspended by the Company.

408.    Furthermore, both Carberry and Murray were terminated by the Company once the Board and their advisors were permitted the opportunity to study the nature of the fraud engaged in by Defendants during the Class Period.

409.    Such swift action by a board of directors in response to allegations of accounting fraud is a clear indication that even the Board recognizes that the conduct of Carberry and Murray was committed with scienter.

-130-

## VIII.

## ADDITIONAL FACTS THAT SUPPORT THE
## CONCLUSION THAT KPMG ACTED WITH SCIENTER

410.    KPMG made the misrepresentations and omissions concerning then-existing facts complained of herein with scienter in that KPMG knew or recklessly disregarded that its representations concerning the Company and its financial statements were materially false and misleading when made.  The additional facts that support the conclusion that KPMG acted with scienter by ignoring multiple red flags that indicated that the CyberGuard Defendants had engaged in fraudulent accounting practices include the following.

411.    By virtue of its position as CyberGuard's independent accountant and auditor, KPMG had access to the files and key employees of the Company at all relevant times.

412.    In connection with the auditing services that it provided to the Company, KPMG was frequently present at CyberGuard's corporate headquarters throughout the Class Period.  As a result, KPMG had ample opportunity to observe the Company's employees engaging in the improper accounting practices alleged by Plaintiffs and to discuss those practices with the employees.

413.    Furthermore, during the course of the audit that KPMG performed of the Company's financial statements for the 1997 fiscal year, KPMG had complete access to CyberGuard's confidential financial, operating and business information.  Documents and information that did or would have revealed the CyberGuard Defendants' accounting fraud to KPMG were therefore readily accessible to KPMG prior to the time that it issued its materially misleading audit opinion on September 23, 1997.

414.    During the course of KPMG's audit, it also had complete access to information concerning the lack of internal controls employed in CyberGuard's financial reporting function.

415.    For example, although numerous CyberGuard employees informed the Company's senior management that CyberGuard was engaging in improper revenue recognition and improperly reporting accounts receivable  (paragraphs 371-393), no steps were undertaken by management to terminate that practice.

416.    Despite the existence of those patent deficiencies in the Company's accounting controls, KPMG issued a clean audit opinion with respect to the Company's fiscal 1997 financial statements without undertaking the fundamental and necessary step of communicating with the Company's non-officer accounting personnel regarding CyberGuard's compliance with GAAP.  The issuance of that false clean audit opinion was a clear violation of AU § 110.01.

417.    KPMG's disregard of the gross deficiencies in the Company's accounting system and controls is also demonstrated by the events that followed CyberGuard's announcement of Defendants' accounting fraud.  Although, as James conceded during the January 13, 1999 conference call, the Company spent $600,000 in accounting fees and $400,000 in legal fees during the six-month period ended December 31, 1998, CyberGuard was still unable to determine the duration or the scope of Defendants' fraudulent conduct by that date.

418.    In fact, CyberGuard's new auditors, PriceWaterhouseCoopers ("PWC"), were unable to complete their audit of the Company's fiscal 1996, 1997 and 1998 financial statements until July 22, 1999 — nearly a year after CyberGuard disclosed Defendants' fraud.  PWC's ability to complete that audit was severely hampered by the Company's

failure to maintain adequate accounting controls and systems.  KPMG could not have remained ignorant of those grossly deficient controls and systems during the course its audit of the Company's 1997 financial statements.

419.    A significant number of red flags existed with respect to CyberGuard's financial performance that should have alerted KPMG to the need to employ enhanced diligence and scrutiny in performing its audit of the Company's 1997 financial statements.

420.    Perhaps most importantly, as is specifically alleged above (¶¶ 286-329), throughout the Class Period, CyberGuard and the CyberGuard Defendants were under constant pressure to raise additional financing in order to fund the Company's money-losing operations.  KPMG was particularly cognizant of the Company's need to raise additional funding because it was intimately involved with the Company's failed 1996 secondary offering.

421.    KPMG also was aware that the Individual Defendants possessed financial motives to engage in fraudulent accounting, particularly as a result of the efforts that CyberGuard was undertaking throughout the Class Period to locate an acquiror or merger partner (¶¶ 308-318).

422.    In such circumstances, the possibility of management utilizing fraudulent accounting practices is particularly strong.  As a result, KPMG was required by AU §§ 150.02, 311.07 and 311.06 to give such factors heightened consideration in planning its audit.  Yet, KPMG failed to conduct its audit in a manner designed to uncover improper revenue recognition and other accounting fraud.

423.    KPMG also ignored the fact that high-level employees in CyberGuard's management team had raised significant questions regarding accounting irregularities with the CyberGuard Defendants and members of the Board (¶¶ 371-391).  As a result of its

-133-

inadequate audit of the Company, KPMG either did not discover or ignored those communications.

424.    Similarly, despite the departure of Gelbart from the Company's executive ranks following his communications with Carberry and the Company's Board regarding CyberGuard's improper accounting practices, KPMG either did not undertake sufficient efforts to determine the circumstances surrounding Gelbart's termination or disregarded the findings of that inquiry. An adequately-designed audit would have included efforts to determine why Gelbart had left the Company's executive ranks.

425.    The nature of the fraud engaged in by the CyberGuard Defendants during the Class Period also supports the conclusion that KPMG acted knowingly or in a grossly reckless manner in issuing its clean audit opinion in that the "audit" was so deficient as to amount to no audit at all.

426.    Although the CyberGuard Defendants' fraud was widespread, it was by no means sophisticated. Indeed, it is difficult to imagine a more simple fraud than the repeated recognition of revenues despite the existence of contingencies to payment. Numerous other tactics employed by the CyberGuard Defendants to inflate the Company's financial results — including those reported by accountant Jiminez (¶ 373) — were equally crude.

427.    KPMG could therefore have discovered the existence of the CyberGuard Defendants' fraud merely by contacting the Company's resellers and making inquiries regarding the terms of their payment obligations to CyberGuard. GAAS required that those precise steps be undertaken. In violation of its obligations under GAAS — particularly its obligations under AU § 316.05 to design its audit to provide reasonable assurance of detecting errors and intentional misstatements and under AU § 230.01 to exercise due professional care in performing its audit — KPMG either failed to determine that the

CyberGuard Defendants were not following the Company's announced revenue recognition policy or recklessly disregarded that information.

428.    The CyberGuard Defendants' fraud was also easily detectable because it related to transactions involving significant dollar amounts.  According to an October 21, 1996 article in <u>Information Week</u>, the Company's CyberGuard Firewall 3.0 — the principal product sold by the Company during the 1997 fiscal year — was priced from "$9,995 to $24,995, depending on options and platform."

429.    Accordingly, because the Company's revenues during the 1997 fiscal year ranged roughly between $2.6 million and $4.9 million per quarter, those revenues were generated in connection with a relatively small number of transactions.  Thus, any appropriately-designed audit of the Company's financial statements would have disclosed that approximately 10% of the revenues recorded by the Company during fiscal 1997 had not been realized.

430.    Moreover, the vast majority of the revenues that were fraudulently recorded by the CyberGuard Defendants related to sales that were purportedly made to the Company's resellers, who generally purchased multiple items from CyberGuard in a single order.

431.    KPMG therefore was able to perform testing of a relatively high percentage of the Company's transactions during the course of its audit, particularly with respect to the Company's transactions with its resellers.

432.    Despite the ability and opportunity to do so, however, KPMG utterly failed to satisfy its obligation under GAAS to design its audit in a manner reasonably likely to discover the CyberGuard Defendants' fraud.

433.    The conclusion that KPMG acted knowingly or in a grossly reckless fashion in issuing a clean audit opinion concerning the Company's fiscal 1997 financial statements is

also strongly supported by KPMG's repeated failure to follow GAAS principles in performing its audit, as is specifically alleged in ¶¶ 163-64.

434.   The scope of the restatement of the Company's financial results eventually announced by CyberGuard further supports the conclusion that KPMG acted with scienter.

435.   The Company's restatement was not limited to a specific quarter or a particular measure on CyberGuard's financial statements.  Rather, the restatement related to all four quarters of the fiscal year and involved nearly all of the most significant measures set forth on the Company's income statement, including CyberGuard's:  (a) revenues;  (b) gross profit;  (c) development, selling, general and administrative expenses;  (d) other expenses; (e) net loss; and (f) loss per share.

436.   The following chart, which was included in the July 1999 8-K reveals the massive scope of the restatement that was necessary with respect to the fiscal 1997 results that were audited by KPMG (all numbers are in 000s, except per share numbers):

| | Q1 1997 9/30/96 | Q2 1997 12/31/96 | Q3 1997 3/31/97 | Q4 1997 6/30/97 | Q1 1998 9/30/97 | Q2 1998 12/31/97 | Q3 1998 3/31/98 |
|---|---|---|---|---|---|---|---|
| *Reported Revenues* | *3,067* | *3,047* | *4,105* | *5,402* | *5,063* | *4,854* | *5,152* |
| *Restatements to Reported Revenues* | *(457)* | *(389)* | *(52)* | *(499)* | *(890)* | *(669)* | *(636)* |
| *Revenues* | *2,610* | *2,658* | *4,053* | *4,903* | *4,173* | *4,185* | *4,516* |
| | | | | | | | |
| *Reported Cost of Revenues* | *1,874* | *1,508* | *1,870* | *1,988* | *1,796* | *1,828* | *1,778* |
| *Restatements to Cost of Revenues* | | | *4* | *(25)* | *(5)* | *(30)* | |
| *Cost of Revenues* | *1,874* | *1,508* | *1,870* | *1,992* | *1,771* | *1,823* | *1,748* |
| | | | | | | | |
| *Reported Gross Profit* | *1,193* | *1,539* | *2,235* | *3,414* | *3,267* | *3,026* | *3,374* |

-136-

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Restatements to Gross Profit* | *(457)* | *(389)* | *(52)* | *(503)* | *(865)* | *(664)* | *(606)* |
| *Gross Profit* | *736* | *1,150* | *2,183* | *2,911* | *2,402* | *2,362* | *2,768* |
| | | | | | | | |
| *Reported Development, Selling, General and Admin. ("DSG&A") Expenses* | *3,400* | *3,563* | *3,875* | *5,557* | *5,421* | *5,817* | *5,047* |
| *Restatement to DSG&A* | *917* | *942* | *816* | *898* | *389* | *560* | *500* |
| *DSG&A* | *4,217* | *4,505* | *4,691* | *6,455* | *5,810* | *6,377* | *5,547* |
| | | | | | | | |
| *Reported Other Income (Expense)* | *(6,055)* | *1,207* | *748* | *(376)* | *452* | *187* | *29* |
| *Restatements to Other Income (Expense)* | *---* | *(238)* | *(18)* | *178* | *(188)* | *(59)* | *---* |
| *Other Income (Expense)* | *6,055* | *969* | *730* | *(198)* | *264* | *128* | *29* |
| | | | | | | | |
| *Reported Net Loss* | *(8,262)* | *(817)* | *(892)* | *(2,519)* | *(1,702)* | *(2,604)* | *(1,644)* |
| *Restatements to Net Loss* | *(1,274)* | *(1,569)* | *(886)* | *(1,223)* | *(1,442)* | *(1,283)* | *(1,106)* |
| *Net Loss* | *(9,536)* | *(2,386)* | *(1,778)* | *(3,742)* | *(3,144)* | *(3,887)* | *(2,750)* |
| | | | | | | | |
| *Reported Loss Per Share* | *($1.20)* | *($0.12)* | *($0.12)* | *($0.32)* | *($0.22)* | *($0.32)* | *($0.19)* |
| *Restatements to Loss Per Share* | *($0.19)* | *($0.22)* | *($0.12)* | *($0.17)* | *($0.19)* | *($0.16)* | *($0.13)* |
| *Loss Per Share* | *($1.39)* | *($0.34)* | *($0.24)* | *($0.49)* | *($0.41)* | *($0.48)* | *($0.32)* |
| | | | | | | | |
| *Weighted Average Shares Outstanding* | *6,859,146* | *7,086,692* | *7,375,293* | *7,100,014* | *7,688,529* | *8,111,851* | *8,504,575* |

437.   Moreover, a comparison of the results reported in the September 1997 10-K and those reported in the July 1999 8-K reveals the following significant discrepancies between the reported results that were audited by KPMG and the actual results recorded by CyberGuard.

| Financial Statement Measure | As Audited By KPMG | Actual Result | Amount Of Discrepancy | Percentage Of Overstatement *(Understatement)* |
|---|---|---|---|---|
| Revenues | 15,621 | 14,224 | 1,397 | 9.82% |
| Gross Profit | 8,381 | 6,980 | 1,401 | 20.07% |
| Gross Margin | 53.65% | 49.07% | 4.58% | 9.33% |
| Development, Selling, General and Admin. Expenses | 11,410 | 15,133 | 3,723 | (32.63%) |
| Operating Loss | (8,014) | (12,876) | 4,862 | (60.67%) |
| Net Loss | (12,490) | (17,442) | 4,952 | (39.65%) |
| Loss Per Share | ($1.76) | ($2.46) | $0.70 | (39.77%) |
| Accounts Receivable | 6,642 | 5,275 | 1,367 | 25.91% |
| Current Assets | 12,993 | 11,938 | 1,055 | 8.84% |
| Total Assets | 15,974 | 15,205 | 769 | 5.06% |
| Accounts Payable | 1,144 | 2,109 | 965 | (84.35%) |

438.   In light of those glaring discrepancies between the results that KPMG reported were accurately reflected in the Company's financial statements and the results actually generated by the Company, KPMG's clean audit opinion was — at minimum — the product of a grossly reckless audit.

IX.

**DEFENDANTS' MATERIALLY FALSE REPRESENTATIONS
AND OMISSIONS WERE THE CAUSE OF THE DAMAGES
SUFFERED BY PLAINTIFFS AND THE CLASS**

439.   As described herein, Defendants made or caused to be made a series of false statements and failed to disclose various material information concerning CyberGuard. Those material misrepresentations and omissions created an unrealistically positive assessment of CyberGuard, its business and its prospects in the market and caused the Company's securities to be overvalued and artificially inflated at all relevant times.

440.   Defendants' false portrayal of CyberGuard's financial results and business operations during the Class Period resulted in Plaintiffs and other members of the Class purchasing CyberGuard common stock at market prices significantly in excess of the actual value of those securities.

441.   Plaintiffs and other members of the Class would not have purchased CyberGuard common stock at the market prices that prevailed during the Class Period, if at all, had they been aware of the true facts concerning the Company's business operations and prospects.

442.   When the market determined that CyberGuard's financial results for the 1997 fiscal year and the first three quarters of the 1998 fiscal year had been fraudulently reported by Defendants, the Company's stock price decreased substantially in value and thereby causes injury to Plaintiffs and the members of the Class.

443.    Accordingly, the material misrepresentations and omissions alleged herein were the proximate cause of the damages sustained by Class members as a result of their investments in CyberGuard stock.

## X.

### THE CLASS IS ENTITLED TO A PRESUMPTION OF RELIANCE BY VIRTUE OF THE FRAUD-ON-THE-MARKET DOCTRINE

444.    At all relevant times, the market for CyberGuard common stock was efficient, i.e., the market promptly digested information regarding CyberGuard's operations and prospects from all publicly available sources and reflected such information in the price of CyberGuard common stock.

445.    The following factors, among others, caused the market for CyberGuard common stock to operate efficiently:

a.    During the Class Period, CyberGuard common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient market;

b.    As a regulated issuer, CyberGuard filed periodic public reports with the SEC;

c.    CyberGuard regularly communicated with public investors via established market communication mechanisms such as the regular dissemination of press releases on major newswire services, regular communications with the financial and trade press and through meetings with institutional investors and other major CyberGuard shareholders; and

d.    CyberGuard was followed by several securities analysts employed by major brokerage firms and institutional investors who analyzed the Company's operations and

-140-

prospects on a regular basis and who recommended the purchase or sale of CyberGuard stock on the basis of those analyses.

446.   The members of the Class are therefore entitled to the presumption that they relied upon the integrity of the market price for CyberGuard common stock provided by the fraud-on-the-market doctrine.

## XI.

## THE BASIS OF PLAINTIFFS' ALLEGATIONS

447.   Plaintiffs' information and belief arises from, inter alia, the investigation undertaken by and under the supervision of Plaintiffs' counsel.  That investigation has included: (a) the review and analysis of each of the filings made by Defendants with the SEC that is specifically identified herein; (b) the review and analysis of each of the press releases issued by the Defendants that is specifically identified herein; (c) the review and analysis of the various reports concerning defendant CyberGuard that are specifically identified herein which have appeared in newspapers and financial, trade and other magazines and publications; (d) interviews with CyberGuard shareholders; (e) interviews with former employees of the Company, including the former employees specifically identified herein; (f) interviews with other persons familiar with the facts relevant to Plaintiffs' claims; and (g) the review of investor conference call presentations made by the members of CyberGuard's management.

## COUNT I

### [Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder]

448.   Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

449.   This claim is brought against all Defendants on behalf of Plaintiffs and the Class with respect to the entire Class Period.

450.   During the Class Period, Defendants, individually and in concert, engaged in a plan, scheme and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon Plaintiffs and other members of the Class.

451.   Defendants perpetrated this fraudulent scheme by making various representations that were false or which omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

452.   Defendants were obligated to supplement and update the disclosures that they made during the Class Period because: (a) they voluntarily made materially misleading statements regarding CyberGuard's operations and prospects throughout the Class Period; (b) they engaged in insider trading while in possession of material, adverse information concerning CyberGuard's operations; and (c) such disclosures were mandated by SEC regulations, including Item 303 of SEC Regulation S-K.

453.   Defendants had actual knowledge that the statements specifically alleged above were materially false and misleading and that additional disclosures were necessary to correct the misleading effect of their statements.  In the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain that their optimistic assessments of the Company's business, operations and prospects lacked a reasonable basis when made.

454.   As a direct and proximate result of the foregoing material misrepresentations and omissions, the market price of CyberGuard common stock was artificially inflated during the Class Period.

455.   In ignorance of the materially misleading and/or incomplete nature of Defendants' Class Period representations, Plaintiffs and other members of the Class relied to their detriment upon the accuracy and completeness of Defendants' statements and/or upon the integrity and efficiency of the market for CyberGuard common stock.

456.   Plaintiffs and the other members of the Class would not have purchased CyberGuard stock at the market prices that prevailed during the Class Period, if at all, had they been aware of the true facts concerning the Company's operations and future prospects.

457.   The market price of CyberGuard common stock declined dramatically upon the public disclosure of the facts that had been concealed and misrepresented by Defendants during the Class Period.   Plaintiffs and other members of the Class have therefore suffered substantial damages.

458.   By reason of the foregoing, Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made material misrepresentations of fact and failed to disclose material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and other members of the Class in connection with their purchases of CyberGuard common stock during the Class Period.

## COUNT II

### [Against the Individual Defendants for
### Violation of Section 20(a) of the Exchange Act]

459.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

460.   This Count is brought against the Individual Defendants on behalf of Plaintiffs and the Class with respect to the entire Class Period.

461.   As is particularized above, during the entire Class Period, defendants Carberry and James were "controlling persons" of the Company within the meaning of § 20(a) of the Exchange Act.

462.   Furthermore, during the entire period in which they served as the Company's CFO or acting CFO, defendants Murray and Wheeler were controlling persons of the Company within the meaning of § 20(a) of the Exchange Act.

463.   The Individual Defendants qualify as "controlling persons" because they had the power to cause CyberGuard to engage in the unlawful conduct complained of herein and because they could have prevented the unlawful conduct that Plaintiffs allege.

464.   Because each of the Individual Defendants is a "controlling person" of the Company, which is a person primarily liable to Plaintiffs and the Class under Section 10(b) of the Exchange Act, the Individual Defendants are secondarily liable for those primary violations pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.   An Order determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs' counsel as Class counsel;

   b. Compensatory damages plus interest thereon in an amount to be proven at trial against all of the Defendants, jointly and severally;

   c. The reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

   d. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

  Plaintiffs hereby demand a trial by jury.

Dated:  August 23, 1999     Respectfully submitted,

          **MILBERG WEISS BERSHAD
          HYNES & LERACH, LLP**

          By: _____
            Abraham Rappaport
            Florida Bar No. 0163211
            e-mail:  ABR@MWBHLNY.com
            Maya Saxena
            Florida Bar No. 0095494
            e-mail:  MS@MWBHLNY.com

          5355 Town Center Road
          Suite 900
          Boca Raton, FL 33486
          Tel:  (561) 361-5000
          Fax:  (561) 367-8400

          **BURT & PUCILLO, LLP**
          Michael J. Pucillo
          Wendy Zoberman
          Northbridge Centre, Suite 1701
          515 North Flagler Drive
          West Palm Beach, FL 33401
          Tel:  (561) 835-9400
          Fax:  (561) 835-0322

**GOODKIND LABATON RUDOFF**
**& SUCHAROW, LLP**
Emily C. Komlossy
Peter H. Rachman
International Building
Suite 813
2455 East Sunrise Boulevard
Fort Lauderdale, FL 33304
Tel:  (954) 630-1000
Fax:  (954) 565-1312

**Plaintiffs' Liaison Counsel**

**MILBERG WEISS BERSHAD**
**HYNES & LERACH LLP**
Steven G. Schulman
Samuel H. Rudman
One Pennsylvania Plaza
49th Floor
New York, NY 10119
Tel:  (212) 594-5300
Fax:  (212) 868-1229

**SHALOV STONE & BONNER**
Lee S. Shalov
James P. Bonner
276 Fifth Avenue
Suite 704
New York, NY 10001
Tel:  (212) 686-8004
Fax:  (212) 686-8005

**BERNSTEIN LIEBHARD & LIFSHITZ**
Mel E. Lifshitz
Michael S. Egan
274 Madison Avenue
New York, NY 10016
Tel:  (212) 779-1414
Fax:  (212) 779-3218

**ABBEY, GARDY & SQUITIERI, LLP**
Stephen Fearon, Jr.
James Notis
212 E. 39th Street
New York, NY 10016
Tel:  (212) 889-3700

**Plaintiffs' Lead Counsel**

**KAUFMAN MALCHMAN KIRBY**
 **& SQUIRE, LLP**
Jeffrey S. Squire
919 Third Avenue
New York, NY 10022
Tel:  (212) 371-6600
Fax:  (212) 751-2450

**WEISS & YOURMAN**
Kevin Yourman
10940 Wilshire Boulevard
24th Floor
Los Angeles, CA 90024
Tel:  (310) 208-2800
Fax:  (310) 209-2348

**BEATIE & OSBORN, LLP**
Eduard Korsinsky
599 Lexington Avenue
New York, NY 10022
Tel:  (212) 888-9000
Fax:  (212) 888-9664

**BARRACK RODOS & BACINE**
Daniel E. Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel:  (215) 963-0600
Fax:  (215) 963-0838

**STULL STULL & BRODY**
Jules Brody
6 East 45th Street
New York, NY 10017
Tel:  (212) 877-72390
Fax:  (212) 986-0158

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett
1622 Locust Street
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604

**CHESTNUT & BROOKS**
Karl Cambronne
3700 Piper Jaffray Tower
222 South 9th Street
Minneapolis, MN 55042
Tel: (612) 336-2940

**REINHARDT & ANDERSON**
Randall Steinmeyer
E-1000 First Nat'l. Bank Bldg.
332 Minnesota Street
St. Paul, MN 55101
Tel: (651) 227-9990

**RABIN & PECKEL**
Marvin Frank
275 Madison Avenue
New York, NY 10016
Tel: (212) 818-1818

**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600

**LAW OFFICE OF LEO DESMOND**
Leo Desmond
2151 Palm Beach Lakes Blvd.
Suite 204
West Palm Beach, FL 33409
Tel: (561) 712-8000

**THE MOGIN LAW FIRM**
Daniel J. Mogin
701 C Street
Suite 200
San Diego, CA 92101-5307
Tel: (619) 687-6700

**LEESFIELD LEIGHTON RUBIO**
  **& MAHFOOD, P.A.**
George Mahfood
2350 South Dixie Highway
Miami, FL 33133
Tel: (305) 854-4900

**THE ALEXANDER LAW FIRM**
William M. Audet
152 North Third Street
Suite 600
San Jose, CA 95112
Tel:  (408) 289-1776

**FARUQI & FARUQI**
Nadeem Faruqi
415 Madison Avenue
New York, NY 10017
Tel:  (212) 986-1074

**LAW OFFICES OF**
  **JAMES V. BASHIAN, P.C.**
500 Fifth Avenue
New York, NY 10010
Tel:  (212) 981-4110

**COHEN MILSTEIN HAUSFIELD**
  **& TOLL PLLC**
Steven J. Toll
999 Third Avenue, Suite 3600
Seattle, WA 98104
Tel:  (206) 521-0080

**ZWERLING SCHACTER &**
**ZWERLING LLP**
Richard Spiers
767 Third Avenue
New York, NY 10017
Tel:  (212) 223-3900

**SAVETT FRUTKEN PODELL &**
**RYAN, P.C.**
Robert P. Frutken
325 Chestnut Street
Philadelphia, PA 19106
Tel:  (215) 923-5400

**ENTWISTLE & CAPUCCI**
Vincent Capucci
330 Madison Avenue
New York, NY 10017
Tel:  (212) 867-1030

**BERNSTEIN LITOWITZ BERGER
    GROSSMAN**
Daniel Berger
1285 Avenue of the Americas
33rd Floor
New York, NY 10019
Tel:  (212) 554-1400

**FINKELSTEIN & KRINSK**
Arthur L. Shingler, III
The Koll Center
501 W. Broadway
Suite 1250
San Diego, CA 92101

**WAMPLER BUCHANAN & BREEN**
Atlee Wampler, III
900 Sun Bank Building
777 Brickell Avenue
Miami, FL 33131
Tel:  (305) 577-0044

**SCHUBERT & REED LLP**
Robert C. Schubert
Two Embarcadero Center
Suite 1050
San Francisco, CA 94111
Tel:  (415) 788-4220

**ROBERT C. GILBERT, P.A.**
1333 Sevilla Avenue
Coral Gables, FL 33134
Tel:  (305) 529-9100

**KAUFMAN MILLER DICKSTEIN
    & GRUNSPAN**
Alan Grunspan
200 South Biscayne Blvd.
Suite 4650
Miami, FL 33131
Tel:  (305) 372-5200

**POMERANTZ HAUDEK BLOCK
   GROSSMAN & GROSS LLP**
Stanley M. Grossman
Shaheen Rushad
100 Park Avenue, 26th Floor
New York, NY 10017
Tel:  (212) 661-1100

**JAROSLAWICZ & JAROS**
David Jaroslawicz
150 William Street, 19th Floor
New York, NY 10038
Tel:  (212) 227-2780

**HAROLD B. OBSTFELD, P.C.**
Harold B. Obstfeld
260 Madison Avenue
New York, NY 10016
Tel:  (212) 696-1212

**WEISS & YOURMAN**
Joseph H. Weiss
551 Fifth Avenue, Ste. 1600
New York, NY 10176
Tel:  (212) 682-3025

**STULL STULL & BRODY**
Michael D. Braun
10940 Wilshire Blvd.
Suite 2300
Los Angeles, CA 90024
Tel:  (310) 209-2468

**SHELLER LUDWIG & BADEY, P.C.**
Jonathan Shub
1528 Walnut Street
Third Floor
Philadelphia, PA 19102
Tel:  (215) 790-7300

**WOLF POPPER LLP**
Robert Kornreich
Suzanne Elovic
845 Third Avenue
New York, NY 10022
Tel:  (212) 759-4600

**COHEN MILSTEIN HAUSFELD**
  **& TOLL PLLC**
Steven J. Toll
999 Third Avenue, Suite 3600
Seattle, WA 98104
Tel:  (206) 521-0080

**COHEN MILSTEIN HAUSFELD**
  **& TOLL PLLC**
Andrew N. Friedman
1100 New York Avenue
Suite 500
Washington, D.C. 20005
Tel:  (202) 408-4600

**MEREDITH COHEN GREENFOGEL**
  **& SKIRNICK PC**
Bruce K. Cohen
Krishna B. Narine
117 S. 17th Street, 22nd Floor
Philadelphia, PA 19103
Tel:  (215) 564-5182

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been forwarded via Federal Express to all counsel listed below this 23rd day of August 1999.

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
Eugene E. Stearns
Betty Chang Rowe
150 West Flagler Street
Suite 2200, Museum Tower
Miami, FL 33130
Tel:  (305) 789-3200
Fax:  (305) 789-3395

**GETTY, KEYSER & MAYO, LLP**
Richard A. Getty
Walker P. Mayo, III
1900 Lexington Financial Center
250 West Main Street
Lexington, KY 40507
Tel:  (606) 259-1900
Fax:  (606) 259-1909

**KENNY NACHWALTER SEYMOUR ARNOLD CRITCHLOW & SPECTOR, P.A.**
Richard H. Critchlow
Jeffrey T. Froeman
1100 Miami Center
201 South Biscayne Blvd.
Miami, FL 33131
Tel:  (305) 373-1000
Fax:  (305) 372-1861

**TEW, CARDENAS, REBAK, KELLOGG, LEHMAN, DEMARIA & TAGUE, LLP**
Thomas Tew
Joseph A. DeMaria
Miami Center, 26th Floor
201 S. Biscayne Blvd.
Miami, FL 33131
Tel:  (305) 536-1112
Fax:  (305) 536-1116

**HANZMAN CRIDEN KORGE CHAYKIN PONCE & HEISE, P.A.**
Michael A. Hanzman
2100 First Union Financial Center
200 S. Biscayne Blvd.
Miami, FL 33131

_____
Abraham Rappaport